06-5015-cr (L)
United States v. Sattar (Stewart; Yousry)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: January 29, 2008          Decided: November 17, 2009
                As Amended:  December 23, 2009)[*]

Docket Nos. 06-5015-cr (L), 06-5031-cr (con), 06-5093-cr (con),
    06-5131-cr (con), 06-5135-cr (con), 06-5143-cr (con)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

Appellee-Cross-Appellant,

- v. -

LYNNE STEWART, MOHAMMED YOUSRY, AHMED ABDEL SATTAR,

Defendants-Appellants-Cross-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before:   WALKER, CALABRESI, and SACK, Circuit Judges.

Appeal by the defendants from judgments of conviction of the United States District Court for the Southern District of New York (John G. Koeltl, Judge) on charges arising from their unauthorized contacts with and behavior relating to Sheikh Omar Ahmad Ali Abdel Rahman, a high-security federal prisoner. Abdel Rahman, serving a life sentence for seditious conspiracy, solicitation of murder, solicitation of an attack on American military installations, conspiracy to murder, and conspiracy to bomb, is subject to "Special Administrative Measures" designed to

---

[*] The panel withheld consideration of this appeal pending the Court's en banc decision in United States v. Cavera, 550 F.3d 180 (2d Cir. Dec. 4 2008).

restrict his communications with terrorist organizations and their members. The defendants were convicted principally with respect to their violations of those measures by which they had agreed to abide. The government cross appeals, challenging the reasonableness of the defendants' sentences. We affirm the judgments except with respect to the sentencing of defendant Lynne Stewart, and remand all three cases to the district court. The district court is directed to revoke Stewart's and Yousry's bail pending appeal and to order them to surrender to the United States Marshal to begin serving their sentences forthwith as directed by the district court.

Judge Calabresi concurs, and also files a separate concurring opinion. Judge Walker concurs in part and dissents in part in a separate opinion.

JOSHUA L. DRATEL (Meredith S. Heller, Erik B. Levin, David B. Rankin, of counsel), Law Offices of Joshua L. Dratel, P.C., New York, NY, for Defendant-Appellant-Cross-Appellee Lynne Stewart.

ROBERT A. SOLOWAY (David Stern, David A. Ruhnke, of counsel) Rothman Schneider Soloway & Stern, LLP, New York, NY, and Ruhnke & Barrett, Montclair, NJ, for Defendant-Appellant-Cross-Appellee Mohammed Yousry.

BARRY M. FALLICK (Jillian S. Harrington, Kenneth A. Paul, of counsel) Rochman Platzer Fallick Sternheim Luca & Pearl, LLP, New York, NY, for Defendant-Appellant-Cross-Appellee Ahmed Abdel Sattar.

ANTHONY S. BARKOW, Assistant United States Attorney (Michael J. Garcia,

United States Attorney for the Southern District of New York, Andrew S. Dember, Michael D. Maimin, Diane Gujarati, Katherine Polk Failla, Celeste L. Koeleveld, Assistant United States Attorneys, of counsel), New York, NY, for Appellee-Cross-Appellant.

SACK, Circuit Judge:

Defendants Lynne Stewart, Mohammed Yousry, and Ahmed Abdel Sattar appeal from judgments of conviction of the United States District Court for the Southern District of New York (John G. Koeltl, Judge) for various crimes arising from their contacts with and behavior relating to government restrictions on communications and other contacts with Sheikh Omar Ahmad Ali Abdel Rahman. Rahman is serving a life sentence in a maximum security prison for terrorism-related crimes of seditious conspiracy, solicitation of murder, solicitation of an attack on American military installations, conspiracy to murder, and a conspiracy to bomb. He is subject to "Special Administrative Measures" ("SAMs") restricting his ability to communicate with persons outside of the prison in which he is incarcerated so as to prevent him from continuing to lead terrorist organizations and their members. The government cross-appeals from the defendants' sentences.

We would be remiss if we did not, at the outset, commend the district court for its thoroughness, thoughtfulness, and effectiveness in the conduct of these unusually lengthy, difficult, and sensitive proceedings. Much of what follows simply reports what it did and tracks what it said.

-3-

We affirm the judgments of conviction. We also affirm the sentences of Yousry and Sattar. We remand the case, however, with respect to the sentence of Stewart, and also with respect to the sentences of Yousry and Sattar in light of the resentencing of Stewart.

In particular, we affirm the judgments as to each defendant's conviction of conspiring to defraud the United States, in violation of 18 U.S.C. § 371, by violating SAMs imposed upon Abdel Rahman. Contrary to the defendants' arguments, the evidence is sufficient to sustain these convictions. Moreover, we reject both Stewart's argument that, as a lawyer, she was not bound by the SAMs, and her belated argument collaterally attacking their constitutionality.

We affirm as to Sattar's conviction of conspiring to murder persons in a foreign country in violation of 18 U.S.C. § 956, and his conviction of soliciting persons to commit crimes of violence -- viz., murder and conspiracy to commit murder -- in violation of 18 U.S.C. § 373. We conclude that the evidence is sufficient to sustain these convictions, especially in light of testimony establishing that Sattar attempted to undermine a unilateral cease-fire by an Egyptian terrorist organization and to draft a fatwa calling for, inter alia, the killing of "Jews and Crusaders."

We affirm as to Stewart's and Yousry's convictions of providing and concealing material support to the conspiracy to murder persons in a foreign country in violation of 18 U.S.C.

-4-

§ 2339A and 18 U.S.C. § 2, and of conspiring to provide and conceal such support in violation of 18 U.S.C. § 371. We conclude that the charges were valid -- that 18 U.S.C. § 2339A is neither unconstitutionally vague as applied nor a "logical absurdity," as Stewart asserts -- and that the evidence was sufficient to sustain the convictions. We also reject Stewart's claims that her purported attempt to serve as a "zealous advocate" for her client provides her with immunity from the convictions.

Finally, we affirm Stewart's convictions for knowingly and willfully making false statements in violation of 18 U.S.C. § 1001 when she affirmed that she intended to, and would, abide by the SAMs. In light of her repeated and flagrant violation of the SAMs, a reasonable factfinder could conclude that Stewart's representations that she intended to and would abide by the SAMs were knowingly false when made.

We reject the remaining challenges to the convictions. We affirm the district court's rejection of Sattar's vindictive prosecution claim because there is insufficient evidence to support a finding that the government's pre-trial decision to add new charges against Sattar amounted to an effort to punish him for exercising his constitutional rights. And, because Stewart's conduct was materially different from, and more serious than, the conduct of other lawyers representing Abdel Rahman who may also have violated the SAMs, we affirm the district court's rejection of Stewart's claim that she was selectively prosecuted on account

-5-

of her gender or political beliefs. We also conclude that the district court did not abuse its discretion in declining to sever the trial of Stewart and Yousry from that of Sattar in light of the general preference for joint trials, the specific charges at issue here, and the district court's curative instructions. Nor did the district court abuse its discretion by empaneling an anonymous jury in light of the particular allegations of criminal wrongdoing at issue, involving the corruption of the judicial process, and the widespread publicity about the case. We find no fault with the district court's resolution of allegations of juror impropriety. We also agree with the district court's treatment of confidential information, including its denial of Stewart's motion to suppress evidence obtained pursuant to the Foreign Intelligence Surveillance Act ("FISA"), its ex parte, in camera examination of FISA wiretap applications, and its rejection of Stewart's more general challenges to the constitutionality of FISA. Finally, we find no fault with the district court's treatment, in accordance with the Classified Information Procedures Act ("CIPA"), of Stewart's motion to compel disclosure of information related to potential surveillance conducted by the National Security Agency.

We therefore affirm the convictions in their entirety.

We also affirm the sentences of Sattar and Yousry. We conclude that the district court committed neither procedural error in calculating the applicable Guidelines ranges, nor substantive error in varying from those ranges pursuant to its

-6-

consideration of the factors set forth in 18 U.S.C. § 3553(a). We nonetheless remand their cases to the district court to allow it to reconsider their sentences should it choose to do so in light of the resentencing of Stewart.

We cannot affirm Stewart's sentence on the basis of the record before us. Because the district court declined to find whether Stewart committed perjury at trial, we cannot conclude that the mitigating factors found to support her sentence can reasonably bear the weight assigned to them. This is so particularly in light of the seriousness of her criminal conduct, her responsibilities as a member of the bar, and her role as counsel for Abdel Rahman. We therefore remand the cause to the district court for further consideration of her sentence, in light of, among other things, the charges of perjury against her and of any other matter it deems necessary or advisable, and direct the court to revoke Stewart's and Yousry's bail pending appeal and to order them to surrender to the United States Marshal to begin serving their sentences forthwith.

## BACKGROUND

The transcript of the trials in the cases on appeal runs in excess of thirteen thousand pages. The district court issued nine opinions and a wide variety of orders addressing issues presented during the course of the proceedings. See principally, United States v. Sattar, 272 F. Supp. 2d 348 (S.D.N.Y. 2003) ("Sattar I"); United States v. Sattar, No. 02 Cr. 395 (JGK), 2003 WL 22137012, 2003 U.S. Dist. LEXIS 16164

-7-

(S.D.N.Y. Sept. 15, 2003) ("Sattar II"); <u>United States v. Sattar</u>, 314 F. Supp. 2d 279 (S.D.N.Y. 2004) ("Sattar III"); <u>United States v. Sattar</u>, 395 F. Supp. 2d 66 (S.D.N.Y. 2005) ("Sattar IV"); <u>United States v. Sattar</u>, 395 F. Supp. 2d 79 (S.D.N.Y. 2005) ("Sattar V").[1] The filings in this Court reflect the massiveness of the record.[2] We therefore describe the proceedings in the district court and the relevant facts only in the detail we think necessary to explain our decision. In reviewing the conviction, we set forth the facts, as we must, in the light most favorable to the government. <u>See</u> <u>United States v. Aleskerova</u>, 300 F.3d 286, 292 (2d Cir. 2002).

### The SAMs

In October 1995, Sheikh Omar Ahmad Ali Abdel Rahman was convicted of a variety of terrorism-related crimes in the United States District Court for the Southern District of New York. According to the government's evidence at his trial,

---

[1] See also <u>United States v. Sattar</u>, No. S1 02 Cr. 395 (JGK), 2006 WL 3165791, 2006 U.S. Dist. LEXIS 79328 (S.D.N.Y. Oct. 27, 2006); <u>United States v. Sattar</u>, No. 02 Cr. 395 (JGK), 2003 WL 22510398, 2003 U.S. Dist. LEXIS 19770 (S.D.N.Y. Nov. 5, 2003); <u>United States v. Sattar</u>, No. 02 Cr. 395 (JGK), 2003 WL 22510435, 2003 U.S. Dist. LEXIS 19772 (S.D.N.Y. Nov. 5, 2003); <u>United States v. Sattar</u>, No. 02 Cr. 395 (JGK), 2002 WL 1836755, 2002 U.S. Dist. LEXIS 14798 (S.D.N.Y. Aug. 12, 2002).

[2] Excluding fifty pages of tables of contents and authorities, the government's principal brief alone approaches within several thousand words of the length of Charles Dickens's <u>A Tale of Two Cities</u>, <u>see</u> http://www.gutenberg.org/files/98/98.txt (last visited April 4, 2009), and is about as long as the recent popular novel "Atonement," <u>see</u> http://store.scriptbuddy.com/ products/Atonement/78622/ (last visited April 4, 2009).

> Abdel Rahman, a blind Islamic scholar and cleric, was the leader of [a] seditious conspiracy, the purpose of which was "jihad," in the sense of a struggle against the enemies of Islam. Indicative of this purpose, in a speech to his followers Abdel Rahman instructed that they were to "do jihad with the sword, with the cannon, with the grenades, with the missile . . . against God's enemies." Abdel Rahman's role in the conspiracy was generally limited to overall supervision and direction of the membership, as he made efforts to remain a level above the details of individual operations. However, as a cleric and the group's leader, Abdel Rahman was entitled to dispense fatwas, religious opinions on the holiness of an act, to members of the group sanctioning proposed courses of conduct and advising them whether the acts would be in furtherance of jihad.[3]

United States v. Rahman, 189 F.3d 88, 104 (2d Cir. 1999) (per curiam), cert. denied, 528 U.S. 1094 (2000) (citations omitted). The crimes of conviction included soliciting the murder of Egyptian President Hosni Mubarak while he was visiting New York City; attacking American military installations; conspiring to murder President Mubarak; conspiring to bomb the World Trade Center in 1993, which succeeded; conspiring subsequently to bomb various structures in New York City, including bridges, tunnels, and the federal building containing the New York office of the Federal Bureau of Investigation ("FBI"), which did not succeed; and conspiring to commit crimes of sedition. Id. at 103-04, 107-11. For these crimes, Abdel Rahman was sentenced to be

---

[3] A fatwa has elsewhere been defined as "a religious opinion on Islamic law issued by an Islamic scholar." Sattar III, 314 F. Supp. 2d at 289; cf. United States v. Al-Moayad, 545 F.3d 139, 151 (2d Cir. 2008) (referring to it as a "religious ruling").

-9-

incarcerated for the remainder of his life. Id. at 148. Following his conviction and appeal therefrom, Abdel Rahman's legal team focused on two goals: improving his conditions of confinement, and obtaining his transfer from prison in the United States to Egypt.

The government asserts that Abdel Rahman was linked to various other acts of violence: He is said to be, or to have been, a spiritual leader of what the indictment in the instant prosecution refers to as "'al-Gama'a al-Islamiyya,' a/k/a 'al-Gama'at,' a/k/a 'Islamic Gama'at,' a/k/a 'Egyptian al-Gama'at al-Islamiyya'" (hereinafter, "al-Gama'a"), also referred to by the district court and the parties in English as the "Islamic Group" or "IG." See Superseding Indictment ¶ 8. Al-Gama'a was designated a foreign terrorist organization ("FTO") by the United States Secretary of State in 1997 pursuant to 8 U.S.C. § 1189, see Notices, Designation of Foreign Terrorist Organizations, Department of State, Office of the Coordinator for Counterterrorism, 62 Fed. Reg. 52650 (Oct. 8, 1997), was redesignated an FTO in 1999 and 2001, see Notices, Designation of Foreign Terrorist Organizations, Department of State, Office of the Coordinator for Counterterrorism, 64 Fed. Reg. 55112 (Oct. 8, 1999); Notices, Redesignation of Foreign Terrorist Organization, Department of State, Office of the Coordinator for Counterterrorism, 66 Fed. Reg. 51088 (Oct. 5, 2001), and remains so designated today, see Foreign Terrorist Organizations, Fact Sheet, Department of State, Office of the Coordinator for

-10-

Counterterrorism (Apr. 8, 2008), underline available at

http://www.state.gov/s/ct/rls/fs/08/103392.htm (last visited Mar. 28, 2009).

"Federal regulations provide that the Bureau of Prisons may implement SAMs, '[u]pon direction of the Attorney General,' when 'reasonably necessary to protect persons against the risk of death or serious bodily injury.' 28 C.F.R. § 501.3(a)." In re Basciano, 542 F.3d 950, 954 (2d Cir. 2008) (alteration in original), cert. denied, 128 S. Ct. 1401 (2009). The Bureau of Prisons, following Abdel Rahman's remand to its custody in August 1997, imposed severely restrictive SAMs upon him. They were designed to prevent him from directing or facilitating yet more violent acts of terrorism from his prison cell. The SAMs have been renewed, and sometimes modified, every 120 days since they were first imposed.

The May 11, 1998, SAMs applicable to Abdel Rahman "prohibited [him] from having contact with . . . others (except as noted in this document) that could foreseeably result in [his] communicating information (sending or receiving) that could circumvent the SAM intent of significantly limiting [his] ability to communicate (send or receive) terrorist information." SAMs of May 11, 1998, ¶ 3. To enforce this general prohibition, the measures regulated Abdel Rahman's telephone contacts, id. ¶ 4, his mail, id. ¶ 5, and his visitors' visits, id. ¶ 6. The measures limited his telephone contacts solely to his attorneys of record and his wife, id. ¶ 4(a), and prevented matters

-11-

discussed in those calls from being "divulged in any manner to any third party," id. ¶ 4(c)(i). The measures required the screening of all his outgoing and incoming non-legal mail, id. ¶ 5, and prohibited him from "talk[ing] with, or otherwise communicat[ing] with, any representative of the news media," including "through [his] attorney(s)/staff, or otherwise," id. ¶ 8. The measures also provided for the monitoring of all non-legal visits. Id. ¶ 6. On the condition that his attorneys would not divulge any information to third parties, Abdel Rahman was permitted to communicate with his legal team by telephone, id. ¶¶ 4(a) & 4(d), mail, id. ¶ 5(a), and in person, id. ¶ 6, with fewer restrictions than with other persons. Members of this legal team included lawyers Ramsey Clark, Abdeen Jabara, Lawrence Schilling, and defendant Lynne Stewart.

Subsequent versions of the SAMs retained similar prohibitions and screening mechanisms including the prohibition against communications with the news media. See, e.g., SAMs of Apr. 7, 1999, ¶ 9; SAMs of Dec. 10, 1999, ¶ 9. They retained similar provisions regarding legal communications, and incorporated provisions requiring Abdel Rahman's attorneys to sign affirmations acknowledging their receipt of the version of the SAMs in effect. See, e.g., SAMs of Apr. 7, 1999, ¶ 4; SAMs of Dec. 10, 1999, ¶ 4. By virtue of those affirmations, counsel agreed to abide by the terms of SAMs then in effect. See, e.g., Unsigned Affirmation of Abdeen Jabara, Apr. 2000; Unsigned Affirmation of Ramsey Clark, Apr. 2000; Affirmation of Ramsey

-12-

Clark, Jan. 10, 2001; Affirmation of Abdeen Jabara, Jan. 10, 2001; Affirmation of Ramsey Clark, Apr. 24, 1997.

Stewart repeatedly executed such statements. On May 1, 1998, she signed a document entitled "Attorney Affirmation," in which she affirmed, under penalty of perjury, the truth of specified statements regarding the then-applicable SAMs: that she had read the May 11, 1998, version of the SAMs; that she "underst[ood] the restrictions contained in that document and agree[d] to abide by its terms"; that during her visits to Abdel Rahman she would "employ only cleared translators/interpreters and [would] not leave [any] translator/interpreter alone with inmate Abdel Rahman"; and that she would "only be accompanied by translators for the purpose of communicating with inmate Abdel Rahman concerning legal matters." Affirmation of Lynne Stewart, May 1, 1998. Stewart also affirmed that neither she nor any member of her office would "forward any mail received from inmate Abdel Rahman to a third person" nor would she "use [her] meetings, correspondence or phone calls with Abdel Rahman to pass messages between third parties (including, but not limited to, the media) and Abdel Rahman." Id. On May 16, 2000, and again on May 7, 2001, Stewart signed similar affirmations under penalty of perjury, again affirming that she had read the most recent versions of the SAMs, and that she would not use her contact with Abdel Rahman to pass messages between him and third parties, including members of the media. Affirmation of Lynne Stewart, May 16, 2000; Affirmation of Lynne Stewart, May 7, 2001.

-13-

Defendant Mohammed Yousry, a middle-aged New York University graduate student who served as one of the legal team's translators had also been, in that capacity, a member of Abdel Rahman's trial team. As a translator, Yousry was permitted to read to Abdel Rahman, who is blind, and to take dictation from him.

Various members of the team, including Stewart and Yousry, also maintained contact with defendant Ahmed Abdel Sattar, who had served as a paralegal during Abdel Rahman's trial. The evidence established that Sattar was in continual contact with various members of al-Gama'a abroad. See, e.g., Transcript of Conversation between Ahmed Abdel Sattar and Rifa'i Ahmad Taha Musa, May 9, 2000.

### The Visits to Abdel Rahman

Sometime in 1997, more than three years after Abdel Rahman was taken into federal custody, a faction of al-Gama'a declared a unilateral "cease-fire," i.e., a halting of violent operations, in Egypt. When the cease-fire was first announced, Abdel Rahman was understood to support it.

In November 1997, despite the cease-fire, a group associated with al-Gama'a attacked, killed, and mutilated the bodies of more than sixty tourists, guides, and guards at the Hatshepsut Temple in Luxor, Egypt. Rifa'i Taha Musa ("Taha") -- a military leader of al-Gama'a, a follower of Abdel Rahman, and an unindicted co-conspirator herein -- was involved in the

-14-

incident.[4] Alaa Abdul Raziq Atia ("Atia"), later a leader of al-Gama'a's military wing in Egypt, was also involved in the killings. Al-Gama'a later claimed responsibility for the attack and demanded Abdel Rahman's release from prison in the United States.

In January 1998, Abdel Rahman was assigned by the Bureau of Prisons to the Federal Medical Center in Rochester, Minnesota ("FMC Rochester"). In March 1999, Stewart and Yousry visited him there. Prior to the visit, Stewart signed and delivered to the United States Attorney's Office for the Southern District of New York a document in which she affirmed, under penalty of perjury, that she would abide by the SAMs imposed by the Bureau of Prisons on Abdel Rahman.

At about this time, defendant Sattar was in contact with members of al-Gama'a, who were divided over their support for what remained of the cease-fire. Pro-cease-fire and anti-cease-fire factions developed, and members of the organization wanted Abdel Rahman to take a position on the matter. To that end, several wrote messages addressed to Abdel Rahman, which they sent to Sattar for delivery to Abdel Rahman. Sattar gave the messages to Stewart and Yousry, who surreptitiously brought the messages with them to Abdel Rahman during a subsequent visit in May 2000.

---

[4] In 1998, Taha joined with Osama Bin Laden and Ayman Al-Zawahiri to sign a _fatwa_ entitled "_Jihad_ against the United States and the Jews." See Translation of World Islamic Front's Statement Urging Jihad Against Jews and Crusaders.

-15-

Yousry read the messages to Abdel Rahman during the visit, and Abdel Rahman dictated to Yousry responses to some of them.  Yousry and Stewart then smuggled the responses out of FMC Rochester among their legal papers, and sent them to Sattar.  As directed by Abdel Rahman, Sattar informed various members of al-Gama'a that Abdel Rahman was willing to reconsider the effectiveness of the cease-fire and had rejected the associated idea that al-Gama'a should form a political party in Egypt.

News of Abdel Rahman's purported position spread.  But some members of the media in the Middle East expressed skepticism about the veracity of Sattar's representations, questioning whether they in fact came from Abdel Rahman or whether Sattar had fabricated them himself.  To refute those reports, Sattar and Yousry asked one of Abdel Rahman's lawyers, former United States Attorney General Ramsey Clark, to tell a reporter for an Arabic-language newspaper that Abdel Rahman opposed al-Gama'a's formation of a political party.  Clark, they thought, would be perceived as more authoritative than Sattar.  Clark eventually agreed to talk to the reporter.  He told the reporter that "[t]he Sheikh has said he believes that the formation of a new political party to engage in politics in Egypt at this time is . . . not correct and should not be done."  Transcript of Conversation between Ahmed Abdel Sattar, Mohammed Yousry, Ramsey Clark, and Muhammad Al-Shafi'i, Nov. 5, 1999, at 15.

In September 1999, Farid Kidwani, the then-leader of al-Gama'a's military wing, was killed along with three other

-16-

members of the group in a shootout with Egyptian police. Kidwani's death precipitated further tension and debate within al-Gama'a regarding the advisability and efficacy of the cease-fire.

Taha sent another message to Sattar to be relayed to Abdel Rahman urging Abdel Rahman to support the termination of the cease-fire and noting that Taha and his associates needed a "powerful word" from Abdel Rahman to achieve this goal. Taha told Sattar that such support from Abdel Rahman would "strengthen me among the brothers." Sattar agreed to send the message to Abdel Rahman and prepared a letter to Abdel Rahman for that purpose. In mid-September 1999, Clark and Yousry surreptitiously took the letter, along with newspaper articles relating to the killing of Kidwani in Egypt, with them during a visit to Abdel Rahman in FMC Rochester. Yousry read the letter and newspaper clippings aloud to Abdel Rahman. From these documents, Abdel Rahman first learned of Kidwani's death.

Abdel Rahman dictated a letter to Yousry in response.

> To those against whom war is made, permission is given to fight, because they are wronged (oppressed) -- and verily God is most powerful for their aid. . . . The latest thing published in the newspapers was about the Egyptian regime's killing of four members of the Group. This is . . . enough proof that the Egyptian regime does not have the intention to interact with this peaceful Initiative [i.e., the cease-fire] which aims at unification. I therefore demand that my brothers, the sons of [al-Gama'a] do a comprehensive review of the Initiative and its results. I also demand that they consider themselves absolved from it.

-17-

Transcript of Conversation between Ahmed Abdel Sattar and Rifa'i Ahmad Taha Musa, Sep. 20, 1999, at 6-7 (emphasis omitted, parenthetical in original).  Sattar expected Clark to make a public statement to similar effect, but Clark declined to do so.

On February 18 and 19, 2000, Yousry and Abdeen Jabara, an Arabic-speaking lawyer and member of Abdel Rahman's legal team, visited Abdel Rahman at FMC Rochester.  They brought with them another letter which included another message from Taha, again asking for Abdel Rahman's support for ending the cease-fire.  But Jabara would not permit Abdel Rahman to dictate a letter to Yousry in response.  And, notwithstanding pressure from Sattar and Taha, Jabara, like Clark before him, refused to issue any public statement regarding Abdel Rahman's position on the matter.

On May 16, 2000, defendant Stewart signed another affirmation that she and her staff would abide by the SAMs.  She did not submit that affirmation to the United States Attorney's Office until May 26.

On May 18, 2000, Stewart met with Sattar, who gave her more letters for Abdel Rahman, including another message from Taha yet again seeking Abdel Rahman's approval of an end to the cease-fire.  Taha asked Abdel Rahman to take a "more forceful position" regarding the end of the cease-fire and to "dictate some points we can announce in a press conference with Lynne."  Transcript of Second Audiovisual Recording involving Omar Abdel

-18-

Rahman, Mohammed Yousry, Lynne Stewart, and others, May 19, 2000, ("Video Tr. May 19, 2000, Tape 2"),[5] at 36.

On May 19 and 20, 2000, Stewart and Yousry visited Abdel Rahman, taking Sattar's most recent letters with them, including the letter containing the message from Taha. Unbeknownst to them, the government, pursuant to a warrant, videotaped the meetings. Yousry told Abdel Rahman that Abu Sayyaf -- an Islamic terrorist group in the Philippines -- had taken hostages to be used in bargaining for the release of Abdel Rahman and others. When Yousry explained to Stewart that he was "telling the Sheikh about the Abu Sayyaf group in the Philippines" and how "they took hostages," Stewart replied, "Good for them." Transcript of First Audiovisual Recording involving Omar Abdel Rahman, Mohammed Yousry, and Lynne Stewart, May 19, 2000, at 27.

From the beginning of the visit, Stewart was aware of the prison guards' presence. For example, she asked Yousry, "Do they usually sit like this and watch us?" Id. at 10. And during this meeting, Stewart and Yousry took overt steps to ensure that the nature of their communication with Abdel Rahman would be concealed from the prison guards. As she suggested to Yousry, they "should give them [i.e., the guards] something to watch."

_____

[5] Similar citations to transcripts of audiovisual recordings of prison visits to Abdel Rahman will follow the same format, i.e., "Video Tr. May 19, 2000, Tape 1," "Video Tr. May 20, 2000, Tape 1," "Video Tr. May 20, 2000, Tape 2," and "Video Tr. July 13, 2001, Tape 2."

-19-

Id. at 11. When the guards were standing close to the window of the conference room in which Abdel Rahman, Stewart, and Yousry, were meeting Yousry told Stewart to "look at me and talk a little bit because they are watching us closely." Id. at 51. While Yousry read the message to Abdel Rahman, Stewart uttered a meaningless series of phrases to Yousry so that it would appear to an observer as though she was taking part in a three-way conversation: "I am talking to you about. . . him going to have a, uh, chocolate eh . . . heart attack here . . . . Why don't you stop a minute now. And (UI)[6] say to him that, you know, 'You understood what we are saying, (UI).'" Id. As Stewart spoke, Yousry said to Abdel Rahman, "I don't know, Sir, they are standing very close by the glass. . . . Lynne says, (UI) when they look, you look at me a little, talk, then look at the Sheikh." Id.

Stewart continued to talk while Yousry read aloud Taha's statement in Sattar's letter. Yousry explained to Abdel Rahman that "Lynne just says anything, [laughing] (UI) Sir." Id. at 52 (bracketed material in original). Stewart remarked, "I can get an academy award for it." Id.

Stewart and Yousry then had this exchange:

YOUSRY: . . . Lynne, I think you should talk
to him because they are looking at me.

---

[6] "UI" stands for "unintelligible."

STEWART: (UI) there (UI), they, uh, (UI). . . . [she taps Yousry's pad with her pen][7] uhm, if he finds out what this is, then we're . . . [Laughs.]

YOUSRY: [Laughs] In trouble.

STEWART: [Laughing] Yeah, that's right.

Video Tr. May 19, 2000, Tape 2, at 29 (brackets in original).

Stewart and Yousry also took evasive action when a guard appeared to take interest in their conversation. At one point, while Yousry was conversing with Abdel Rahman, Stewart touched Yousry's hand and said "Why don't you stop there and we'll talk a minute um, the, uh. . . . Ahmed's youngest son needs glasses, did you know that?" Id. at 30. Yousry then explained to Abdel Rahman, "Lynne says, stop a little because they are by the glass." Id. Not long afterwards, Stewart tapped with the pen on the paper in front of Yousry and told him to "continue reading this 'cause this is setting up the organizational system around his conditions." Id. Yousry continued reading. Stewart then made a series of statements unrelated to the substance of the conversation between Yousry and Abdel Rahman. Yousry kept Abdel Rahman informed of what Yousry and Stewart were doing, noting that "Lynne continues to eh, she's watching them, she's watching them," to which Abdel Rahman replied, "[v]ery good, very good." Id. at 33. After Yousry

---

[7] These bracketed comments, which are in the original transcripts of the audiovisual recordings that were introduced as exhibits, are descriptions of relevant visual information.

finished reading Taha's message to Abdel Rahman, he returned it to a notebook that he had brought with him and with which he left.

On the second day of the same visit, Abdel Rahman dictated to Yousry, among other things, a letter to an al-Gama'a lawyer who favored the cease-fire, asking him to allow others in al-Gama'a to criticize it, and another to Taha asking him to "escalate the language" of criticism of the cease-fire. Video Tr. May 20, 2000, Tape 2, at 32.

Meanwhile, Stewart and Yousry continued to engage in what Stewart later called "[c]overing noises," Video Tr. July 13, 2001, Tape 2, at 12, and other tactics designed to obscure the nature of what they were doing. After one such incident, Yousry explained to Abdel Rahman, "[S]he just has to say that in order to break the . . . The people are looking." Video Tr. May 20, 2000, Tape 1, at 14. Stewart told Yousry, "I am making allowances for them looking in at us and seeing me never speaking and writing away here while you talk Arabic." Id. at 17. She then directed Yousry to "talk back to me now, because otherwise it doesn't make any sense. . . . So say something in English . . . ." Id. As Yousry explained to Abdel Rahman, "We are now acting, I talk to her in Arabic, and she responds in English, and they don't understand what is going on." Video Tr. May 20, 2000, Tape 2, at 38.

At the end of the visit, Stewart and Yousry took the Yousry-transcribed responses from Abdel Rahman with them from the

prison, and later gave them to Sattar. Sattar then passed them along to Taha and another member of al-Gama'a. Sattar also spoke to various members of al-Gama'a, informing them that Abdel Rahman would have "no objection" to a return to violence. Transcript of Audio Recording of Ahmed Abdel Sattar, Rifa'i Ahmad Taha Musa, and Salah Hashim, May 29, 2000, at 3.

At about this time, Sattar told members of al-Gama'a that Stewart would be making a public statement about Abdel Rahman's views on the cease-fire. Sattar and Stewart first discussed what Stewart would say to the press. Then, on June 13, 2000, Sattar and Stewart spoke to Esmat Salaheddin, a Reuters reporter based in Cairo. Stewart told Salaheddin that Abdel Rahman "is withdrawing his support for the ceasefire that currently exists." Trial Transcript ("Trial Tr.") at 5574, 5617, testimony of Salaheddin. She explained that Abdel Rahman had made the statement from prison two weeks before.

The next day, other Middle Eastern press outlets carried the news that Abdel Rahman had withdrawn his support for the cease-fire. Many noted that for the cease-fire to hold, Abdel Rahman's support was essential.

On June 20, 2000, Stewart participated in a telephone conference with Abdel Rahman. She then sent another statement on Abdel Rahman's behalf via facsimile to Salaheddin, the Reuters reporter in Cairo. The telecopy said, "Everything said in the previous statements is correct" and quoted Abdel Rahman as saying, "I do withdraw my support to the [cease-fire]

-23-

initiative." Statement for Release, Abdel Rahman, June 20, 2000. Following Stewart's statements on Abdel Rahman's behalf, several members of al-Gama'a began preparations to engage anew in acts of violence.

On October 4, 2000, Sattar and Taha completed a <u>fatwa</u> on Abdel Rahman's behalf, imitating his style, "mandating the killing of the Israelis everywhere" and "the killing [of] the Jews wherever they are (UI) and wherever they are found." Transcript of Audio Recording of Ahmed Abdel Sattar and Yassir Al-Sirri Oct. 4, 2000, ("Audio Tr. Oct. 4") at 13-16.[8] Sattar

---

[8] Sattar read the <u>fatwa</u> to Yassir Al-Sirri, a London-based supporter of al-Gama'a and an unindicted co-conspirator, during a telephone conversation that was intercepted by U.S. agents. Another portion of the transcript of the conversation reads in small part:

> A statement to the nation, the old and the young: Fatwah mandating the killing of the Israelis everywhere. . . . I, as a Muslim scholar . . . I appeal to my brothers, the scholars all . . . over our Islamic world: . . . . From our Islamic world, to portray their role, and issue a unanimous Fatwah calling on the Islamic nation to mandate the killing [of] the Jews wherever they are (UI) and wherever they are found. . . . [T]he Jihad today is the duty of the entire nation until Palestine and the Aqsa Mosque are liberated, and till the Jews are driven to their graves or out to the countries where they had come from. . . . The Muslim youth everywhere, especially in Palestine, Egypt, Syria, Lebanon and Jordan, as nations neighboring the Aqsa Mosque . . . they have to fight the Jews by all possible means of Jihad, either by killing them as individuals or by targeting their interests and their advocates, as much as they can.
>
> Your Brother, Omar Abdel Rahman . . . [i]n
> (continued...)

sent the fatwa to, among others, Atia, who had in the meantime become the military leader of al-Gama'a. Upon receiving the message, Atia began preparing for an attack. But, on October 19, 2000, before Atia could act, the Egyptian authorities raided his hideout, killing him and killing or arresting other al-Gama'a members.

On July 13 and 14, 2001, Stewart again paid a visit to Abdel Rahman at FMC Rochester, having signed a revised affirmation agreeing to abide by the SAMs and having sent the affirmation by facsimile to the United States Attorney's Office for the Southern District of New York on May 7, 2001. Stewart again, with Yousry's assistance and contrary to provisions of the SAMs, surreptitiously brought messages to and from Abdel Rahman.

Procedural History

On April 8, 2002, the defendants were indicted in connection with these and related acts; a superseding indictment was filed on November 19, 2003. On February 10, 2005, a jury found the defendants guilty on all counts in the superseding indictment. Specifically, all three defendants were convicted of conspiring to defraud the United States in violation of 18 U.S.C. § 371 (Count One) by violating SAMs imposed upon Abdel Rahman, and various related offenses. Sattar was convicted of conspiring

[8](...continued)
the USA's prisons, and a scholar of the
Azhar.

Audio Tr. Oct. 4 at 13, 15-17.

-25-

with Taha, Abdel Rahman, and others to murder persons in a foreign country in violation of 18 U.S.C. § 956 (Count Two), and with soliciting persons to commit crimes of violence -- murder and conspiracy to commit murder -- in violation of 18 U.S.C. § 373 (Count Three). Stewart and Yousry were convicted of providing and concealing material support to the Count-Two conspiracy, in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2 (Count Five), and with conspiracy to provide and conceal such support, in violation of 18 U.S.C. § 371 (Count Four). Stewart was also convicted of making false statements in violation of 18 U.S.C. § 1001 (Counts Six and Seven).

On October 16, 2006, following the denial of the defendants' motions for a judgment of acquittal and other relief, the district court sentenced the defendants. See Sentencing Transcript of Oct. 16, 2006 ("Sent'g Tr."). Sattar was sentenced to a 288-month term of incarceration to be followed by a five-year term of supervised release and a $300 special assessment; Stewart was sentenced to a 28-month term of incarceration to be followed by a two-year term of supervised release and a $500 special assessment; and Yousry was sentenced to a 20-month term of incarceration to be followed by a two-year term of supervised release and a $300 special assessment. Sattar is currently serving his sentence; Stewart and Yousry are free on bail pending appeal.[9]

_____

[9] We are aware of a statement famously attributed to
(continued...)

-26-

All three defendants appeal, challenging the validity of their convictions on a variety of grounds. The government challenges the reasonableness of the sentences on cross-appeal.

**DISCUSSION**

I. Standard of Review

We review de novo the district court's legal conclusions, including those interpreting and determining the constitutionality of a statute. United States v. Awadallah, 349 F.3d 42, 51 (2d Cir. 2003), cert. denied, 543 U.S. 1056 (2005). We also review de novo a district court's denial of a motion pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal on the ground that the evidence was insufficient to sustain the conviction. United States v. Florez, 447 F.3d 145, 154 (2d Cir.), cert. denied, 549 U.S. 1040 (2006). Because the jury verdict will be upheld against a sufficiency challenge "if we find that 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis

---

[9](...continued)
Stewart by, inter alia, the Los Angeles Times, immediately following her sentencing: "I can do that [time] standing on my head." Ellen Barry, Terrorist's Lawyer Gets Two-Year Term, L.A. Times, Oct. 17, 2006, at A12. A fuller purported quotation in the article reads, "I don't think anybody would say that to go to jail for two years is anything to look forward to. But -- as some of my clients once put it -- I can do that standing on my head." Id. Whether Stewart made this statement in full, in part, or not at all, is obviously entirely irrelevant to any of the issues before us.

in Jackson)), a convicted defendant making such a claim "bears a very heavy burden," United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002). We are required to evaluate "all of the evidence in the light most favorable to the government." United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002).

II.  Count One

Each defendant asserts that the evidence admitted at trial was insufficient to support his or her conviction under 18 U.S.C. § 371 for defrauding the United States and obstructing the Department of Justice and the Bureau of Prisons in the administration and enforcement of the SAMs in force with respect to Abdel Rahman. Stewart also argues that the SAMs do not apply to lawyers, and that the district court improperly prevented her from challenging the underlying validity of the SAMs.

A. Sufficiency of the Evidence

In order to establish a conspiracy-to-defraud offense under 18 U.S.C. § 371 as charged in Count One of the indictment, a reasonable jury must have been able to conclude beyond a reasonable doubt "(1) [that the defendants] entered into an agreement (2) to obstruct a lawful function of the government [in this case, the administration and enforcement of the SAMs] (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy." United States v. Ballistrea, 101 F.3d 827, 832 (2d Cir. 1996), cert. denied, 520 U.S. 1150 (1997) (citation and internal quotation marks omitted). "'Both the existence of a conspiracy and a given defendant's participation

-28-

in it with the requisite knowledge and criminal intent may be established through circumstantial evidence.'" United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008) (quoting United States v. Stewart, 485 F.3d 666, 671 (2d Cir. 2007)) (alteration omitted).

1. Evidence as to Stewart. Stewart argues that her defiance of the SAMs was open, not deceitful. One aspect of her defiance was undoubtedly public -- the conveyance of Abdel Rahman's statements regarding the cease-fire and related matters to the Reuters journalist. But we agree with the district court that "[a] reasonable jury could certainly [have found] that Stewart gained access to Abdel Rahman [and thereby the information that she conveyed to the journalist] by deceit and dishonest means." Sattar V, 395 F. Supp. 2d at 89. "Without [Stewart's] agreement to abide by the SAMs and the other representations contained in her affirmations, she knew that she would not have been allowed to visit Abdel Rahman," id.; see also id. at 84-89, and therefore would not later have been able to defy the regulations openly by publicizing messages on his behalf.

Stewart insists that she acted with the intent, not to defraud the government, but to "zealously" represent her client.[10] But the jury had a reasonable basis on which to

---

[10] The word "zealot," taken from a first century A.D. anti-Roman Jewish movement, carries with it overtones of fanaticism, see The American Heritage Dictionary of the English Language 2000 (4th ed. 2000). The American Heritage Dictionary lists as principal definitions: "1a. One who is zealous, especially
(continued...)

disbelieve this, and to "disbelieve that zealous representation included filing false affirmations, hiding from prison guards the delivery of messages to Abdel Rahman, and the dissemination of responses by him that were obtained through dishonesty." Id. at 90. Moreover, even if Stewart acted with an intent to represent her client zealously, a rational jury could nonetheless have concluded that Stewart simultaneously acted with an intent to defraud the government. A genuinely held intent to represent a client "zealously" is not necessarily inconsistent with criminal intent.

2. Evidence as to Yousry. Yousry argues that, as a translator who was taking direction from others, he did only what he was told to do and acted in good-faith reliance on the guidance and conduct of the members of the bar for whom he worked. Based on the evidence admitted at trial, however, a rational jury could have found that Yousry knew of and understood the terms of the SAMs.

---

[10](...continued)
excessively so. b. A fanatically committed person." Id.

The word has historically been used as a positive commandment, however, with respect to the ethical obligations of members of the bar. Until recently, for example, Canon 7 of the New York Lawyer's Code of Professional Responsibility provided: "A Lawyer Should Represent a Client Zealously Within the Bounds of the Law." It is in that sense that we understand Stewart to use the term here.

Yousry had in his possession the December 1999 version of the SAMs as well as a copy of the underlying regulations. That version of the SAMs provided that Abdel Rahman's legal team could pass along to him "only inmate case-related correspondence," and set forth a process for screening all non-legal mail. SAMs of Dec. 10, 1999, ¶ 7. The SAMs in Yousry's possession also specifically prohibited Abdel Rahman's communication with news media "in person, by telephone, by furnishing a recorded message, through the mails, through his attorney(s), or otherwise." Id. ¶ 9. Yousry himself acknowledged that members of the legal team were not "to disclose any portion of their conversation with the Sheik to the media." Excerpts from Draft of Dissertation of Mohammed Yousry at 29. Yousry also knew that Clark and Jabara had refused to relay messages from Abdel Rahman.

From this evidence, a reasonable factfinder could conclude beyond a reasonable doubt that Yousry knew that his assistance, by providing translation services, in facilitating Abdel Rahman's continued contact with members of al-Gama'a violated the SAMs. Moreover, as with Stewart, Yousry's deceptive and evasive conduct during the course of his visits to Abdel Rahman undercuts his claim of good faith.

Yousry argues that the evidence established, at most, that he intended to violate the SAMs, not that he knew that doing so might constitute a crime. But even if he misunderstood the

-31-

law in that respect, such a mistake provides no defense to a charge of criminal misbehavior. See Cheek v. United States, 498 U.S. 192, 199 (1991). The fact that Yousry was aware that his acts, in knowing violation of the SAMs, would defraud the government is sufficient to sustain the conviction. The government need not also prove that he knew that there was a criminal statute -- 18 U.S.C. § 371 -- that criminalized such behavior. "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." Cheek, 498 U.S. at 199.

B. Propriety of the SAMs

1. Stewart's Argument. Stewart contends that the district court erred by preventing her from challenging the validity of the SAMs as part of her defense. She sought to argue that the Attorney General has no authority to have lawyers held criminally liable for violating the SAMs and that the SAMs are unconstitutionally vague as applied to her. Under Dennis v. United States, 384 U.S. 855 (1966), however, Stewart's strategy of collaterally attacking the validity of the SAMs is futile.

As the Supreme Court recognized in Dennis, there are "appropriate and inappropriate ways to challenge acts of government thought to be unconstitutional." Id. at 867. There is "no reason for [federal courts] to consider the constitutionality of a statute at the behest of petitioners who have been indicted for conspiracy by means of falsehood and

-32-

deceit to circumvent the law which they now seek to challenge."
Id. at 866. Stewart, like the defendants in Dennis, was indicted
for engaging in a "voluntary, deliberate and calculated course of
fraud and deceit." Id. at 867. This is a "prosecution directed
at [Stewart's] fraud[,] not an action to enforce the [law]
claimed to be unconstitutional." Id.[11]

The result may be different where the constitutionality
of a law is "challenged by those who of necessity violate its
provisions and seek relief in the courts," id. at 865, or where
the governmental action at issue was taken with no "colorable
authority," United States v. Barra, 149 F.2d 489, 490 (2d Cir.

---

[11] The fraudulent scheme in Dennis related to a statutory
scheme, whereas the fraudulent conduct here related to a
regulatory one. The fundamental principles, however, remain the
same; the central issue remains the deceitful act, not the form
or nature of the governmental conduct that prompted the deceit.

1945).[12] But, as with Dennis, "[t]his is not such a case." 384 U.S. at 865.

We have no basis upon which to entertain a doubt as to the authority of the Attorney General of the United States to ensure that reasonable measures are designed and implemented in an attempt to prevent imprisoned criminals who are considered dangerous despite their incarceration from engaging in or facilitating further acts of criminality from their prison cells. See 28 C.F.R. § 501.3(a) (setting forth the boundaries of that authority). Nor have we any reason to doubt the Attorney General's conclusion that Abdel Rahman fits within that category of prisoner. He has demonstrated his willingness to engage in

---

[12] The defendants here are not, of course, subject to a contempt proceeding for violation of an injunction. But we note some similarity between the principles established in Dennis and the collateral bar rule of Walker v. Birmingham, 388 U.S. 307, 315 (1967), which limits the ability to defend against charges of contempt for violating a court-ordered injunction on the ground that the injunction itself was unconstitutional, see Matter of Providence Journal Co., 820 F.2d 1342, 1346 (1st Cir. 1986), modified, 820 F.2d 1354 (1st Cir. 1987), cert. dismissed, 485 U.S. 693 (1988) ("As a general rule, a party may not violate [a court] order and raise the issue of its unconstitutionality collaterally as a defense in the criminal contempt proceeding. Rather, the appropriate method to challenge a court order is to petition to have the order vacated or amended."). With respect to exceptions to the "general rule," there is also some similarity between Barra, 149 F.2d at 490 (allowing prosecution for making false statements in connection with government requests for information so long as the government "has colorable authority to do what it is doing'") and Matter of Providence Journal Co., 820 F.2d at 1344, 1352 (allowing collateral attack on an injunction in contempt proceeding for violating that injunction where it was a "transparently invalid prior restraint on pure speech").

violent criminality not by acting violently himself, but by ordering, encouraging, and conspiring with others who would actually shed the blood. The likelihood that he would continue to order, direct, or encourage such acts from prison, if he could, was plain, and his incapacitation reasonably required not just his physical immobility, but also his virtual silence vis-à-vis the world at large.

Stewart might have effectively challenged the SAMs by refusing to sign the affirmations in which she said she would abide by them. She might then have invoked the jurisdiction of the courts by bringing suit on Abdel Rahman's or her own behalf to challenge their validity. She might have argued -- as she forcefully does here -- that the SAMs interfered with her capacity to effectively represent Rahman. But she did not. Instead, she signed the affirmations. Having chosen that path, she cannot be heard to attack the validity of those measures when called to account for violating them, especially where, as here, her fraudulent and deceptive conduct endangered people's lives.

The district court did not err in preventing Stewart from challenging the validity of the SAMs as part of her defense, and the jury acted within its province when it found that Stewart intentionally and fraudulently subverted them.

2. Sattar's Related Arguments on Appeal. Sattar relies on Stewart's and Yousry's arguments with respect to Count One.

For the reasons set forth above addressing those arguments, we conclude that they are also unpersuasive as applied to him.

### III. Counts Two and Three

Only Sattar was charged in Counts Two and Three of the superseding indictment. He does not challenge the sufficiency of the evidence supporting his Count Two conviction for conspiring with Abdel Rahman, Taha, and others to murder persons in a foreign country, in violation of 18 U.S.C. § 956.[13] Instead, he asserts that the district court should have dismissed this count on the grounds of vindictive prosecution. Similarly, Sattar does not challenge his conviction on Count Three for soliciting persons to engage in crimes of violence -- murder and conspiracy to commit murder -- in violation of 18 U.S.C. § 373.[14] He argues instead that he was denied a fair trial. These arguments are addressed below in the context of the defendants' more general challenges to the probity of the proceedings.

### IV. Counts Four and Five

Stewart and Yousry challenge their Count Five convictions for violating 18 U.S.C. § 2339A and 18 U.S.C. § 2 by providing and concealing material support for the Count-Two conspiracy for which Sattar was convicted and their Count Four

---

[13] By special verdict, the jury concluded that the object of the Count-Two conspiracy was murder, not kidnaping.

[14] By special verdict, the jury concluded that the crimes of violence Sattar solicited were murder and conspiracy to murder.

-36-

convictions for conspiracy to provide and conceal such support, in violation of 18 U.S.C. § 371. They argue that the evidence was insufficient to support their conviction on either count, and contend that their conduct was constitutionally protected in any event.

## A. History of the Charges

By way of background, the initial indictment charged all three defendants with violating 18 U.S.C. § 2339B.[15] The defendants argued before the district court that "18 U.S.C. § 2339B is unconstitutionally vague . . . with regard to the statute's prohibition on providing material support or resources in the form of communications equipment and personnel." Sattar I, 272 F. Supp. 2d at 356 (internal quotation marks omitted). The district court agreed, and therefore dismissed those charges. Id. at 361.[16]

The government then filed a superseding indictment alleging that by essentially the same course of conduct, i.e., coordinating the surreptitious passage of al-Gama'a messages to and from Abdel Rahman, Stewart and Yousry violated 18 U.S.C.

[15] At the time of the relevant offense conduct, section 2339B provided, in relevant part, that "[w]hoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be [guilty of a crime.]" 18 U.S.C. § 2339B(a)(1) (2000).

[16] The constitutionality of 18 U.S.C. § 2339B is not before us.

-37-

§ 2339A.[17]  The relevant version of section 2339A, entitled "Providing material support to terrorists," provided in relevant part:

> Whoever, within the United States, provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [various enumerated statutes related to terrorism] or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be [subject to criminal punishment].

18 U.S.C. § 2339A(a) (2000).  For purposes of both sections 2339A and 2339B, "material support or resources" may be provided in the form of:

> currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1) (2000); see also id. § 2339B(g)(4) (2000) ("[T]he term 'material support or resources' has the same meaning given that term in section 2339A . . . .").  Section 2339A, however, in contrast to section 2339B, does not penalize the

---

[17]  The superseding indictment did not charge Sattar with violating section 2339B; instead, he was charged with conspiracy to murder persons in a foreign country in violation of 18 U.S.C. § 956, i.e., Count Two.

provision of material support without regard to what the support is for. Section 2339A requires instead that the defendant provide support or resources <u>with the knowledge or intent</u> that such resources be used to commit specific violent crimes.[18]

The government charged that the defendants provided "material support or resources" in the form of "personnel" -- namely, Abdel Rahman -- to the Count-Two conspiracy, knowing or intending that Abdel Rahman, as an active co-conspirator, would help commit crimes. <u>See</u> <u>Sattar III</u>, 314 F. Supp. 2d at 296. The government further asserted that Stewart and Yousry "conceal[ed] and disguise[d] the nature, location, and source" of their material support by means of the defendants' covert conduct disguising Abdel Rahman's participation as a co-conspirator. <u>See</u> <u>id.</u> The government had initially argued that Stewart and Yousry could be convicted for providing themselves as "personnel" to a foreign terrorist organization and by providing communications equipment to the conspiracy. After the dismissal of the section 2339B charges and following the filing of the superseding indictment, however, the government abandoned those contentions. <u>See</u> <u>id.</u>

---

[18] Section 2339B criminalizes the <u>knowing</u> provision of material support. <u>See</u> 18 U.S.C. § 2339B(a)(1) (2000). Section 2339A criminalizes the provision of material support <u>knowing or intending</u> that such support is used to aid crimes of terrorism. <u>See</u> 18 U.S.C. § 2339A(a) (2000). Therefore, the mental state in section 2339A extends both to the support itself, and to the underlying purposes for which the support is given.

As an initial matter, Stewart and Yousry challenge the sufficiency of the evidence supporting their convictions on this count. They also argue that the district court erroneously instructed the jury on the elements of a violation of section 2339A. In addition, they raise more general challenges to the statute, arguing that section 2339A does not criminalize the behavior alleged in the indictment, that the provision is unconstitutional as a multi-level inchoate offense, and that the statute is unconstitutionally vague as applied to them. We examine their arguments in the context of the statutory elements of the crime, addressing first the sufficiency arguments.

B. Elements of Section 2339A

1. Proof of the Underlying Conspiracy to Kill Persons Abroad.[19] There was sufficient evidence of the existence of the predicate crime -- the Count-Two conspiracy to kill or kidnap -- for which Sattar was convicted. Indeed Sattar, the only defendant charged with and convicted of participating in the Count-Two conspiracy, does not challenge the sufficiency of the evidence as to this count.

The government offered evidence that Sattar and Taha composed a fatwa in Abdel Rahman's name calling for "the killing [of] the Jews wherever they are (UI) and wherever they are

---

[19] As noted above, the jury found that the underlying conspiracy involved the murder, not the kidnaping, of persons abroad.

found." Audio Tr. Oct. 4, at 15. It also offered proof that this _fatwa_ was communicated to Atia, an al-Gama'a military leader. Although the evidence may not have established any particular plan of action to execute the _fatwa_, a reasonable jury could have found beyond a reasonable doubt from the fatwa's exhortations and Atia's readiness to act on it that there was a concrete, illegal objective to murder persons abroad.

A review of the transcripts of various intercepted telephone conversations introduced into evidence, particularly the September 18, 2000, conversation involving Sattar, Taha, and another party, bolsters this conclusion. The discussion goes well beyond the abstract and contemplates the coordination with Atia of violent actions, presumably along the lines of the Luxor massacre. In light of such evidence, a rational jury could have found beyond a reasonable doubt that the conspiracy as charged in Count Two existed.

2. _Proof of Material Support to the Conspiracy._

Stewart and Yousry also assert that they did not provide material support in the form of "personnel" to the Count-Two conspiracy. A reasonable jury could have concluded otherwise. There was evidence introduced at trial sufficient to support a reasonable juror's inference that Stewart and Yousry helped Abdel Rahman participate covertly in the conspiracy to engage in violence abroad by communicating to members of al-Gama'a and others his withdrawal of support for the cease-fire. Abdel Rahman's

-41-

instrumental participation -- indeed, his leadership -- would, as the district court observed, have been unavailable to the Count-Two conspiracy "without the active participation of Stewart and Yousry." Sattar V, 395 F. Supp. 2d at 95.

The defendants argue that the government established only that they provided the underlying conspiracy with Abdel Rahman's "pure speech" and therefore did not provide "personnel" within any constitutional interpretation of section 2339A. The government does not deny that section 2339A may not be used to prosecute mere advocacy or other protected speech, but contends that the defendants were prosecuted for criminal actions that did not amount to protected speech.

Resolution of this dispute does not turn on whether the prosecution introduced evidence of "pure speech." "Numerous crimes under the federal criminal code are, or can be, committed by speech alone," and certain crimes "are characteristically committed through speech." Rahman, 189 F.3d at 117. The issue is, instead, whether Abdel Rahman's statements were protected speech. We conclude that the statements were not protected such as to cast doubt on the convictions.

Words that are "the very vehicle of [a] crime" are not protected "merely because, in part, [the crimes] may have involved the use of language." United States v. Rowlee, 899 F.2d 1275, 1278 (2d Cir.), cert. denied, 498 U.S. 828 (1990). As we recognized when affirming Abdel Rahman's sentence, "freedom of

speech and of religion do not extend so far as to bar prosecution of one who uses a public speech or a religious ministry to commit crimes." Abdel Rahman, 189 F.3d at 116-17. "[I]f the evidence shows that the speeches crossed the line into criminal solicitation, procurement of criminal activity, or conspiracy to violate the laws, the prosecution is permissible." Id. at 117. Words "that instruct, solicit, or persuade others to commit crimes of violence . . . violate the law and may be properly prosecuted regardless of whether they are uttered in private, or in a public speech, or in administering the duties of a religious ministry." Id.

The dissemination of some of the speech introduced at trial might be viewed as nothing more than the expression of views on the broad political situation in Egypt. For example, in reaffirming that he was withdrawing his support for the cease-fire, Abdel Rahman said that he had "expressed [his] opinion and left the matters to [his] brothers to examine it and study it." Statement for Release, Abdel Rahman, June 20, 2000.

But a reasonable jury could have found, in light of Abdel Rahman's role as "spiritual" leader of al-Gama'a, that his messages were ultimately intended to sway al-Gama'a members to end the cease-fire, and by implication to commit criminal acts of violence. Abdel Rahman's statements were therefore not an expression of opinion, but a call to arms.

-43-

The evidence establishes, moreover, more than a one-way broadcast of Abdel Rahman's views. Abdel Rahman's comments were made in direct response to solicitations of his views from other al-Gama'a members who were seeking to effect an end to the cease-fire and to resume violence. In light of the information available to Abdel Rahman at the time, a reasonable jury could have read his statements as tailored to and necessary for al-Gama'a's operations and increased use of violence. Viewed through this lens, Abdel Rahman's statements were not materially different in substance from a crime boss making decisions about his criminal enterprise from prison and ordering a "hit."

3. Proof Regarding Knowing or Intentional Provision of Material Support. Stewart and Yousry argue that the prosecution did not prove the requisite mental state to sustain their convictions. They contend that they were not aware of the existence of the conspiracy charged in Count Two and therefore could not have intended to aid it.

These arguments are unavailing. From the evidence at trial, a reasonable factfinder could have concluded that Stewart and Yousry knew (1) that an active group of people within al-Gama'a including, most notably, Taha, sought to commit violent crimes but were hindered by the cease-fire and by those members of al-Gama'a who sought to adhere to it; (2) that the support of Abdel Rahman -- a key leader of the group -- was critical to the continued maintenance of the cease-fire; and (3) that, in light

-44-

of the letters and messages from Taha and Sattar that Yousry read to Abdel Rahman in prison, Abdel Rahman's particular opinion regarding the cease-fire -- and not the view of any other person -- would be dispositive on the question of whether al-Gama'a members would continue to abide by the cease-fire. A reasonable factfinder could thus have concluded that Yousry and Stewart actively and intentionally facilitated communications between Abdel Rahman and al-Gama'a, in part by engaging in various ruses during the course of their visits to Abdel Rahman, and thereby effectively delivered Abdel Rahman's order to commit violence. Stewart also did so by reaffirming to the press Abdel Rahman's stated withdrawal of support for the cease-fire, thereby dispelling any notion that the message came not from Abdel Rahman himself, but was instead fabricated by members of the pro-violence faction of al-Gama'a.

C. Other Challenges with Respect to 18 U.S.C. § 2339A

1. Vagueness. Section 2339A criminalizes the provision of material support or resources "knowing or intending" that they are to be used to assist in certain enumerated crimes of terrorism. 18 U.S.C. § 2339A(a) (full text set forth on page [38], supra). Stewart and Yousry assert that insofar as the statute does not require "conscious, knowing intent" or "knowledge and intent," the statute is unconstitutionally vague as applied to them. They argue that the district court should have dismissed the section 2339A charges for substantially the

-45-

same reasons that it dismissed the section 2339B charges that were contained in the initial indictment. The government urges to the contrary that the text of section 2339A, which requires "knowing or intending," 18 U.S.C. § 2339A(a) (emphasis added), is sufficiently precise.

In analyzing the defendants' arguments in this regard, we must focus on two major differences between the initial and superseding indictment.

First, the statutes upon which they were based differ. Unlike section 2339A, section 2339B penalizes the knowing provision of material support alone. Unlike section 2339A, section 2339B does not require for conviction proof that the defendant has provided support or resources with the knowledge or intent that such resources be used to commit specific violent crimes.[20]

Second, the factual bases for the charges differ. In the initial indictment, the government alleged that the defendants violated section 2339B by the "provision" of "communications equipment" to the conspiracy, Sattar I, 272 F. Supp. 2d at 357, and the "provision" of themselves as "personnel" to the conspiracy, id. at 358. In the superseding indictment, the government charged instead that the defendants acted with the "knowledge or intent" to provide material support. And rather

_____

[20] As already noted, the propriety of the district court's dismissal of the section 2339B charges from the initial indictment is not before us; we assume for purposes of this discussion that the district court was correct.

-46-

than proceeding on the theory that the defendants provided themselves as "personnel" to the conspiracy, the superseding indictment alleges that the defendants provided Abdel Rahman as the "personnel."

As we have explained, the district court dismissed the section 2339B charges on the ground that they were unconstitutional as applied to the defendants. The basis for dismissal of the "communications equipment" charges was that the statute, as read to apply to the facts of this case, could "criminaliz[e] the mere use of phones and other means of communication [with] neither notice nor standards for [the statute's] application." Id. And the basis for the dismissal of the "personnel" charges, as framed in the initial indictment, was that such a charge could criminalize the actions of "'[s]omeone who advocates the cause of the [Foreign Terrorist Organization].'" Id. at 359 (quoting Humanitarian Law Project v. Reno, 205 F.3d 1130, 1137 (9th Cir. 2000), cert. denied, 532 U.S. 904 (2001)) (brackets omitted). Without more, the district court concluded, such conduct cannot be punished without violating the First Amendment. See id.

The initial charges raised the possibility, moreover, that under the government's reading of the statute, "a lawyer, acting as an agent of her client, an alleged leader of an FTO, could [be] subject to criminal prosecution as a 'quasi-employee.'" Id. As we shall see, the charges in the superseding indictment do not pose this risk.

-47-

A statute is unconstitutionally vague as applied "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000); accord United States v. Rybicki, 354 F.3d 124, 132 (2d Cir. 2003) (en banc), cert. denied, 543 U.S. 809 (2004). As a general matter, scienter requirements may "ameliorate[]" concerns of improper notice. See Hill, 530 U.S. at 732.

We are satisfied that section 2339A's knowledge-or-intent formulation saves the statute from being unconstitutionally vague as applied here. Unlike the application of section 2339B proposed in the initial indictment, the superseding indictment required the jury to find that the defendants knew or intended the criminal uses to which the conspiracy would put the material support they provided, thereby eliminating concerns about inadequate notice. In other words, if Stewart and Yousry knew that their actions provided material support to a conspiracy to end the cease-fire and thereby unloose deadly acts of terrorism by al-Gama'a and others, then they were on notice that what they were doing was prohibited by a statute that criminalizes the provision of material support "knowing or intending that [such support is] to be used in preparation for, or in carrying out," criminal actions. 18 U.S.C. § 2339A.

Stewart and Yousry argue nonetheless that several statutory terms, such as "personnel," are unconstitutionally

-48-

vague as applied to them. They note that "personnel," undefined at the relevant time, applies equally to sections 2339A and 2339B, compare id. § 2339A(b)(1) (2000) with id. § 2339B(g)(4) (2000).[21] They point out that the district court held this term to be unconstitutionally vague in Sattar I. See 272 F. Supp. 2d at 360.

We agree, however, with the district court's conclusion that "[t]he meaning of 'personnel' is clear in the context of § 2339A when applied to personnel who are to be used in preparation for, or in carrying out, specific crimes." Sattar III, 314 F. Supp. 2d at 301 n.11. By applying, in the first

---

[21] At the time of the alleged criminal acts, "personnel" was undefined. In December 2004, the term "personnel" was changed to "personnel (1 or more individuals who may be or include oneself)." See Intelligence Reform and Terrorism Prevention Act, Pub. L. No. 108-458, § 6603(b), 118 Stat. 3638, 3762 (codified at 18 U.S.C. § 2339A(b)(1)). By the same act, the term was defined in more detail for purposes of section 2339B:

> No person may be prosecuted under [section 2339B] in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

Id. § 6603(f),118 Stat. at 3763 (codified at 18 U.S.C. § 2339B(h)). This amended definition applies to section 2339B but not to section 2339A.

indictment, the prohibition against providing "personnel" to the conspiracy to a circumstance in which the defendants provided themselves, the government created a situation in which the defendants could be punished for, in effect, providing themselves to speak out in support of the program or principles of a foreign terrorist organization, an activity protected by the First Amendment. See Sattar I, 272 F. Supp. 2d at 359. The more limited charge that they knowingly or intentionally provided Abdel Rahman (as "personnel"), whose voice of command or words of approbation were a means by which al-Gama'a members could prepare for, or carry out, terrorist acts in Egypt, does not carry the same risk with its corresponding constitutional implications.

In addition, the heightened scienter requirement in section 2339A constrains prosecutorial discretion, and ameliorates concerns of arbitrary and discriminatory enforcement. Similar scienter requirements have saved other statutes from void-for-vagueness challenges. See, e.g., Hill, 530 U.S. at 732; see also Colautti v. Franklin, 439 U.S. 379, 395 & n.13 (1979) (citing cases); United States v. Curcio, 712 F.2d 1532, 1543 (2d Cir. 1983).

2. Nature of the Offense. Stewart and Yousry also contend that Count Four, alleging a conspiracy to violate section 2339A, acts impermissibly as a charge of a "multi-level inchoate offense," a "logical absurdity" that "violate[s] due process." Stewart Br. 161-65. The gist of their argument is that the charge effectively criminalizes a "conspiracy to conspire,"

thereby violating due process by extending criminal liability to a degree too remote from any substantive criminal offense to pass constitutional muster. Id. at 165-69. We need not consider this argument;[22] Count Five charges the knowing provision of aid -- a substantive, not inchoate, offense -- and Count Four, pursuing a conspiracy to commit that substantive offense, functions as a traditional conspiracy charge.

As what seems to us to be a variation on the same theme, Stewart and Yousry assert that the district court erred by "impermissibly dilut[ing]" the proof required for conviction of the Count-Two conspiracy in the context of the material support convictions under section 2339A. Stewart Br. 158. But the government need not have established beyond a reasonable doubt that Stewart or Yousry engaged in a conspiracy to kidnap or commit murder abroad; neither was charged with doing either. Instead, both were charged with and convicted of violating section 2339A, and, as discussed, the evidence is sufficient to sustain the conviction on those charges. Stewart and Yousry do not, presumably because they cannot, suggest that Congress did not have the power to criminalize the relevant underlying conduct.

_____

[22] We note nonetheless that the defendants do not provide authority for their argument that a "multi-level inchoate offense" such as a conspiracy to conspire would violate the Due Process Clause.

-51-

## V. Counts Six and Seven

Stewart challenges her convictions on Counts Six and Seven for violating the blanket provisions of 18 U.S.C. § 1001, which subjects to criminal sanctions

> whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
>
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry . . . .

18 U.S.C. § 1001(a). Stewart argues that, at worst, she broke a promise, and that the statute criminalizes false statements, not false promises.

We conclude otherwise. On May 16, 2000, Stewart signed an affirmation stating that she would ("shall") abide by the SAMs. On May 26, 2000, Stewart submitted the affirmation to the United States Attorney's Office for the Southern District of New York. On May 7, 2001, Stewart signed a revised affirmation to the same effect and telecopied it to the same office. Before, after, and between executing these affirmations, she helped smuggle messages to and from Abdel Rahman in violation of the SAMs.

Stewart at least thrice affirmed "under the penalties of perjury the truth" of certain statements. The May 16, 2000, statement reads in pertinent part:

> I . . . understand that neither I nor any member of my office shall forward any mail received from inmate Abdel Rahman to a third person. Nor shall I use my meetings, correspondence or phone calls with Abdel Rahman to pass messages between third parties (including, but not limited to, the media) and Abdel Rahman.

Stewart May 2000 Aff. (Gov't Ex. 7.) In the May 7, 2001, statement, Stewart affirmed:

> I . . . specifically understand that the meetings shall not be for the purpose of presenting statements to the defense team for further dissemination to third parties, including the media. I will only allow the meetings to be used for legal discussion between Abdel Rahman and me.

Stewart May 2001 Aff. (Gov't Ex. 12.)

A reasonable factfinder was entitled to conclude that Stewart affirmed under penalty of perjury that she had the then-present intent to have her actions conform to the terms of the SAMs. From Stewart's smuggling messages to and from Abdel Rahman, the factfinder could conclude that the assertion about her intent was knowingly and willfully false when it was made. See United States v. Urum, 148 F.2d 187, 189 (2d Cir. 1945) (concluding that allegation of a false representation as to future use of loan proceeds was "an allegation of a present statement and the assertion of existing intent"); cf. United States v. Shah, 44 F.3d 285, 294 (5th Cir. 1995) (observing that

-53-

"a promise may amount to a 'false, fictitious or fraudulent' statement if it is made without any present intention of performance and under circumstances such that it plainly, albeit implicitly, represents the present existence of an intent to perform").

Stewart seeks support for her argument from Williams v. United States, 458 U.S. 279 (1982). There, the Supreme Court reversed a conviction of the defendant under 18 U.S.C. § 1014 for his making of a "false statement" -- a check drawn on an account containing insufficient funds -- for the purpose of influencing the actions of a federally insured institution. But central to the Williams Court's analysis was the proposition that a check, even a bad check, "is not a factual assertion at all." Id. at 284. A check "d[oes] not, in terms, make any representation as to the state of [the drawer's] bank balance" but "serve[s] only to direct the drawee banks to pay the face amounts to the bearer, while committing [the drawer] to make good the obligations if the banks dishonor[] the drafts." Id. at 284-85.

Williams does not apply to the conduct at issue here. A reasonable jury could have concluded that Stewart's affirmations that she would abide by the SAMs amounted to factual assertions regarding her then-present intent to abide by the SAMs. Based on her repeated affirmations, and her repeated violations of those affirmations, moreover, a reasonable jury could have concluded that at the time Stewart executed and submitted the affirmations at issue, she did not intend to abide

-54-

by them -- in other words, that her representations were knowingly false when made. On this basis, a reasonable jury could have properly concluded that Stewart violated section 1001 as charged in Counts Six and Seven.

VI.  General Challenges to the
      Validity of the Convictions

In addition to their challenges to specific counts in the indictment, Stewart and Sattar make general assertions of error regarding the government's conduct during the course of the prosecution. Stewart argues that she was selectively prosecuted on account of her gender and political beliefs, and both Stewart and Sattar assert that the government's decision to file a superseding indictment following their successful efforts to dismiss several counts of the initial indictment constitutes vindictive prosecution.

The defendants also raise various challenges to the district court's case administration. First, they allege a variety of pretrial errors: in the denial of their motions to sever their trial from Sattar's; in the empaneling of an anonymous jury; in the denial of Stewart's motion to suppress certain evidence obtained pursuant to the Foreign Intelligence Surveillance Act of 1978, Pub. L. No. 95-511, 92 Stat. 1783, 50 U.S.C. §§ 1801 et seq. ("FISA"); and in the denial of Stewart's motion for disclosure of whether she, her co-defendants, or others were subject to surveillance by the National Security Agency. The defendants also argue that the district court made

various evidentiary errors. Finally, the defendants argue that the district court erred in addressing post-conviction claims of juror misconduct.

A. Selective Prosecution

Stewart argues that she was selectively prosecuted on account of her gender and political beliefs in violation of the Equal Protection Clause of the Fourteenth Amendment. This argument requires Stewart to establish that she was "treated differently from other similarly situated individuals" and that "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure [her]." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (internal quotation marks omitted); accord United States v. Fares, 978 F.2d 52, 59 (2d Cir. 1992); United States v. Moon, 718 F.2d 1210, 1229 (2d Cir. 1983), cert. denied, 466 U.S. 971 (1984).

Stewart compares her treatment with that of Abdel Rahman's former lawyers Ramsey Clark and Abdeen Jabara, who, even though they allegedly violated the same SAMs as she did, were not prosecuted for doing so. Clark's and Jabara's alleged misconduct, however, was different from Stewart's adjudicated misconduct in at least one crucial respect: both Clark and Jabara refused to publicize Abdel Rahman's withdrawal of support for the al-Gama'a cease-fire, something Stewart did at least twice. Like Stewart, Clark spoke to the media on Abdel Rahman's behalf. But

-56-

unlike Stewart, the message Clark disseminated in apparent violation of the SAMs -- that Abdel Rahman did not support the formation of a political party in Egypt -- did not have the same potential for inciting violence. For that reason and those set forth by the district court in its decisions addressing the matter, see Sattar V, 395 F. Supp. 2d at 103 (denying selective prosecution claim), cf. Sattar III, 314 F. Supp. 2d at 311-14 (denying vindictive prosecution claim), and Order, Sept. 1, 2004 (denying selective prosecution claim), Stewart's arguments in this regard are without merit.[23]

B. Vindictive Prosecution

Sattar argues that the district court erred in denying his motion to dismiss the Count-Two conspiracy charge in the superseding indictment because the institution of the charge was driven by prosecutorial vindictiveness. This argument is also without merit.

The government filed the original five-count indictment in April 2002. In it, Sattar, Stewart, Yousry, and another[24]

_____

[23] In rejecting Stewart's selective prosecution claim in part by comparison with Clark's and Jabara's alleged misbehavior, we do not, of course, suggest our approval of Clark's or Jabara's remarkable alleged courses of conduct. But neither of them was indicted or tried for, let alone convicted of, a crime. We are therefore reluctant to comment on their alleged misdeeds at any length. Stewart cites them as evidence of selective prosecution, however, and we therefore note an important difference between Clark and Jabara's alleged actions and Stewart's -- that she, unlike either of them, was willing to issue a public statement regarding Abdel Rahman's changed position on the cease-fire.

[24] In addition to the defendants here, the initial indictment also named Yassir Al-Sirri, a/k/a "Abu Ammar," as a

(continued...)

-57-

were charged with providing, attempting to provide, and conspiring to provide material support and resources to an FTO in violation of 18 U.S.C. § 2339B. Sattar moved to dismiss these charges on the ground that section 2339B was unconstitutionally vague as applied to the allegations in the indictment. By opinion and order dated July 22, 2003, the district court agreed with Sattar. Sattar I, 272 F. Supp. 2d at 358-61. Following that decision, the government filed a superseding indictment adding a new count charging Sattar with conspiring to murder persons in a foreign country in violation of 18 U.S.C. § 956.

Sattar argues that the government's decision to file the superseding indictment and add the charge of violating section 956 "was a retaliatory act . . . motivated by the embarrassment [the government] suffered as a result of the dismissal" of two central counts in the original indictment. Sattar Br. 17. He asserts that an inference of vindictive prosecution is supportable in two ways: First, the addition of Count Two -- which carries a potential sentence of life imprisonment, a longer sentence than that authorized by the dismissed charge pursuant to section 2339B -- "up[ped] the ante" for the consequences of conviction. Sattar III, 314 F. Supp. 2d at 311. Second, the government could have brought the section 956 charge in the original indictment, inasmuch as it was based

---

[24] (...continued)
defendant. The superseding indictment named him as an unindicted co-conspirator, instead.

on information known to the government prior to the filing of the initial indictment, but the government declined to do so.

"[T]he decision as to whether to prosecute generally rests within the broad discretion of the prosecutor, and a prosecutor's pretrial charging decision is presumed legitimate." United States v. Sanders, 211 F.3d 711, 716 (2d Cir.), cert. denied, 531 U.S. 1015 (2000) (citations and internal quotation marks omitted). Nonetheless, "a prosecution brought with vindictive motive, penalizing those who choose to exercise constitutional rights, would be patently unconstitutional." Id. (internal quotation marks omitted). We will dismiss an indictment if actual vindictiveness has been demonstrated, or if, under the circumstances, "there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action." Id. (internal quotation marks omitted).

We review a district court's factual findings on prosecutorial vindictiveness for clear error, and its legal conclusions de novo. United States v. Johnson, 171 F.3d 139, 140 (2d Cir. 1999) (per curiam). We review a district court's decision denying discovery on claims of prosecutorial vindictiveness for abuse of discretion. Sanders, 211 F.3d at 717.

"Th[e] need to avoid the appearance of vindictiveness has taken the form of a presumption of prosecutorial vindictiveness . . . , applied when (but only when) the

circumstances of a case pose a "realistic likelihood" of such vindictiveness. United States v. King, 126 F.3d 394, 397 (2d Cir. 1997) (citations and internal quotation marks omitted). The district court found no reason to presume that the actions at issue, which arose in a pretrial setting, were vindictive. See Sattar III, 314 F. Supp. 2d at 311-12.

"The circumstances must present a realistic likelihood of vindictiveness that would be applicable in all cases, and any such presumption may be overcome by objective evidence justifying the prosecutor's action." Sanders, 211 F.3d at 717 (citations and internal quotation marks omitted). "[T]his court has consistently adhered to the principle that the presumption of prosecutorial vindictiveness does not exist in a pretrial setting." Paradise v. CCI Warden, 136 F.3d 331, 335 (2d Cir.), cert. denied, 525 U.S. 836 (1998) (internal quotation marks omitted); see also Sanders, 211 F.3d at 717 (same). Sattar provides no reason for us to deviate from this general rule here, and no basis upon which we can conclude that the district court's findings in this respect were clearly erroneous.

Sattar's claim of actual, as opposed to presumptive, vindictiveness is also without merit. A finding of actual vindictiveness requires a showing that a "prosecutor's charging decision [is] a 'direct and unjustifiable penalty,' that resulted 'solely from the defendant's exercise of a protected legal right.'" Sanders, 211 F.3d at 716-17 (internal citation omitted). The evidence Sattar offers in this regard is that the

-60-

government possessed the same information when preparing the original and superseding indictments, that the maximum punishment Sattar faced if convicted under the superseding indictment was greater than that he faced if convicted under the original indictment, and that the superseding indictment was the result of the district court's dismissal of the section 2339B material support charges in the original indictment. We have no warrant to conclude that the district court clearly erred in finding that the charging decision was not vindictive, or that the government was attempting to do anything more than hold Sattar criminally responsible for engaging in the underlying acts that form the basis of the indictment. See Paradise, 136 F.3d at 336. Put another way, it does not follow from the facts Sattar recites that the resulting charge was necessarily brought vindictively; for this reason the district court did not err in concluding otherwise.

C. Trial Administration

1. Alleged Pre-Trial Errors

a. Severance

Stewart and Yousry assert that the district court abused its discretion by denying their motions to sever their trial from the trial of Sattar because Sattar was charged with, and convicted of, conspiracy to murder persons in a foreign country -- allegations different from and more serious than those with which Stewart and Yousry were charged. To succeed on this argument, Stewart and Yousry must show that the district court

abused its discretion in this regard and that the resulting prejudice rose to the level of "a miscarriage of justice." See United States v. Yousef, 327 F.3d 56, 150 (2d Cir. 2003). Stewart and Yousry complain primarily that as a result of the district court's denial of their motion for severance, evidence irrelevant to their actions and unfairly prejudicial to their case permeated the trial. They further contend that the volume of limiting instructions given to the jury rendered them effectively useless in attempting to curb any prejudicial effect.

But the district court did not abuse its discretion in this respect. Count Two charged Sattar with conspiring to murder persons in a foreign country. Count Five charged Stewart and Yousry with providing and concealing material support to that conspiracy, and Count Four charged them with conspiring to provide and conceal that support. Most of the evidence against Sattar that Stewart and Yousry assert to have been unduly prejudicial to them -- evidence submitted to establish the existence of the Count-Two conspiracy charge against Sattar -- would have been admissible against Stewart and Yousry even had the trial been severed. See Sattar I, 272 F. Supp. 2d at 380-81. This is so because the Count-Two conspiracy was an element of the crimes charged against Stewart and Yousry in Counts Four and Five, and the government would have been entitled, and expected, to elicit relevant evidence regarding its existence. "[T]he fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible

-62-

against the moving defendant tried separately." United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993), cert. denied, 511 U.S. 1042 (1994).

To the extent that evidence introduced at trial was not admissible against a particular defendant, the district court gave detailed -- if necessarily voluminous -- curative instructions to the jury. Neither Stewart nor Yousry proffer instructions that should have been given, but were not. Nor do they identify improper curative instructions that were given. This is not a case where "the risk that the jury [would] not, or [could] not, follow instructions [was] so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system [could not] be ignored." Bruton v. United States, 391 U.S. 123, 135 (1968). Despite the length of the instructions, we presume, as did the district court, see Sattar V, 395 F. Supp. 2d. at 104, that the jurors followed them, see, e.g., Richardson v. Marsh, 481 U.S. 200, 206 (1987) (noting that it is an "almost invariable assumption of the law that jurors follow their instructions"); United States v. Salameh, 152 F.3d 88, 116 (2d Cir. 1998), cert. denied, 525 U.S. 1112 (1999) ("Juries are presumed to follow their instructions." (internal quotation marks and brackets omitted)). Neither Stewart nor Yousry provide us with a convincing reason to conclude that the district court abused its discretion in this regard.

**b. Empaneling an Anonymous Jury**

By order dated April 29, 2004, the district court granted the government's motion to empanel an anonymous jury, in light of the substantial publicity surrounding the case and the seriousness and nature of the charges in the indictment, especially the charge that the defendants had attempted "to interfere with the ordered procedures of law enforcement and the judicial process." Order, Apr. 29, 2004. As a general rule, a district court may order the empaneling of an anonymous jury upon "(a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991), cert. denied, 505 U.S. 1220 (1992). A defendant's apparent "willingness to tamper with the judicial process" will support the use of an anonymous panel. United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995) (internal quotation marks and ellipses omitted). Where otherwise warranted,

> the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a careful voir dire designed to uncover any bias as to the issues or the defendants and takes care to give the jurors a plausible and non-prejudicial reason for not disclosing their identities.

Id. If "there is evidence to support the district court's finding of reason to believe the jury needs protection," and if

-64-

"the court has taken reasonable precautions to minimize any prejudicial effects on the defendant and to ensure protection of his fundamental rights, the decision to empanel an anonymous jury is reviewed only for abuse of discretion." United States v. Thai, 29 F.3d 785, 801 (2d Cir.), cert. denied, 513 U.S. 977 (1994).

In light of (a) the charges against the defendants, which included a terrorist conspiracy to murder, and Stewart's and Yousry's alleged provision of material support to that conspiracy; (b) the reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety; (c) the fact that the charges against Stewart and Yousry were in significant part about their alleged corruption of the judicial process; (d) the widespread pretrial publicity about the case; and (e) the extensiveness of the voir dire administered to the jury by the court, we conclude that the district court did not abuse its discretion.

**c. Pre-Trial Suppression of Evidence**

i. Suppression of Evidence Obtained Pursuant to FISA. The defendants argue that evidence obtained from electronic surveillance pursuant to FISA should have been suppressed because such surveillance was improperly instituted for the purpose of a criminal investigation, rather than for the gathering of intelligence, and because FISA was unconstitutional as applied in this case.

By Opinion and Order dated September 15, 2003, the district court denied the defendants' motions to suppress the relevant evidence. Sattar II, 2003 WL 22137012, at *22, 2003 U.S. Dist. LEXIS 16164, at *70. At a pretrial hearing held on April 9, 2002, the government informed the district court and the defendants that it had

> conducted a series of court-authorized electronic surveillance over a period of several years authorized under [FISA], consisting of the electronic surveillance of defendant Sattar's home phone, his computer, [and] fax machine, [and] defendant Yousry's telephone. The government also monitored several prison visits, both audio and video, to Sheik Abdel Rahman over the past several years, one of which involved defendant Stewart in May of 2000.

Id. at *2, 2003 U.S. Dist. LEXIS 16164, at *6. A month later, by letter dated May 8, 2002, the government also informed the defendants that "information obtained or derived pursuant to the authority of the FISA was used, and will continue to be used, in connection with the prosecution of [this] case." Id.; see 50 U.S.C. § 1806(c) (providing that where the government intends to disclose information obtained from FISA surveillance, the government "shall, prior to the trial . . . notify the aggrieved person and the court . . . that the Government intends to so disclose or so use such information").

As part of its pretrial obligations under FISA, the government

> made extensive disclosures to the defendants, including over 85,000 audio recordings of voice calls, fax-machine sounds, and

-66-

computer-modem sounds obtained through audio surveillance of telephone numbers used by Sattar and Yousry; the FBI's written summaries . . . of approximately 5,300 voice calls that the FBI deemed to contain foreign intelligence information and therefore did not minimize; approximately 150 draft transcripts of voice calls; and approximately 10,000 pages of e-mails obtained through electronic surveillance of an e-mail account used by Sattar. The Government has also disclosed certain evidence solely to Stewart and Yousry, including audiotapes of 63 telephone conversations between the imprisoned Sheikh Abdel Rahman and his attorneys and Yousry, and audio and video recordings of three prison visits to Sheikh Abdel Rahman by his attorneys and Yousry on February 19, 2000, May 19 and 20, 2000, and July 13 and 14, 2001.

Sattar II, 2003 WL 22137012, at *2, 2003 U.S. Dist. LEXIS 16164, at *7.

In accordance with the procedure set forth in FISA, see 50 U.S.C. § 1806(e), Sattar and Stewart moved to suppress the evidence arising out of the FISA surveillance, and for access to classified information regarding that surveillance. The government argues on appeal, as it did before the district court, that the FISA surveillance at issue was lawfully authorized and conducted. The government moved the district court to order that none of the classified documents or classified information contained therein would need to be disclosed to the defendants. Pursuant to 50 U.S.C. § 1806(f), the government requested that the court conduct an in camera and ex parte review of the materials and proffered an affidavit of then-Attorney General John Ashcroft stating, in relevant part, that "it would harm the

national security of the United States to disclose or have an adversary hearing with respect to materials submitted to the United States Foreign Intelligence Surveillance Court . . . in connection with this matter." Sattar II, 2003 WL 22137012, at *5, 2003 U.S. Dist. LEXIS 16164, at *18.

After reviewing the classified materials, the district court concluded that "all of the requirements of FISA were satisfied" and "each of the FISA surveillances was authorized by a FISA Court order that complied with the statutory requirements for such orders and was supported by the statements and certifications required by the statute." Id. at *6, 2003 U.S. Dist. LEXIS 16164, at *21. The district court also concluded that this was "not a case where disclosure [of the classified FISA materials] was necessary or where a review of all of the materials suggested that due process required disclosure to the defendants." Id. at *6, 2003 U.S. Dist. LEXIS 16164, at *22.

On appeal, Stewart argues that the materials generated pursuant to the FISA surveillance should have been suppressed because the surveillance was instituted for the purposes of a criminal investigation, not for the purpose of intelligence gathering. In addition, Stewart contends that the FISA review process lacks meaningful judicial review, and that due process required that her counsel have access to the FISA applications and warrants.

Stewart's attacks on the constitutionality of the FISA statute are foreclosed by this Court's decision in United States

-68-

v. Duggan, 743 F.2d 59 (2d Cir. 1984), which, despite its age, remains binding precedent in this Circuit. There, we concluded that "the procedures fashioned in FISA [are] a constitutionally adequate balancing of the individual's Fourth Amendment rights against the nation's need to obtain foreign intelligence information." Id. at 73.

Congress created the FISA system in an attempt to accommodate "the legitimate need of Government for intelligence information and the protected rights of our citizens." United States v. U.S. District Court, 407 U.S. 297, 322-23 (1972). As we have explained, "Congress passed FISA to settle what it believed to be the unresolved question of the applicability of the Fourth Amendment warrant requirement to electronic surveillance for foreign intelligence purposes, and to remove any doubt as to the lawfulness of such surveillance." Duggan, 743 F.2d at 73 (internal quotation marks omitted). FISA's primary focus is surveillance for the purpose of gathering foreign intelligence information, which is defined to include "information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against [inter alia] international terrorism." 50 U.S.C. § 1801(e)(1).

FISA established a court (the "FISA Court") comprised of designated district court judges ("FISA Judges"). The FISA Court has jurisdiction over applications for electronic surveillance relating to the gathering of potential foreign

-69-

intelligence information under the procedures set forth in FISA. See id. § 1803. FISA generally permits a federal officer, when authorized by the President of the United States acting through the Attorney General, to obtain from any FISA Judge an order "approving electronic surveillance of a foreign power or an agent of a foreign power for the purpose of obtaining foreign intelligence information." Id. § 1802(b). "[A] group engaged in international terrorism or activities in preparation therefor," is a "foreign power," id. § 1801(a)(4), and an "agent of a foreign power" includes any person who "knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power" or "knowingly aids or abets any person in [such] conduct," id. § 1801(b)(2)(C) & (E).

In order to secure an order authorizing surveillance from a FISA Judge, the officer's application must meet the statutory requirements set forth in 50 U.S.C. § 1804. For example, the application must set forth the identity or description of the target of the surveillance, id. § 1804(a)(2), and a statement of facts and circumstances relied upon to justify the officer's belief that the target is a foreign power or agent of a foreign power and that each facility or location to be subjected to surveillance is being used or is about to be used by the target, id. § 1804(a)(3). Prior to October 26, 2001, such a federal officer was required to certify to the FISA judge that "the purpose" of the FISA surveillance was the interception of

-70-

foreign intelligence information. See id. § 1804(a)(7)(B) (2000). In Duggan, we interpreted this provision to mean that the interception of foreign intelligence information must be the "primary objective" of the surveillance. Duggan, 743 F.2d at 77. The statute was changed in the wake of the events of September 11, 2001, however, to require only that "a significant purpose" of the surveillance be the interception of such information. See 50 U.S.C. § 1804(a)(7)(B) (2003); see also 50 U.S.C. § 1804(a)(6)(B) (2008) (redesignated from (a)(7)).

Only after a FISA Judge has been satisfied that the application meets FISA's requirements will he or she authorize the surveillance. To enter an order approving surveillance, the FISA Judge must find that the application was properly filed and properly authorized by the Attorney General; that associated procedures designed to minimize the acquisition and retention of non-publically available information concerning "United States persons" satisfy FISA's requirements, see id. § 1801(h); that the facts set forth in the application provide probable cause to believe that the target is a foreign power or agent of such a power; and that the locations to be subject to surveillance are being used, or are about to be used, by the target, id. § 1805(a).

When the application is complete and properly certified by an executive branch official, however,

> it is, under FISA, subjected to only minimal
> scrutiny by the courts. Congress deemed it a
> sufficient check in this regard to require

> the FISA Judge (1) to find probable cause to believe that the target of the requested surveillance is an agent of a foreign power; (2) to find that the application is complete and in proper form; and (3) when the target is a United States person, to find that the certifications are not "clearly erroneous."

Duggan, 743 F.2d at 77. Stewart's argument that FISA does not ensure adequate judicial view is therefore foreclosed by Duggan. See id. at 77 & n.6.

Although the purpose of the surveillance must be to obtain foreign intelligence information, "otherwise valid FISA surveillance is not tainted simply because the government can anticipate that the fruits of such surveillance may later be used . . . as evidence in a criminal trial." Id. at 78. To the contrary, the statute specifically contemplates the introduction of FISA surveillance evidence in criminal prosecutions. See 50 U.S.C. § 1806(b). As both Congress and this Court have recognized, "in many cases the concerns of the government with respect to foreign intelligence will overlap those with respect to law enforcement." Duggan, 743 F.2d at 78.

When such FISA information is introduced in the course of a criminal prosecution, and upon review of a suppression motion, the trial court has the opportunity to review the FISA Court's order, issued pursuant to 50 U.S.C. § 1805, in light of the underlying applications for surveillance, filed pursuant to 50 U.S.C. § 1804, in order "to determine whether the surveillance [at issue] was lawfully authorized and conducted." 50 U.S.C. § 1806(f). The district court's review of the FISA Judge's

-72-

decision is, like the FISA Judge's decision itself, deferential. "[A] reviewing court [has] no greater authority to second-guess the executive branch's certifications than has the FISA Judge." Duggan, 743 F.2d at 77.

FISA applications are likely to contain allegedly sensitive information relating to perceived issues of national security. The applications are required to set forth how and why the Executive Branch knows what it knows, which may include references to covert agents and informers. For this reason, "'ex parte, in camera determination is to be the rule.'" Id. at 78 (quoting United States v. Belfield, 692 F.2d 141, 147 (D.C. Cir. 1982)). The district court has the "discretion to disclose portions of [relevant materials], under appropriate protective procedures, [but] only if [it] decides that such disclosure is 'necessary to make an accurate determination of the legality of the surveillance'" or is otherwise required by due process. Id. (quoting 50 U.S.C. § 1806(f)).

Stewart argues on appeal that the "primary purpose" of the FISA wiretapping in this case was to pursue a criminal investigation, not to collect foreign intelligence information. The district court, having reviewed the FISA materials, concluded that "all of the surveillance at issue was conducted with the appropriate purpose," whether with a "primary purpose" or "a significant purpose" to obtain foreign intelligence information. Sattar II, 2003 WL 22137012, at *12-*13, 2003 U.S. Dist. LEXIS 16164, at *40-*42.

Upon our own in camera review of the underlying material and the district court's order filed under seal, we are confident that the district court did not err in so concluding. Since the interceptions meet the "primary purpose" test, we, like the district court, need not and do not address Stewart's argument that FISA's new and less demanding "significant purpose" test is unconstitutional. Cf. In re Sealed Case, 310 F.3d 717, 735 (FISA Ct. Rev. 2002) (rejecting the "primary purpose" test in favor of a "significant purpose" test). Similarly, based on the relevant evidence which, as adduced at trial, is outlined above, the district court did not err in finding there to be "ample probable cause to believe that the targets of the relevant surveillance -- Sattar, Yousry, and Sheikh Abdel Rahman -- were acting as agents of a foreign power" as defined by FISA, i.e., al-Gama'a, "and that each of the facilities at which the surveillance was directed was being used, or was about to be used, by that target." Sattar II, 2003 WL 22137012, at *7, 2003 U.S. Dist. LEXIS 16164, at *24.

Stewart also argues that she was an inappropriate target of the surveillance. As the district court noted, however, Stewart was never designated as a target in any of the applications at issue; her alleged co-conspirators were. "Once the proper preconditions are established with respect to a particular target, there is no requirement in FISA that all those likely to be overheard engaging in foreign intelligence conversations be named." Duggan, 743 F.2d at 79. Because

-74-

Stewart's co-conspirators were targeted pursuant to proper procedures, the Fourth Amendment did not require that Stewart also be identified or described as a target in order for her intercepted conversations to be used in a criminal prosecution. Id. at 79 n.7.

Stewart further argues that the district court erred in declining to disclose FISA materials to her counsel. The district court may order disclosure of FISA materials "under appropriate security procedures and protective orders," but "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f). When the district court "determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure." Id. § 1806(g).

As we have noted, in these circumstances disclosure is the exception and "'ex parte, in camera determination is [] the rule.'" Duggan, 743 F.2d at 78. The need to disclose materials to defense counsel may arise if the judge determines there to be "potential irregularities such as possible misrepresentation of fact, vague identification of the persons to be surveilled or surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order." Id. (internal quotation marks and brackets omitted). But Stewart does not point to any case where any court has

ordered disclosure in a situation similar to hers. Upon our own review of the materials, we conclude that there was no error in the district court's determination that disclosure was unnecessary for an accurate determination of the legality of the surveillance at issue or to satisfy the requirements of due process.

ii. Disclosure Regarding NSA Surveillance. On June 16, 2006, Stewart moved to compel disclosure as to whether she or any of her co-defendants were subject to surveillance by the National Security Agency ("NSA"). The government filed, ex parte, a classified response to be reviewed in camera. At a hearing on September 25, 2006, the government insisted that its classified submission was properly filed under section 4 of the Classified Information Procedures Act ("CIPA"), Pub. L. No. 96-456, 94 Stat. 2025 (1980) (codified at 18 U.S.C. app. 3). The government also argued that none of the defense counsel was properly cleared for access to the information and that, "without going into the details of the classification level of our submission, I don't think any defense counsel would ever have a need to know the details of the terrorist surveillance program, especially in this case." H'g Tr. 13-14, Sept. 25, 2006. Following the hearing and in response to subsequent orders from the district court, the government filed supplemental ex parte confidential responses dated October 6, 2006, October 12, 2006, and October 13, 2006 for in camera review. After additional materials were submitted by the government, the district court

granted, in part, the motion for disclosure, ordering the government to make specified disclosures,[25] but otherwise denied the motion. Order, Oct. 17, 2006, at 2. In that public order, the district court noted that it had filed an "ex parte Order under seal containing classified information which explains in detail the reasons for the Court's decision," and found that there was a

> compelling reason for filing the additional Order ex parte and under seal because it contains classified information that cannot reasonably be segregated from the other material in the Order, and that such a filing is consistent with the Classified Procedures Act and the rights of the defendants. See [United States] v. Yunis, 867 F.2d 617, 622-25 (D.C. Cir. 1989).

Id.

Through CIPA, Congress established procedures for handling classified information in criminal cases. "Classified information" is defined to include "information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security." 18 U.S.C. app. 3 § 1(a). CIPA is "meant to protect and restrict the discovery of classified information in a way

---

[25] The ordered disclosures do not appear to be in the record on appeal. According to Stewart, by letter dated October 13, 2006, the government informed her that certain telephone conversations between a third party and Sattar were intercepted pursuant to a court-authorized Title III warrant in 1994, that these conversations, or the "fruits" of those conversations, were not used as evidence in the present case, and that there was no Brady material. Stewart Br. 211.

that does not impair the defendant's right to a fair trial."

United States v. Aref, 533 F.3d 72, 78 (2d Cir. 2008)

(alterations and internal quotation marks omitted), cert.

denied., 129 S. Ct. 1582 (2009).

Section 4 of CIPA establishes procedures for discovery

of classified information.  It provides:

> The court, upon a sufficient showing, may
> authorize the United States to delete
> specified items of classified information
> from documents to be made available to the
> defendant through discovery under the Federal
> Rules of Criminal Procedure, to substitute a
> summary of the information for such
> classified documents, or to substitute a
> statement admitting relevant facts that the
> classified information would tend to prove.
> The court may permit the United States to
> make a request for such authorization in the
> form of a written statement to be inspected
> by the court alone.  If the court enters an
> order granting relief following such an ex
> parte showing, the entire text of the
> statement of the United States shall be
> sealed and preserved in the records of the
> court to be made available to the appellate
> court in the event of an appeal.

18 U.S.C. app. 3 § 4.

This section "clarifies district courts' power under

Federal Rule of Criminal Procedure 16(d)(1) to issue protective

orders denying or restricting discovery for good cause," which

includes "information vital to the national security." Aref, 533

F.3d at 78 (internal quotation marks omitted).  CIPA does not

itself create a government privilege against the disclosure of

classified information; it presupposes one. Id.  The "most

likely source for the protection of classified information lies

in the common-law privilege against disclosure of state secrets." Id.

We have recently held that the state-secrets privilege applies to criminal cases, but that "it must give way under some circumstances to a criminal defendant's right to present a meaningful defense." Id. at 79. To determine such circumstances, we have employed the standard first articulated in Roviaro v. United States, 353 U.S. 53 (1957), in the context of the so-called informer's privilege in criminal prosecutions, see Aref, 533 F.3d at 79-80.[26]

First, the district court must determine whether the material in dispute is discoverable, and if so, whether the state-secrets privilege applies. Id. at 80. It applies if "(1) there is 'a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged,' and (2) the privilege is 'lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.'" Id. at 80 (quoting United States v. Reynolds, 345 U.S. 1, 8, 10 (1953)). If the information is discoverable but the privilege applies, then the district court must determine "whether the

[26] The privilege is "in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law," and it "recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." Roviaro, 353 U.S. at 59.

information is helpful or material to the defense, i.e., useful 'to counter the government's case or to bolster a defense.'" Id. (citation omitted). In order to be helpful or material, the evidence "need not rise to the level that would trigger the Government's obligation under Brady v. Maryland, 373 U.S. 83 (1963), to disclose exculpatory information." Id.

We review the district court's decision to issue a protective order under CIPA section 4 and Federal Rule of Criminal Procedure 16(d)(1) for abuse of discretion. Aref, 522 F.3d at 80. Similarly, we review for abuse of discretion the district court's finding whether evidence is "helpful" or "material to the defense." Id.

At the time of the district court's decision and order, our decision in Aref had not yet issued. As noted in the district court's public order denying the motion to compel, however, the district court relied on an opinion by a sister circuit embracing a test similar to that embraced by the Aref panel. Order, Oct. 17, 2006, at 2 (citing United States v. Yunis, 867 F.2d 617, 622-25 (D.C. Cir. 1989)).[27]

---

[27] Under the D.C. Circuit's decision in Yunis, first, the district court must determine, in camera and ex parte, whether the information at issue is relevant. Yunis, 867 F.2d at 623. If irrelevant, the inquiry ends. If relevant, however, the district court must determine whether "the assertion of privilege by the government is at least a colorable one." Id. If the claim is colorable, the court must then determine whether the information is "at least 'helpful to the defense.'" Id. (quoting Rovario, 353 U.S. at 60-61). "Where the government asserts a privilege, a trial court abuses its discretion if it orders disclosure 'absent a showing of materiality.'" Id. at 622. The court in Yunis left open the question of whether otherwise
(continued...)

Here, the government has invoked the state-secrets privilege. It asserts that the details of the NSA's operations, including the surveillance vel non of any particular individual or group, implicate national security and are among "the nation's most guarded secrets." Gov't Br. 389-90; id. (quoting Halkins v. Helms, 598 F.2d 1, 7 (D.C. Cir. 1978)). Where evidence is intercepted, the sensitive nature of the information might lie "not so much in the contents of the [information], as in the time, place, and nature of the government's ability to intercept the [information] at all." Yunis, 867 F.2d at 623.[28]

In light of these general concerns and the principles set forth in Yunis and Aref, and based on our own review of the underlying materials and the district court's sealed order, we are satisfied that the district court did not abuse its discretion or otherwise err in denying Stewart's motion to compel disclosure.

We note, as we did in Aref, which postdated the district court's order here, the absence of a formal public "claim of privilege[] lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." Reynolds, 345 U.S. at 7-8; see Aref, 533 F.3d at 80. As in Aref, we conclude that in the pre-Aref context,

----

[27](...continued)
privileged information is protected from disclosure where such information has "more than theoretical relevance" and is "genuinely helpful to [the] defense." Id. at 625.

[28] We make neither reference to nor conclusions regarding the material at issue in the instant case.

such a flaw "is not necessarily fatal," and that "[i]t would 'be of little or no benefit' for us to remand for the purpose of having the department head agree that disclosure of the classified information would pose a risk to national security here." Aref, 533 F.3d at 80. But the absence of the formal claim is not a trivial matter. We do not demean it. We expect that, in light of the holding in Aref, we will not need to address this issue in appeals from future prosecutions in which the state-secrets privilege is invoked as the government is now well-informed of this obligation. Cf. id. ("Based on our holding today . . . we trust that this issue will not arise in future CIPA cases.").

We reject Stewart's claim that the district court erred in reviewing materials ex parte and in camera. As we noted in Aref, "[b]oth CIPA section 4 and Rule 16(d)(1) authorize ex parte submissions. . . . When the 'government is seeking to withhold classified information from the defendant, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules.'" Aref, 533 F.3d at 81.

The CIPA procedures followed by the district court place all parties involved (except perhaps the government) at a substantial disadvantage: defendants are hampered in contesting the assertions that are being made to the court by the government; district courts and courts of appeals are deprived of the opportunity for an adversarial proceeding upon which they are typically dependent in attempting fairly and properly to resolve

-82-

disputes; and the public, as well as the litigants, are deprived of the assurances that come with public scrutiny of the work of the courts.  The procedures are also, of course, subject to abuse by the executive.  But a method for protection of classified material is necessary, and these procedures have been established by Congress and held to be constitutional.  We, as did the district court, therefore accept them as a necessary, if imperfect, accommodation of the varied interests implicated.

2.  Alleged Trial Errors.  Both Sattar and Yousry challenge various evidentiary rulings made by the district court.  Sattar argues that the court abused its discretion by admitting a book by Taha and a videotape of Taha, Osama Bin Laden, and other al-Gama'a members encouraging violence, and by excluding news footage purporting to depict Israeli violence against Palestinian demonstrators.  In addition, Yousry challenges the exclusion of several statements he made to FBI agents.

We review a district court's evidentiary rulings for abuse of discretion.  See United States v. Kelley, 551 F.3d 171, 174 (2d Cir. 2009) (per curiam); United States v. Anglin, 169 F.3d 154, 162 (2d Cir. 1999).  Here, the district court did not abuse its discretion with respect to any such rulings.

We are guided by certain basic principles established by the Federal Rules of Evidence -- that, as a general rule, "[a]ll relevant evidence is admissible," Fed. R. Evid. 402, but that even relevant evidence, although admissible, may be excluded by the district court "if its probative value is substantially

-83-

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Fed. R. Evid. 403. "A district court is obviously in the best position to do the balancing mandated by Rule 403." Salameh, 152 F.3d at 110. "We will second-guess a district court only if there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally." Id. (internal quotation marks omitted); accord United States v. Szur, 289 F.3d 200, 217 (2d Cir. 2002).

Taha's book was relevant and admissible as evidence of the existence of the Count-Two conspiracy to murder persons in a foreign country. The Bin Laden video was similarly admissible, and relevant to Taha's intent to murder or kidnap. The district court did not err in failing to find that the evidence was unduly prejudicial.

It was also within the district court's discretion to exclude both the news video, which it found to be of minimal relevance yet highly prejudicial and confusing, and Yousry's statements to the FBI, which it found to be essentially duplicative of Yousry's own testimony.

The district court made a "conscientious assessment of whether unfair prejudice substantially outweigh[ed] probative value," Salameh, 152 F.3d at 110 (internal quotation marks omitted), and did not otherwise abuse its discretion in making

-84-

this assessment. We therefore will not disturb its judgments on these grounds.

3. Allegations of Juror Misconduct. It was brought to the district court's attention after the jury rendered its verdict that a juror, referred to by the parties as "Juror # 39," had come forward with allegations concerning improprieties during the jury's deliberations. The defendants requested that the district court "'follow up' and conduct an inquiry" into these allegations. Sattar IV, 395 F. Supp. 2d at 74-78. By written opinion, the district court denied the request. Id. Sattar argues on appeal that the district court's actions were an abuse of its discretion, insisting that the court should have met, post-verdict, with Juror # 39 to conduct an inquiry. We disagree.

The district court properly construed the request as one for an evidentiary hearing, and concluded that there was no "clear, strong, substantial and incontrovertible evidence . . . that a specific, non-speculative impropriety has occurred," United States v. Ianiello, 866 F.2d 540, 543 (2d Cir. 1989), especially in light of the fact that the juror had "several opportunities to communicate directly with the court" regarding any potential improprieties, but failed to do so, Jacobson v. Henderson, 765 F.2d 12, 15 (2d Cir. 1985). As the district court explained, "the fact that Juror # 39 had direct access to the Court and did not complain of any problems supports the conclusion that these allegations are post hoc efforts caused by

-85-

dissatisfaction that do not require further post-verdict inquiry." Sattar IV, 395 F. Supp. 2d at 77. We agree.

4. Cumulative Error Doctrine. Yousry also argues on appeal that we should reverse under the cumulative error doctrine. But the defendants have not identified any error in the district court's rulings, "and the accumulation of non-errors does not warrant a new trial." United States v. Lumpkin, 192 F.3d 280, 290 (2d Cir. 1999).

VII. Propriety of the Sentences

The government appeals from the sentences imposed on the defendants, asserting that they are unreasonable and unduly lenient. The government's principal brief was submitted prior to the Supreme Court's decisions in Gall v. United States, 128 S. Ct. 586 (2007), and Kimbrough v. United States, 128 S. Ct. 558 (2007), which, as recognized by this Circuit in its en banc decision in United States v. Cavera, 550 F.3d 180 (2d Cir. 2008), have significantly altered the landscape of sentencing jurisprudence. The Supreme Court issued both Gall and Kimbrough before the government filed its reply brief and oral argument took place, but not before this Circuit had spoken in Cavera.[29]

---

[29] As noted in this case's caption, this appeal was argued on January 29, 2008. On December 12, 2007, approximately one month prior thereto, a majority of the active judges of this Court voted to vacate the initial three-judge panel's decision in Cavera, see 505 F.3d 216 (2d Cir. 2007), and to rehear the case en banc. As Cavera preceded this case and would address many issues critical to the resolution of this appeal, and as noted in footnote [*], we deemed it prudent to stay our resolution of this case pending this Court's en banc resolution of Cavera, despite
(continued...)

## A. Standard of Review

The principles that guide our review of the district court's sentences are, "at first glance, beguilingly simple." Cavera, 550 F.3d at 188. Generally, we review for abuse of discretion. Id. at 189. That "deferential" scrutiny "encompasses two components: procedural review and substantive review." Id.

1. Procedural Review. We first determine whether the sentence was procedurally reasonable. See id. Ordinarily, the district court must first correctly calculate the appropriate range set forth by the United States Sentencing Guidelines. Id. at 190. Then it "must form its own view of the nature and circumstances of the offense and the history and characteristics of the defendant," id. at 188, as mandated and guided by 18 U.S.C. § 3553(a)(1).[30] In this context, "we review factual

---

[29] (...continued)
the unfortunate delay involved. The en banc opinion issued on December 4, 2008.

[30] Section 3553(a) provides, in pertinent part:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> (A) to reflect the seriousness of
> (continued...)

findings for clear error and the court's interpretation of the Sentencing Guidelines de novo." United States v. Jeffers, 329 F.3d 94, 97 (2d Cir. 2003); see also Gall, 128 S.Ct. at 597 (stating that a court procedurally errs when it "select[s] a sentence based on clearly erroneous facts"). In imposing the chosen sentence, the court must "adequately . . . explain [that]

---

[30](...continued)
the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [and recommended by the Sentencing Guidelines];

(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . ;
. . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

sentence," including "any deviation from the Guidelines range." *Cavera*, 550 F.3d at 190.

District courts are "generally free to impose sentences outside the recommended [Guidelines] range" but "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 189 (citations and internal quotation marks omitted).

Thus, a district court "must satisfy us that it has 'considered the parties' arguments' and that it has a 'reasoned basis for exercising [its] own legal decisionmaking authority.'" *Id.* at 193 (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)) (brackets in *Cavera*). When a court commits "significant procedural error," we may "remand to the district court so that it can either explain what it was trying to do, or correct its mistake and exercise its discretion anew . . . rather than . . . proceed[ing] to review the sentence for substantive reasonableness." *Id.* at 190 (citations and internal quotation marks omitted).

2. *Substantive Review.* Once we are satisfied that a sentence was procedurally proper, we then review the district court's determination for substantive reasonableness, "tak[ing] into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Id.* at 190. Our role is no more than to "patrol the boundaries of reasonableness." *Id.* at 191. Indeed, we "must defer heavily

to the expertise of district judges," id. at 193, and will "set aside a district court's substantive determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions," id. at 189 (internal quotation marks and emphasis omitted).

We do not "presume that a non-Guidelines sentence is unreasonable," nor do we "require 'extraordinary' circumstances to justify a deviation from the Guidelines range." Id. at 190 (quoting Gall, 128 S. Ct. at 595). In evaluating a sentence's substantive reasonableness, "we may take the degree of variance into account and consider the extent of a deviation from the Guidelines.'" Id. We may "consider whether the factor, as explained by the district court, can bear the weight assigned it under the totality of circumstances in the case." Id. at 191. "[A] major departure should be supported by a more significant justification than a minor one." Gall, 128 S. Ct. at 597. "But we must not employ a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." Cavera, 550 F.3d at 190 (internal quotation marks omitted).

Some decisions by the district court may be entitled to more deference than others. For example, as both the Supreme Court and we have noted, variations from the Guidelines "may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply." Kimbrough, 128 S. Ct at

574-75 (internal quotation marks omitted); accord Cavera, 550 F.3d at 192. When, on the other hand, the variation is based on a general disagreement with the Guidelines' applicability in a "mine-run case," then "closer review may be in order." Kimbrough, 128 S. Ct at 575.

But such "closer review" is less appropriate where the Guideline in question is not based on empirical data and national history. The issuance of that sort of Guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role." Id. "[A] categorical disagreement with and variance from [such a] Guideline[]," or, at least from the crack cocaine Guidelines, "is not suspect." Spears v. United States, 129 S. Ct. 840, 843 (2009) (per curiam).

The Supreme Court has yet to address fully the contours of the "respect" that should be afforded to "an 'inside the heartland' departure," id., from Guidelines created by the Commission pursuant to its characteristic institutional role. Such a departure would "necessarily [be] based on a policy disagreement with the Guidelines" and would "necessarily disagree[] [with the Guidelines] on a 'categorical basis.'" Id. We have recognized, however, that "some Guidelines enhancements and reductions apply without modulation to a wide range of conduct." Cavera, 550 F.3d at 192. Thus, "a district court may find that even after giving weight to the [factors that drive the enhancement or reduction] there is [still] a wide variety of culpability amongst defendants and, as a result, impose different

sentences based on the factors identified in § 3553(a)." Id. Of course, irrespective of whether the conduct is found to be inside or outside the "heartland," the "district court must explain its reasons for its chosen sentence." Id.[31]

Affording greater discretion to the district courts may result in greater apparent disparities in sentences. But "the Supreme Court has made clear its view that disparities in sentences imposed by different district judges are more likely to reflect justified differences than are those arising from differences of opinion among appellate panels." Cavera, 550 F.3d at 193.

B. Application to This Case

The government's principal claim of error on appeal is that the district court abused its discretion by imposing unreasonably lenient sentences. The government also argues that the district court erred as a matter of law by failing to apply the Guidelines terrorism adjustment, U.S.S.G. § 3A1.4, to Yousry's offense level.

1. Yousry's Sentence. The district court initially calculated Yousry's Guidelines range based on a total offense level of 28 and a criminal history category of I, for a range of 78 to 97 months. According to the government, Yousry's

_____

[31] As is discussed in more detail below, the district court found that the terrorism enhancement did not apply to Yousry's conduct, and that his conduct fell outside the heartland of material support for terrorist activity crimes. The district court found Sattar's and Stewart's conduct to merit the terrorism enhancement, but, at least for Stewart, found the case to be an unusual one for the enhancement.

-92-

applicable Guidelines range should have been enhanced in accordance with the terrorism enhancement provided by the Guidelines, U.S.S.G. § 3A1.4. The district court concluded to the contrary that the terrorism enhancement did not apply to Yousry because he did not act with the requisite state of mind. Based on the district court's findings, we agree with its conclusion.

Upon consideration of the various factors set forth in section 3553(a), the district court concluded that a significant downward variance[32] was appropriate, and ultimately sentenced Yousry to a non-Guidelines sentence of 20 months of imprisonment, followed by 2 years of supervised release.

**a. Guidelines Calculations**

We review the district court's interpretation of the Guidelines de novo, and the district court's findings of fact for clear error. United States v. Legros, 529 F.3d 470, 474 (2d Cir. 2008). We interpret the Guidelines as though they were a statute, giving the words used their common meaning. United

---

[32] We distinguish between "a 'variance' from the advisory Guidelines" and "a 'departure' within the Guidelines." Irizarry v. United States, 128 S.Ct. 2198, 2204 (2008) (Breyer, J., dissenting) (emphasis in original). As the Supreme Court noted in Irizarry, "'[d]eparture' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." Id. at 2202. In contrast, a variance is a modification of the applicable Guidelines sentence "that a District Court may find justified under the sentencing factors set forth in 18 U.S.C. [§ 3553(a)]." Id. at 2203.

States v. Kirvan, 86 F.3d 309, 311 (2d Cir. 1996). Section 3A1.4, the so-called "terrorism enhancement," provides:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
>
> (b) In each such case, the defendant's criminal history . . . shall be Category VI.

U.S.S.G. § 3A1.4. The application notes incorporate 18 U.S.C. § 2332b(g)(5) by reference. See id. cmt. n.1. That section defines a "Federal crime of terrorism" as:

> an offense that--
>
> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
>
> (B) is a violation of [any one of many statutes, including 18 U.S.C. § 2339A, relating to the provision of material support to terrorists, and 18 U.S.C. § 956(a)(1), relating to conspiracies to murder persons abroad].

18 U.S.C. § 2332b(g)(5). The conventional meaning of "calculated" is "devised with forethought." II Oxford English Dictionary 777 (2d ed. 1999). Therefore, if a defendant's purpose in committing an offense is to "influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," the first requirement of section 2332b(g)(5)(A) is satisfied. If, however, there is no evidence that the defendant "sought to influence or affect the conduct of the government," the crime is not a federal crime of

terrorism.  See United States v. Leahy, 169 F.3d 433, 446 (7th Cir. 1999).

The enhancement is not limited, however, to offenses that are themselves federal crimes of terrorism.  By including the "intended to promote" language, the drafters of the Guideline "unambiguously cast a broader net."  United States v. Mandhai, 375 F.3d 1243, 1247 (11th Cir. 2004), cert. denied, 549 U.S. 923 (2006).  The criminal conduct at issue need not itself meet the statutory definition of a federal crime of terrorism if "a goal or purpose [of the defendant's act] was to bring or help bring into being a crime listed in 18 U.S.C. 2332b(g)(5)(B)."  Id. at 1248; accord United States v. Arnaout, 431 F.3d 994, 1001-02 (7th Cir. 2005).

The district court declined to apply the terrorism enhancement to Yousry's sentence.  The court explained:

> This is a motivational requirement and focuses on the defendant's purpose.  The government has conceded the lack of motivation or purpose and has failed to show that the defendant's offenses were calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government action.

Sent'g Tr. 143-44; see 18 U.S.C. § 2332b(g)(5)(A) (defining "Federal crime of terrorism").  The government does not challenge this finding, which we conclude to be consistent with the record and not clearly erroneous.

Nonetheless, the government argues that the enhancement is appropriate despite the fact that Yousry has committed neither a federal crime of terrorism nor any other crime with the intent

-95-

to promote such a crime. According to the government, the enhancement applies because Yousry's offense was "a felony that involved . . . a federal crime of terrorism." U.S.S.G. § 3A1.4 (emphasis added). But under the "involved" prong of section 3A1.4, the enhancement would be applicable to Yousry only if he himself had committed a federal crime of terrorism. See Arnaout, 431 F.3d at 1001 ("The ordinary and plain meaning of 'involved' means 'to include.'"); United States v. Graham, 275 F.3d 490, 516 (6th Cir. 2001), cert. denied, 535 U.S. 1026 (2002) ("[W]e believe that in the context at hand, the word 'involved' signifies that a defendant's offense included a federal crime of terrorism; in other words, that a defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)."). And, as the Fourth Circuit has recognized, commission of a federal crime of terrorism, which would trigger the "involved" prong of the enhancement, incorporates "a specific intent requirement, namely, that the underlying felony was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.' 18 U.S.C. § 2332b(g)(5)." United States v. Chandia, 514 F.3d 365, 376 (4th Cir. 2008). So the problem for the government remains: there is no evidence that Yousry himself sought to influence or affect the conduct of a government. The enhancement therefore does not apply under the "involved" prong. See Leahy, 169 F.3d at 446.

The government maintains that any motivational requirement imposed by the terrorism enhancement can be imputed to Yousry from his co-conspirators' relevant conduct under section 1B1.3(a) of the Guidelines. It provides, in relevant part:

> [A]djustments in Chapter Three [including the terrorism enhancement] shall be determined on the basis of the following:
>
> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . .

U.S.S.G. § 1B1.3(a). The government asserts that it was reasonably foreseeable to Yousry that his co-conspirators were acting in a manner "calculated to influence or affect the conduct of government," so that the requirement of section 2332b(g)(5)(A) is satisfied as to him.

But sections 1B1.3(a)(1)(A) and (B) apply to "acts and omissions," while, as noted above, section 2332b(g)(5)(A) describes a motivational requirement, a "specific intent." Chandia, 514 F.3d at 376. We cannot conflate Yousry's acts with his co-defendants' mental states. As one member of this Court has pointed out, "We have never regarded mens rea as an 'act' of

the defendant for purposes of the relevant conduct guideline, nor should we." United States v. McHugh, 122 F.3d 153, 158 (2d Cir. 1997) (Newman, J., concurring). "Section 1B1.3(a)(1)(A) permits selection of an enhanced guideline for 'acts' committed by the defendant. . . . The natural meaning of 'act' connotes conduct, and the meaning of the guideline should not be strained to include state of mind." Id. Here, too, the terrorism enhancement's motivational requirement, as incorporated by reference to section 2332b(g)(5)(A), is not an "act" or "omission" under section 1B1.3(a)(1)(B). The enhancement is therefore not applicable.

We have examined the other arguments made by the government in support of its expansive reading of the "involved" prong of the terrorism enhancement and we find them to be similarly without merit.

**b. Section 3553(a) Factors**

We conclude, then, that the district court properly calculated Yousry's Guidelines range to be 78 to 97 months. We must therefore determine in light of that range and the totality of the circumstances whether Yousry's sentence of 20 months of imprisonment, imposed following the district court's section 3553(a) inquiry, was substantively unreasonable.

We need not outline again the nature of the crimes of which Yousry was convicted. We focus instead on the reasons given by the district court in support of its downward variance.

First, the court found that Yousry's conduct was "unusual and f[e]ll outside the heartland of material support for terrorist activity." Sent'g Tr. 150. "[A] district court's decision to vary from the Guidelines 'may attract greatest respect when the sentencing judge finds a particular case outside the "heartland" to which the Commission intends individual Guidelines to apply.'" Cavera, 550 F.3d at 192 (quoting Kimbrough, 128 S. Ct. at 574-75). We perceive no basis for concluding that the district court erred in deciding that to be the case with respect to Yousry, particularly because he was acting as a translator, not a lawyer or other professional.

Second, the district court found that "no actual harm to victims occurred" although the court was "well aware that such harm is not required and that if such harm occurred the guideline range would be higher." Sent'g Tr. 150. We conclude that it was not unreasonable for the district judge to decide that the fact that no injury occurred in the case mitigated the gravity of Yousry's offense.[33] The criminal law often punishes the

---

[33] At least in cases like Yousry's where the terrorism enhancement is found not to apply, as a procedural matter, we conclude that a district court may rely on the fact that no harm resulted from the criminal act at issue. The weight that such a factor can bear in any particular instance, however, is an analytically separate, and substantive, question. We conclude that the district court did not procedurally err by considering the absence of harm as one factor relevant to the proper sentence of Yousry. We also conclude that both Sattar's and Yousry's sentences are substantively reasonable -- i.e., that the factors identified by the district court can bear the weight assigned to them. Because we vacate Stewart's sentence as procedurally unreasonable, however, we do not address whether the factors identified by the district court, including the apparent lack of

(continued...)

substantive commission of a crime more severely than an attempt to commit the same crime, even when that which separates an attempt from the substantive commission of an offense is not culpability but fortuity. Fortuitous events are not categorically irrelevant to the determination of a just punishment nor is their consideration necessarily inappropriate. As the Supreme Court has recently noted, although "[i]t is unusual to impose criminal punishment for the consequences of purely accidental conduct[,] it is not unusual to punish individuals for the unintended consequences of their unlawful acts." See, e.g., Dean v. United States, 129 S. Ct. 1849, 1857-58 (2009); id. at 1852 (concluding that a defendant who carried a firearm during and in relation to a bank robbery in violation of 18 U.S.C. § 924(c)(1)(A) is subject to a 10 year mandatory minimum pursuant to 18 U.S.C. § 924(c)(1)(A)(iii) because his "firearm [was] discharged" in the course of the robbery, even though "the gun [went] off accidentally," was not pointed at anyone when it discharged, and nobody was hurt).

Third, the court noted that although Yousry's offenses were "plainly serious," his "role in the offenses was subservient to the others involved" in the conspiracy. Sent'g Tr. 150. The Guidelines were "intended to eliminate national disparity," but

---

[33] (...continued)
substantial harm caused by her criminality, can bear the weight assigned them. We note, however, our general view that a district court should be cautious in determining the significance of the fact that no harm may have occurred where a defendant intended such harm.

"[w]e do not, as a general matter, object to district courts' consideration of similarities and differences among co-defendants when imposing a sentence." United States v. Wills, 476 F.3d 103, 109, 110 (2d Cir. 2007) (emphasis omitted), abrogated on other grounds by Kimbrough, 128 S.Ct. at 574-75, as recognized in Cavera, 550 F.3d at 191; accord United States v. Williams, 524 F.3d 209, 216 (2d Cir. 2008). We also defer to the district court's conclusion that Yousry's conduct was less culpable than that of his co-conspirators. On this basis, we conclude that the district court did not err by giving weight to this factor.

Fourth, the district court found that Yousry "did not engage in the offenses for profit and . . . did not support or believe in the use of violence to achieve what he wanted." Sent'g Tr. 150. These facts mitigate the gravity of the conduct at issue. They also affect consideration of the "history and characteristics of the defendant" and the need to "protect the public from further crimes of the defendant" and to "afford adequate deterrence." 18 U.S.C. § 3553(a). The court concluded that a substantial downward variance was thus justified on the grounds that a lesser degree of punishment than otherwise called for would be sufficient for purposes of deterrence and the protection of the public. As the Gall Court noted, a district court is well-situated to make determinations about the "character of the defendant" and whether, given such a character, the defendant is more or less likely "to return to criminal

-101-

behavior" or constitute "a danger to society." Gall, 128 S. Ct. at 600-01.

The district court did not err in finding that Yousry was not motivated by potential profit and did not believe in the use of violence. Nor did it err in considering these factors while fashioning a non-Guidelines sentence for him. In evaluating culpability, we cannot discount the relevance of the defendant's motivations -- i.e., whether mercenary, see, e.g., 18 U.S.C. § 1958 (murder for hire), or born from a commitment to the use of violence. The district court acted well within its discretion in deciding that Yousry was both less dangerous and more easily deterred than had he been acting on a for-hire basis or committed to the use of violence for political ends.

Fifth, the district court found that Yousry's conviction made it "doubtful that the defendant could pursue" his career as an academic or translator, and therefore that the need for further deterrence and protection of the public is lessened because the conviction itself "already visits substantial punishment on the defendant." Sent'g Tr. 151. The district court is specifically required by section 3553(a) to consider the "just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). It is difficult to see how a court can properly calibrate a "just punishment" if it does not consider the collateral effects of a particular sentence. Upon careful review of the record and the reasons given by the court, we are convinced that the court did so appropriately.

Sixth, the district court found that Yousry provided "extensive . . . cooperation" to the government following the terrorist attacks of September 11, 2001. Sent'g Tr. 151. The court concluded that this cooperation "demonstrates a willingness to help law enforcement and reduces the need for rehabilitation and deterrence." Id. We defer to the district court's evaluation of the extent of Yousry's cooperation. And of course, use of a defendant's cooperation to justify significant variances or departures from the otherwise applicable Guidelines calculations is commonplace. The government argues that Yousry's assistance was not as extensive as the district court found it to be, but we have been given no cause to question the court's relevant findings of fact or the manner in which it accounted for them in sentencing.

Seventh, the court found that Yousry "will not be in a situation to commit the offenses of conviction again," because "it is unlikely that he will ever be able to serve as an interpreter in an official capacity." Id. We defer to this finding, too. It is not error for a district court to evaluate, based on the defendant's individual circumstances, the extent of punishment "necessary to deter [him] from engaging in future criminal conduct or to protect the public from his future criminal acts." Gall, 128 S. Ct. at 602; see 18 U.S.C. § 3553(a)(2)(B) & (C).

The district court did not, of course, assign precise weights to particular factors. Doing so would presuppose "the

-103-

existence of some ascertainable method of assigning percentages to various justifications," and would constitute a species of "mathematical approach" which has been expressly disavowed by the Supreme Court as "a classic example of attempting to measure an inventory of apples by counting oranges." Gall, 128 S. Ct. at 596.

In evaluating the ultimate substantive reasonableness of Yousry's sentence, we must determine, under the totality of the circumstances, whether these various factors can "bear the weight" assigned to them by the district court. We are satisfied that they can. We are equally satisfied that the district court "consider[ed] the extent of the deviation and ensure[d] that the justification [was] sufficiently compelling to support the degree of variance." Id. at 597.

In conducting our review, we are further satisfied that the district court did not ignore the Guidelines or "treat them merely as a body of casual advice." Cavera, 550 F.3d at 189 (internal quotation marks omitted). Even were we inclined to think that the district court did not appreciate the weight of the Guidelines -- which, as we say, we are not -- in light of all of the foregoing, including the court's long-term and intimate involvement with these proceedings, any such conclusion would be purely a matter of surmise on our part. See Rita, 551 U.S. at 357-58 (noting that the sentencing judge had "greater familiarity with[] the individual case and the individual defendant before him than the Commission or the appeals court"); see also Gall,

-104-

128 S. Ct. at 597. The district court did not abuse its discretion in sentencing Yousry.

2. Sattar's Sentence. The district court calculated Sattar's total offense level to be 43 and his criminal history category to be VI, for a Guidelines "range" of life imprisonment. But in conducting its own independent review, as guided by section 3553(a), the district court concluded that such a sentence would be "seriously disproportionate" to the offense. Sent'g Tr. 35. The court imposed a sentence of 24 years (288 months) of imprisonment, to be followed by five years of supervised release.

**a. Guidelines Calculation**

The district court calculated Sattar's sentence, as it did Yousry's, under the November 2000 Guidelines. The court ultimately adopted the recommendations of the Probation Department in making its Guidelines calculation, except insofar as the district court added enhancements based on Sattar's obstruction of justice.

i. Enhancements. Sattar's Guidelines "range" of life imprisonment was arrived at based in part on the sentencing court's determination that the terrorism enhancement applied to both Sattar's Count-Two and Count-One conduct. The district court also enhanced Sattar's sentence on the ground that he obstructed justice. See U.S.S.G. § 3C1.1.

ii. Departures. Sattar moved for a downward departure based on the conditions of his confinement. The

-105-

district court recognized that it was able to depart under the Guidelines for severe conditions of detention, but "because thus far th[ose conditions] reflect only strict security measures rather than an abuse of those measures," it declined to do so. Sent'g Tr. 33. Instead, the court concluded that it would take Sattar's conditions of confinement into account in considering the section 3553(a) factors.

### b. Section 3553(a) Factors

The district court began its section 3553(a) analysis with a correct calculation of the applicable Guidelines "range" -- life imprisonment. The court then imposed the non-Guidelines sentence of 24 years' imprisonment, for which it gave three principal reasons.

First, the court concluded that the terrorism enhancement overstated the seriousness of Sattar's crime by transforming a Guidelines range of 97 to 121 months to life imprisonment. The court found that the otherwise-applicable Guideline range was "relatively low" because Sattar was convicted of conspiracy to murder and not of murder itself, and that the terrorism enhancement failed to account for the fact that "no injury actually occurred in this case." Sent'g Tr. 35. The district court noted that a variance downward from a Guidelines range driven upward by the enhancement is permissible when the enhancement "prevents the penalty from fitting the crime, based on the facts of th[e] record." Id. at 35-36 (citing Mandhai, 375 F.3d at 1249).

-106-

Second, the terrorism enhancement put Sattar in the highest criminal history category, VI, "without a single past criminal history point." Id. at 36. The district court concluded that such a jump "overstates [Sattar's] past conduct and the likelihood that the defendant after a substantial period of incarceration would commit further crimes." Id.

Third, the court noted that Sattar had been under "extremely restrictive conditions of confinement for 4-1/2 years," and there "is every reason to expect that his conditions of confinement will continue to be substantially more severe than the average prisoner." Id. at 37. These conditions include being kept in a cell for 23 hours a day and under constant surveillance. As a result, the court concluded, "the punitive aspects of the defendant's confinement are increased and the deterrent effect of the defendant's confinement is also increased." Id.

The court further noted that, for reasons explained in part under seal, a downward variance is warranted based on factors relevant to the history and characteristics of the defendant and the need to afford adequate deterrence.[34] The district court observed that based on the totality of the circumstances and on its review of cases presented by the government as comparators, Sattar's sentence of 24 years'

---

[34] We have reviewed the document under seal. See Sattar Statement of Reasons, Oct. 26, 2006.

incarceration does not promote unwarranted sentencing disparities.

### c. Analysis

The government's principal argument on cross-appeal is that Sattar's sentence is substantively unreasonable in light of his conduct and "long-term dedication to violence." Gov't Reply Br. 39. We have no quarrel with the government as to the nature and quality of Sattar's conduct. Neither, to any significant extent, did the district court. It considered, at length, the seriousness of Sattar's crimes.

"[A] sentence outside the Guidelines carries no presumption of unreasonableness." Irizarry v. United States, 128 S. Ct. 2198, 2202 (2008). "[T]he Guidelines are only one of the factors to consider when imposing sentence . . . ." Gall, 128 S. Ct. at 602. Taking those precepts as a starting point, we are satisfied that in fashioning a non-Guidelines sentence, the district court did not clearly err in according weight to the factors it identified. As we recently noted in Cavera, "at the procedural part of review, we will not categorically proscribe any factor 'concerning the background, character, and conduct' of the defendant, with the exception of invidious factors." Cavera, 550 F.3d at 191. The object is always to fashion a sentence "sufficient, but not greater than necessary" to accomplish the purposes set forth in 18 U.S.C. 3553(a). And it was not clear error for the district court to conclude that a criminal history

category of VI significantly overstated Sattar's criminal history and likelihood of committing further offenses.

We have recognized that "the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." United States v. Meskini, 319 F.3d 88, 92 (2d Cir.), cert. denied, 538 U.S. 1068 (2003). But in the same virtual breath, we said, "[a] judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing. U.S.S.G. § 4A1.3." Id.

And even with enhancements of magnitude -- i.e., those that "sharply increase the recommended sentences" -- there still may be "a wide variety of culpability amongst defendants." Cavera, 550 F.3d at 192. There may therefore be "different sentences based on the factors identified in § 3553(a)." Id. Sattar's crimes are indeed grave; he may well be the most culpable of these defendants. But the district court has a responsibility, inter alia, "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6). Perhaps all who merit this enhancement are culpable and dangerous

-109-

-- but some among them are more culpable, more dangerous, with crimes more serious, than others. It is the district court that is primarily charged with the responsibility for making such distinctions.

The district court is also in the best position to make an individual determination about the "history and characteristics" of a particular defendant, and to adjust the individualized sentence accordingly. See 18 U.S.C. § 3553(a); cf. U.S.S.G. § 4A1.3 (permitting downward departure where "the court concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes"). Upon examining the reasons the district court gave, we have no reason not to defer to its assessment here.

It was not unreasonable for the district court to conclude that the severity of the conditions of confinement would increase the severity of the punishment and the amount of deterrence associated with a given term of imprisonment in light of the particular conditions of confinement under which Sattar is incarcerated. The district court did not abuse its discretion in varying downward based on those conditions here. We think that the factors upon which the district court relied in determining Sattar's appropriate sentence can "bear the weight" the district court assigned to them. Cavera, 550 F.3d at 191.

-110-

We note, finally, that the court sentenced Sattar to more than twice what the maximum Guideline sentence would have been without the terrorism enhancement.

The sentence thus adequately reflected the severity of the crime.

3. Stewart's Sentence. Before sentencing Stewart, the district court calculated her offense level under the November 2000 Guidelines to be 41, her criminal history category to be VI, and her Guidelines range to be 360 months, or 30 years, the statutory maximum. The court concluded, however, that a sentence of 28 months' imprisonment was sufficient but no greater than necessary to accomplish the purposes set forth in 18 U.S.C. § 3553(a).

a. Guidelines Calculations

i. Enhancements. Over Stewart's objection, the district court concluded that the terrorism enhancement of section 3A1.4 applied because she had committed a federal crime of terrorism. The enhancement was triggered in part by the district court's finding that Stewart's actions were "calculated to affect the conduct of the Egyptian government through intimidation and coercion." Sent'g Tr. 108. The district court noted that Stewart's "conduct cannot be found to be outside the heartland of the enhancement," but stated that it nonetheless would "take all of the defendant's arguments [as to why the enhancement did not properly apply to her conduct] into account in performing the analysis under Section 3553(a)." Id.

-111-

The district court noted that the terrorism enhancement automatically placed Stewart in criminal history category VI. The court appeared to accept Stewart's argument that the enhancement overstated the seriousness of her past conduct or the likelihood that she would commit further crimes. Instead of adjusting the criminal history in the context of the Guidelines calculations themselves, however, the court found this to be "one of the rare cases" under United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005), where it would be more appropriate to determine the extent of the downward adjustment in the context of the section 3553(a) analysis. Sent'g Tr. 109.[35]

The government also sought an enhancement of Stewart's sentence on the ground that she obstructed justice. The Guidelines provide that where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and where the obstructive conduct related to the offense of conviction or a closely related offense, that the applicable Guidelines should be enhanced by 2 levels. U.S.S.G. § 3C1.1. The government argued that Stewart committed perjury by

_____

[35] In Crosby, we said that "a sentencing judge will normally have to determine the applicable Guidelines range" but that precise calculation of the range may not be necessary in "situations . . . where either of two Guidelines ranges, whether or not adjacent, is applicable, but the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." Crosby, 397 F.3d at 111-12.

-112-

testifying "that she understood that there was a bubble built into the SAMs whereby the attorneys could issue press releases containing Abdel Rahman's statements as part of their representation of him" and testifying about her purported lack of knowledge of Taha. Sent'g Tr. 111. As we have noted, Taha was a follower of Abdel Rahman and a military leader in al-Gama'a who claimed responsibility for the November 1997 massacre at Luxor, and was allegedly part of the Count-Two conspiracy. The district court noted that there was "evidence to indicate that [Stewart's] statements were false statements." Id. It concluded, however, that it was "unnecessary to reach [the question] whether the defendant knowingly gave false testimony with the intent to obstruct the proceedings" for two reasons: First, the Guidelines calculation already provided for the statutory maximum permitted by the statutes of conviction, and second, a non-Guidelines sentence was, in the estimation of the court, "reasonable and most consistent with the factors set forth in Section 3553(a)." Id. at 111-12.

ii. Departures. Stewart sought a downward departure pursuant to section 5H1.4 of the Guidelines, which provides that while "[p]hysical condition . . . is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range," nonetheless "an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range." U.S.S.G. § 5H1.4. Stewart proffered substantial documentation of serious illness. As with

-113-

Stewart's criminal history calculations, the district court concluded that it "[did] not have to reach the question of whether [Stewart's] medical condition, given her age and continuing treatment, is sufficient in itself to warrant a departure from the guidelines," because it would take that condition into account in making its determination under section 3553(a). Sent'g Tr. 110.

The district court declined to adjust the Guidelines calculations based on Stewart's argument that she committed her crime in order to avoid a perceived greater harm as set forth in "Lesser Harms" policy statement of the Guidelines. See U.S.S.G. § 5K2.11. Stewart argued before the district court that her conduct "was the product of her perception that her client's health and well-being [were] seriously jeopardized by his continued imprisonment in the United States." Stewart Sent'g Br. 44-45. Under the policy statement, where a defendant "commit[s] a crime in order to avoid a perceived greater harm," "a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct, for example, in the case of a mercy killing." U.S.S.G. § 5K2.11. However, "[w]here the interest in punishment or deterrence is not reduced, a reduction in sentence is not warranted." Id. Here, the district court found this case not to be one where the interest in punishment or deterrence is reduced. The policy statement further provides that a reduction in the otherwise applicable sentence might be appropriate where "conduct

-114-

may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue" such as "where a war veteran possessed a machine gun or grenade as a trophy, or a school teacher possessed controlled substances for display in a drug education program." U.S.S.G. § 5K2.11. But the court declined to conclude that Stewart's conduct did not cause or threaten the harm sought to be prevented by the statutes that Stewart violated.

Stewart also moved for a departure on the ground that her conduct was "aberrational." A Guidelines policy statement provides that "[a] sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior." U.S.S.G. § 5K2.20. But the court, noting that Stewart's conduct was "committed over an extended period of time, involv[ing] repeated acts of deception, and . . . significant planning," Sent'g Tr. 110, concluded that such a departure would be inappropriate, and declined to grant it.

The district court thus reached its final Guidelines calculation, using the November 2000 Guidelines, with a total offense level of 41, a criminal history category of VI, and therefore a Guidelines "range" of 360 months, the statutory maximum. The government sought a term of life imprisonment; Stewart sought a non-incarceratory sentence.

**b. Section 3553(a) Factors**

Based on its section 3553(a) analysis, the district court's sentence substantially varied from the applicable Guidelines range.

As the starting point for its section 3553(a) analysis, the court addressed the applicability of the terrorism enhancement, which "while correct under the guidelines, would result in an unreasonable result . . . and produce a guideline range about quadruple the range [that would otherwise apply] without the enhancement." Sent'g Tr. 114. The district court then observed:

First, that Stewart's was an "atypical case" for the terrorism enhancement inasmuch as "the thrust of the violation was the provision of a co-conspirator to a terrorist conspiracy," id. at 113; second, as with Sattar, that the structure of the terrorism enhancement prevented the Guidelines from taking into account the fact that no victim was harmed as a result of the offense as charged; and third, again as with Sattar, that the enhancement operated to prevent the Guidelines from taking into account Stewart's actual criminal history. By virtue of the terrorism enhancement, Stewart was automatically classified as within criminal history category VI, the highest possible category, whereas if her sentence were based on her actual criminal history, she would have been classified in category I, the lowest possible category.

The court therefore concluded that the terrorism enhancement was "dramatically unreasonable" and "overstates the seriousness of [her] past conduct and the likelihood that [she] will repeat the offense." Id. Stewart "has no criminal history and yet is placed in the highest criminal history category equal to that of repeat felony offenders for the most serious offenses including murder and drug trafficking." Id. at 113-14. The criminal history category was inappropriate, the court determined, in light of "the likelihood of recidivism, the difficulty of rehabilitation and the need for incapacitation." Id. at 114.

The court found that Stewart's opportunity to repeat "the crimes to which she had been convicted will be nil" because she "will lose her license to practice law" and "will be forever separated from any contact with Sheikh Omar Abdel Rahman." Id. Loss of her license to practice law both removes "the occasion for her offenses" and "is itself a punishment." Id. at 116.

The district court viewed Stewart's personal characteristics as "extraordinary" and thought they "argue[d] strongly in favor of a substantial downward variance." Id. at 114. The court described her as a dedicated public servant who had, throughout her career, "represented the poor, the disadvantaged and the unpopular, often as a Court-appointed attorney," thereby providing a "service not only to her clients but to the nation." Id. at 115-16. And "[h]aving spent her

professional career often representing the poor, she is now, at the end of her career, financially destitute." Id. at 115.

The court also took into account Stewart's ill health -- she had, for example, suffered from cancer, for which she had undergone surgery and radiation therapy, and for which there is a significant chance of recurrence. The district court was of the view that in light of those conditions and her age, 67 years old at the time, prison would be "particularly difficult" for her, and that at her age, moreover, her sentence would "represent a greater portion of her remaining life than for a younger defendant and provide increased punishment." Id. at 117.

**c. Analysis**

i. The Scope of Review. The government's principal argument on appeal is that in light of the crimes of which Stewart stands convicted, her sentence was substantively unreasonable. Section 3553(a) instructs that the sentence must "reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for the offense" and "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) & (B). Our review for substantive reasonableness is a "particularly deferential form of abuse-of-discretion review." Cavera, 550 F.3d at 188 n.5 (citing Gall 128 S. Ct. at 591). But our review must also be "meaningful." Gall, 128 S. Ct. at 597; cf. Gerard E. Lynch, Letting Guidelines Be Guidelines (And Judges Be Judges), Ohio St. J. Crim. L. Amici: Views From the Field (Jan. 2008), at http://osjcl.blogspot.com/ ("[W]e

-118-

should let (appellate) judges be judges . . . , performing their traditional function of reining in excess and gradually developing a 'common law' of what is and is not sensible." (emphasis deleted)).

Like the district court, we are impressed by the factors that figured in Stewart's modest sentence -- particularly her admirable history of providing, at no little personal cost to herself, proficient legal services in difficult cases to those who could not otherwise afford them. We think it noteworthy, moreover, that the last of the acts for which Stewart is being punished occurred a short time before the September 11 attacks on the United States. That carnage might have raised in her, as it surely has in many or most of us, a heightened awareness of and sensitivity to the imminent dangers of terrorism and the possible scope of the deadly capabilities of the terrorists with whom she was dealing.

We also recognize, as did the district court, that the terrorism enhancement may apply to persons who are culpable in substantially different degrees; that Stewart's culpability may well be understood to be less than Sattar's; and that the district court may differentiate between different levels of culpable conduct that nonetheless trigger the same substantial enhancement. Yet Stewart's sentence is strikingly low in light of what the district court correctly described as the "irreducible core of [her] extraordinarily severe criminal conduct," Sent'g Tr. 118, "which was committed over an extended

-119-

period of time, involved repeated acts of deception, and involve[d] significant planning," id. at 110.

We are obliged to "patrol the boundaries of [the] reasonableness" of a sentence. Cavera, 550 F.3d at 191. While we will not lightly deem unreasonable a sentence imposed by the judge who has "access to, and greater familiarity with, the individual case and the individual defendant before him than the [Sentencing] Commission or the appeals court," Rita, 551 U.S. at 357-58, we think that in light of the fact Stewart used her privileged status as a lawyer to facilitate her serious violation of the law, and possibly committed perjury at trial in an attempt to avoid punishment for her conduct, her sentence at least tests those "boundaries."

ii. Stewart's Abuse of Her Status As a Member of the Bar. Stewart argues that she did no more than serve as a zealous advocate for her client. That belief, if indeed she harbored it, gave her no license to violate the law. Stewart's actions tended ultimately and ironically to subvert the same fundamental right of which she took advantage -- the constitutional right to counsel -- by making it less likely that other incarcerated persons will have the same level of access to counsel that her client was given.

The district court seemed to appreciate that fact, noting that Stewart "abused her position as a lawyer" in committing her crimes. Sent'g Tr. 118. The court did not, however, explain how and to what extent the sentence reflected

the seriousness of the crimes of conviction in light of the fact that Stewart was engaged as a member of the bar when she committed them.

The question therefore remains whether, because she was an experienced and dedicated lawyer acting as such when she broke the law in the manner that she did, her punishment should have been greater than it was.[36]

iii. A Comparison of Yousry's and Stewart's Sentences. A comparison of Stewart's and Yousry's offense conduct serves to highlight the seriousness of Stewart's crimes and the seemingly modest sentence she received for it. Unlike Yousry, Stewart publicly disseminated "potentially lethal" statements on Abdel Rahman's behalf. Unlike Yousry, Stewart was convicted of making false statements to the government when she agreed to abide by the terms of the SAMs. Unlike Yousry, Stewart was a member of the bar and therefore acting as an officer of the

---

[36] The district court did not address whether Stewart "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," meriting a two-level enhancement under the Guidelines. See U.S.S.G. § 3B1.3; see also United States v. Reich, 479 F.3d 179, 192 (2d Cir.), cert. denied, 128 S.Ct. 115 (2007) (concluding that district court did not err in applying enhancement where the defendant "used his special skills as a lawyer" to facilitate the crime). Judge Walker, in his opinion, criticizes the district court for "fail[ing] to explain why an enhancement for abuse of trust is not plainly appropriate in this case." Op. of J. Walker at [35:19-20]. But the government did not specifically invoke section 3B1.3 in its sentencing memorandum or on appeal. We therefore think it hard to fault the district court on this score. We nonetheless share many of Judge Walker's concerns in this regard. See id. at [35:19-38:9]. The district court may address this issue on remand.

court.  See, e.g., United States v. Seltzer, 227 F.3d 36, 41 (2d Cir. 2000).  She was legally knowledgeable, highly experienced, and politically sophisticated, a lawyer acting in her professional capacity; he was a student working for her and Abdel Rahman as a translator.

Yet Yousry's sentence was 20 months; Stewart's only eight months longer.

iv. Stewart's Alleged Perjury.  Also unlike Yousry, Stewart may well have obstructed justice at trial.  The government, supported by substantial evidence, argued that Stewart committed perjury at trial.  The district court summarized the argument as follows:

> First, the government contends that Ms. Stewart knowingly gave false testimony when she testified that she understood that there was a bubble built into the SAMs whereby the attorneys could issue press releases containing Abdel Rahman's statements as part of their representation of him.
>
> The government also contends that Ms. Stewart testified falsely when she denied knowing who Taha was until learning about him in the course of the trial except for an article that she came across in her representation of Yasir Ahmed.

Sent'g Tr. 111.  The court, having thus recited the allegations at sentencing, declined to decide the issue.

As noted, the district court gave two reasons for not making such a finding.  First, it concluded that because Stewart's Guidelines calculations had reached the statutory maximum of 360 months, a finding of obstruction of justice would not have changed the calculation.  This would be true if the

-122-

terrorism enhancement had been applied in Stewart's case, but the district court, after determining that Stewart's conduct was in the enhancement's "heartland," may not have applied it. See infra **[124-25]**. And even were it true, the question of Stewart's perjury is nonetheless relevant to her sentence pursuant to section 3553. Section 3553(a) requires the district court to impose a sentence "sufficient, but not greater than necessary" to, among other things, promote respect for the law. See 18 U.S.C. § 3553(a)(2). Whether Stewart lied to the jury under oath or upon affirmation at her trial is relevant to whether her sentence was "sufficient" under the circumstances.

The district court's second reason for declining to determine whether Stewart committed perjury during the course of her testimony was that it had determined that a non-Guidelines sentence was "reasonable and most consistent with the factors set forth in Section 3553(a)." Sent'g Tr. 111-12. But as noted, we think that whether Stewart lied under oath at her trial is directly relevant to whether her sentence was appropriate in light of Section 3553(a). Her willingness as a lawyer knowingly and falsely to affirm her intention to obey the SAMs and then to seek to cover up this knowing violation of the law with perjurious testimony might well, if proven, influence our conclusion as to the propriety of her sentence. Any cover-up or attempt to evade responsibility by a failure to tell the truth upon oath or affirmation at her trial would compound the gravity of her crime.

We conclude that by declining to decide whether Stewart committed perjury or otherwise obstructed justice, the district court procedurally erred.

v. Effect of Lack of Harm. Noting particularly that the absence of harm was fortuitous and not the result of efforts by Stewart to prevent harm, Judge Walker argues that it was error both procedural and substantive for the district court to use that factor as a basis for downward variance, especially such a large one. The issue is discussed also in Judge Calabresi's opinion. This Court makes no ruling on that issue now, in the circumstances of Stewart's case. We note simply that it is a serious issue to be given consideration by the district court upon reevaluating Stewart's sentence. In view of the fact that the court must resentence, we think it preferable to defer this issue until after it has been reconsidered by the court, upon its consideration of the commentary in the opinions of Judges Walker and Calabresi.

vi. The Terrorism Enhancement. The terrorism enhancement is set forth in section 3A1.4 of the Guidelines.

> Terrorism
>
> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
>
> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4.

-124-

Whether or not the district court applied the terrorism enhancement to Stewart in its Guidelines calculation may be subject to disagreement. Without reaching that issue, we nonetheless note that in light of the facts of this case and the judgments of conviction, which we affirm, the terrorism enhancement plainly applies as a matter of law to the district court's calculation of the applicable Guidelines range, irrespective of whether Stewart's behavior was "atypical" and whether it resulted in death or injury,[37] factors that may (or may not) be employed in rendering the ultimate sentence.

---

[37] It seems possible that, in fact, the district court rejected the terrorism enhancement based on United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), by deeming this to be one of those cases where it would be more appropriate to determine the extent of the downward adjustment in the context of the section 3553(a) analysis. It may be that this invocation of Crosby led the district court to redetermine an adjusted offense level without application of the terrorism enhancement and then consider, in its section 3553(a) analysis, whether Stewart's personal characteristics warranted a variance below the sentencing range calculated without the enhancement. If the district court ultimately sentenced Stewart without "precise calculation of the applicable Guidelines range," Crosby, 397 F.3d at 112, it would, we conclude, be error.

It is possible to read the record to indicate that although, in compliance with Supreme Court instructions, the district court began its Guidelines analysis by correctly calculating an adjusted offense level of 41 with a resulting sentencing range of 360 months, see Gall, 128 S. Ct. at 596, the court nonetheless treated the terrorism enhancement as inapplicable and redetermined a sentencing range of 78 to 97 months without that enhancement. Perhaps the court then relied on its view of Stewart's personal characteristics to justify a variance substantially below this redetermined range. This too would be error because the district court, by effectively recalculating the Guidelines range, would have decided, in substance, that the terrorism enhancement was inapplicable to Stewart's Guidelines calculation.

Whether or not the district court gave appropriate consideration in its section 3553(a) analysis to whether support of terrorism is an aggravating factor in this case, similarly, may be subject to disagreement. Judge Walker argues that the district court's sentence was deficient in this respect, and constituted both procedural and substantive error. But we need not decide whether error in this respect, if any, would be procedural or substantive. Without reaching these issues, and without suggesting that the district court was bound to follow either the Guidelines generally or any Guidelines enhancement specifically in imposing its section 3553(a) sentence, we note that the district court's section 3553(a) analysis must include consideration of whether support of terrorism is an aggravating factor in light of the court's obligation to consider "the nature and circumstances of [Stewart's] offense" and "the need for the sentence imposed . . . to reflect the seriousness of the offense." 18 U.S.C. § 3553(a)(1)-(2)(A).

### d. Remand

A district court's failure to find particular facts will in no way impede our review in some, perhaps in most, situations; this, however, is not one of them. Especially in light of the absence of a finding that Stewart did not commit perjury at trial or otherwise obstruct justice, we think it preferable not to determine whether her sentence was substantively reasonable.

We therefore remand this matter to the district court for resentencing, in the course of which we direct the court to determine the issue of perjury and if it finds such perjury, to resentence Stewart so as to reflect that finding. The district court should also consider whether Stewart's conduct as a lawyer triggers the special-skill/abuse-of-trust enhancement under the Guidelines, see U.S.S.G. § 3B1.3, and reconsider the extent to which Stewart's status as a lawyer affects the appropriate sentence. Finally, the district court should further consider the overall question whether the sentence to be given is appropriate in view of the magnitude of the offense, which the court itself has explicitly recognized. Although we do not preclude the district court's election to continue to impose a non-Guidelines sentence, we do require that such a sentence, selected after the reconsideration we have directed, begin with the terrorism enhancement and take that enhancement into account. We have serious doubts that the sentence given was reasonable, but think it appropriate to hear from the district court further before deciding the issue.

We have identified actions taken or not taken by the district court in imposing sentence that we conclude constituted procedural error and thus require resentencing. Other issues are raised by Judge Walker, who finds that they resulted in procedural error and substantive unreasonableness, and addressed by Judge Calabresi in response. To the extent we did not discuss or rule on those issues in this majority opinion, our

silence should not be construed by the district court, or by others relying on this opinion, to mean that the majority has adopted Judge Calabresi's views or rejected Judge Walker's. We have not.

Although we find no procedural or substantive error in connection with the sentencing of Sattar and Yousry, we nonetheless remand their cases, too. We conclude that, inasmuch as the interrelationship among the sentences of the co-defendants is a principal consideration as to a proper sentence of Stewart, the district court should have the ability, if not the obligation, to resentence them as well.

After the district court completes the resentencing, jurisdiction may be restored to this Court by letter from any party, and the Office of the Clerk of this Court shall set an expeditious briefing schedule and refer the matter to this panel for further review.

**CONCLUSION**

For the foregoing reasons, we affirm the conviction of Stewart, but remand this cause to the district court for resentencing of Stewart, see United States v. Phillips, 431 F.3d 86, 90 (2d Cir. 2005), and resentencing of Sattar or Yousry or both if the district court determines that they should receive different sentences in light of the sentence imposed on Stewart. Inasmuch as the current sentences will remain in effect as to Stewart and Yousry until the district court resentences Stewart -- and Sattar or Yousry if it decides to do so -- and in light

-128-

of the fact that we affirm on all issues related to the guilt of all defendants, the district court is directed to order Stewart and Yousry to surrender forthwith to begin serving their terms of incarceration.

CALABRESI, *Circuit Judge*, concurring:

I join Judge Sack's opinion in full. I write separately to comment on our decision with respect to Stewart's sentence. In doing so, I do not wish to express any disagreement with the majority opinion, which has withheld a final judgment on various aspects of Stewart's sentence in light of the decision to remand. Where I express views on which the majority opinion is silent, I write only for myself.

When a judge of extraordinary ability and a well-earned reputation for exceptional judgment has spent as much time on a case like this, making many decisions of tremendous difficulty—which on review we are all in agreement were correct and wisely done—even the usual deference that the Supreme Court indicated should be paid to the district court's sentencing must constitute an understatement. This is especially so with respect to any notions as to the substantive reasonableness of a sentence. We may find that there are some procedural or technical matters that warrant more consideration by the district judge, such as the question of whether Stewart committed perjury and the relevance of this in determining an appropriate sentence, given the district court's treatment of the terrorism enhancement. But for us—who have not been involved in the case and do not know all the backs and forths, some of which may even be best left not fully articulated—to second guess the district court's judgment seems to me to be precisely what both the Supreme Court and our court sitting *en banc* in *United States v. Cavera*, 550 F.3d 180, 194 (2d Cir. 2008), have said we should not do. I join the majority opinion because I understand it to avoid second guessing, and because I believe it wisely provides the district court with an opportunity to explain further and perhaps to modify the sentence it has imposed. I write here to explore some of the principal issues on which this panel

1

is divided and to give fuller expression to the importance of having appellate courts appreciate the limited, though still important, institutional role we play, particularly in a case such as this one, where the temptation to go beyond that role is so great.[1]

## I.

After calculating Stewart's sentence under the Guidelines, the district court applied the § 3553(a) factors and concluded that the effect of the terrorism enhancement, "while correct under the guidelines, would result in an unreasonable result" in this particular case. Sent'g Tr. 114. The district court arrived at this conclusion based on, *inter alia*, (1) what it described as the somewhat atypical nature of Stewart's case for the imposition of the terrorism enhancement, and (2) the lack of evidence that any victim was harmed as a result of the charged offense.[2] *Id.* at

---

[1] Judge Walker, in his partial dissent, suggests that I believe some judges are infallible and beyond reproach. Far from it; were that my view, I could not join the majority opinion in remanding Stewart's sentence. Indeed, I agree completely with the implication in Judge Walker's statement that all judges, including distinguished appellate ones, can become so preoccupied with a case as to lose perspective. My point is simply that before we assume that a very able district judge has erred substantively in sentencing, we should be especially cautious both in our language and in our judgments, and if we have doubts we should give that judge every opportunity to explain the sentence imposed.

[2] The district court also found that the terrorism enhancement's increase of Stewart's Criminal History Category from I to VI—the result of the enhancement's "horizontal" component—was "dramatically unreasonable in [her] case" because it "overstate[d] the seriousness of [her] past conduct and the likelihood that [she would] repeat the offense." Sent'g Tr. 113. Because no member of this panel suggests this determination was procedural error, I do not focus on it. It is worth keeping in mind, however, that multiple considerations informed the district court's view that the terrorism enhancement—which "produce[d] a guideline range about quadruple the range without that enhancement," *id.* at 114— resulted in a sentencing range for Stewart that was too high. For that reason, some of Judge Walker's contentions—such as that the majority opinion, and my concurrence especially, "erroneously permit[] the district court to eliminate the enhancement altogether primarily because [harm did not result]," Op. of J. Walker at **[28]**, or that the district court "[r]emov[ed]" Stewart from the "terrorism spectrum" because of its view that her crime was atypical, *id.* at **[26]**—strike me as misleading. Furthermore, in doing this, and

2

113. While I agree with the majority opinion that these grounds do not render the terrorism enhancement inapplicable in determining the relevant Guidelines range, I do believe that each ground, if properly articulated, is, as a procedural matter, within the district court's discretion to consider in its application of the § 3553(a) factors. What is more, I would be extremely reluctant to disturb a district court's careful effort to look to the unique circumstances of a defendant like Stewart and arrive at an individualized sentence where the Guidelines recommendation is controlled by an undeniably broad enhancement (or reduction) like the terrorism enhancement.

## A.

When the terrorism enhancement is applied, it has dramatic consequences on the applicable Guidelines range because it automatically increases both the offense level of a crime and the defendant's Criminal History Category. In Stewart's case, for example, the recommended sentence range without the enhancement was 78 to 97 months, while imposition of the enhancement resulted in a recommended sentence of 360 months, the statutory maximum. Yet as both the majority opinion and Judge Walker, in his partial dissent, recognize, the terrorism enhancement casts a very broad net. In this case, that breadth was compounded by the fact that the "federal crime of terrorism" for which Stewart was convicted, i.e. the provision of material support, itself covers a wide range of conduct of varying degrees of culpability ranging from the supply of lodging to the contribution of "weapons, lethal substances, [and] explosives." *See* 18

---

elsewhere in his opinion, Judge Walker seems to label as *procedural errors* decisions that are normally considered substantive judgments about the amount of weight a particular factor can bear—judgments that we are to review under a deferential abuse-of-discretion standard after taking into the account "the totality of the circumstances." *See Gall v. United States*, 128 S. Ct. 586, 597 (2007).

3

U.S.C. § 2339A. When a Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins, unusually broad sentencing discretion in the district court is essential. Indeed, it must be so to comply with the Supreme Court's remedial holding in *United States v. Booker*, 543 U.S. 220, 244 (2005).

We articulated this precise point in *Cavera*, recognizing that "some Guidelines enhancements and reductions apply without modulation to a wide range of conduct." 550 F.3d at 192. We identified as examples several financial crimes where the recommended sentence under the Guidelines varies dramatically according to the money involved, but the culpability of an individual defendant might not be captured accurately by a single variable like financial impact. *Id.* Perhaps more closely analogous to the terrorism enhancement, we pointed to the Armed Career Criminal Guidelines, under which the recommended sentences for firearms offenses increase sharply if the defendant has a prior conviction for a "crime of violence"—an expansive term that places crimes like attempted burglary of a dwelling under the same umbrella as crimes like murder and rape. *See id.* (citing U.S.S.G. § 2K2.1(a)). The terrorism enhancement in its breadth of coverage is akin to these examples from *Cavera*. The majority opinion understands this when it says that the terrorism enhancement "may apply to persons who are culpable in substantially different degrees," and that the district court "may differentiate between different levels of culpable conduct that nonetheless trigger the same substantial enhancement." Maj. Op. at [119].

We indicated in *Cavera* that when a district court faces such over- and under-inclusive Guidelines recommendations and when, after considering the § 3553(a) factors, it promulgates a sentence that varies from that recommendation, the district court's decision, "if adequately

4

explained, should be reviewed *especially deferentially*." 550 F.3d at 192 (emphasis added). Nothing we hold here should be understood to conflict with that principle, or to cast doubt on the district court's apparent conclusion that there must be much room for discretion under the terrorism enhancement.[3]

While we have raised questions about the closeness of Yousry and Stewart's sentences in light of Stewart's seemingly greater level of responsibility and status as a lawyer, and while we would benefit from greater explanation by the district court on this and other issues, it remains the district court's task, for purposes of sentencing under § 3553(a), to assess where Stewart's criminal behavior falls within the spectrum of terrorism enhancement culpability. And I would be very reluctant—when and if I had to review a sentence in this case for substantive reasonableness—to find an abuse of discretion in a thoroughly-explained conclusion by the

---

[3] Let me be absolutely clear. Neither the majority opinion nor my concurrence suggests that district courts have greater discretion exclusively for sentencing terrorism defendants. In fact, I believe precisely the opposite. My point is that the terrorism enhancement is, like the examples identified in *Cavera*, *one* instance of a Guidelines enhancement that applies "without modulation" to a wide range of conduct, and that we should be especially deferential to a district court's reasoned decision to vary from such a broad Guidelines recommendation. *See Cavera*, 550 F.3d at 192.

In contrast, Judge Walker does appear to advocate a separate sentencing jurisprudence for terrorism cases. Judge Walker repeatedly seeks to distinguish terrorism-related crimes from other crimes, and even suggests that, as to harm in terrorism crimes, the sentencing reviews of appellate courts should run in one direction only. *See* Op. of J. Walker at [29] He also states that the wide variety of conduct encompassed by "terrorism support," unlike the wide variety of conduct covered by other crimes, does not give rise to added district court discretion in sentencing. *See id.* at [26]. He attributes this to congressional decisions. With great respect, I have difficulty reading what Congress has mandated as creating these differences. Judge Walker clearly views terrorism-related crimes as in a different category from all other very serious felonies—and he may well be right. It is, however, an error—though a common one among all judges—to attribute one's own heartfelt and perhaps correct views to the legislators.

5

district court that Stewart's conduct, though undeniably serious, was significantly less serious than that of other defendants subject to the terrorism enhancement.

## B.

I am more ambivalent about the degree to which absence of harm is a valid ground on which to mitigate a sentence. I join the majority opinion in withholding judgment on this issue with respect to Stewart. My general view, however, is that while a district court ought to be careful about giving too much weight to a factor like harm that might vary based on events beyond the defendant's control, we should not preclude a district court from giving lack of harm some weight, even for some crimes of terrorism.

Whether it is fair to assign different levels of culpability in criminal sentencing to the same criminal conduct based on the fortuity of whether harm results has long been a contested question in Anglo-American jurisprudence. *See* H.L.A. HART, THE CONCEPT OF LAW 131 (1968) ("Why should the accidental fact that an intended harmful outcome has not occurred be ground for punishing less a criminal who may be equally dangerous and equally wicked?"). But whatever significance the consequences of a defendant's actions ought to have, it is an inevitable part of human nature—and our law—that we as a society *do* give consequences considerable weight when we mete out punishment and blame.[4] This is deeply entrenched in our legal system.

---

[4] *See* Sanford H. Kadish, *The Criminal Law and the Luck of the Draw*, 84 J. CRIM. L & CRIMINOLOGY 679, 688 (1994) ("While in principle it's difficult to find good reasons for making desert turn on chance, here's the rub: most of us do in fact make judgments precisely of this kind."). *See generally* PAUL H. ROBINSON & JOHN DARLEY, JUSTICE, LIABILITY AND BLAME: COMMUNITY VIEWS AND THE CRIMINAL LAW (1995) (presenting studies suggesting public judgments about criminal culpability turn significantly on the level of harm that results from an action).

6

The majority opinion identifies the law of attempts as one generally accepted instantiation of this tendency, Maj. Op. at **[99–100]**, but there are many others—such as crimes of culpable risk creation, like vehicular homicide. And while it is true that material support to terrorism is a complete crime rather than an inchoate one, and so fully punishable even if no further harm results, it simply does not follow that the amount of punishment may not at least in part depend on the harm that occurred. The level of punishment for a completed crime varies all the time based on the amount of harm that has occurred, and the Guidelines themselves often directly embrace such a policy.[5]

Judge Walker suggests terrorism is different, and that, at least in the "very broad heartland of cases," it is procedural error for the district court to consider absence of harm as relevant to the application of the terrorism enhancement and ultimately to the imposition of a sentence.[6] He argues that treating harm as a consideration relevant to sentencing those convicted

---

[5] Judge Walker identifies several examples in his opinion, though he reaches a different conclusion about their import. *See* Op. of J. Walker at **[28 n.11]** (identifying as examples the increase of the offense level for conspiracy or solicitation to commit murder if the offense results in death, U.S.S.G. § 2A1.5(c)(1)), and the increase of the offense level for aggravated assault based on victim's injuries, *Id.* § 2A2.(b)(3)). There are many other examples. *See* Kate Stith, *The Arc of the Pendulum: Judges, Prosecutors, and the Exercise of Discretion*, 117 YALE L.J. 1420, 1476 (2008) ("Guidelines sentences for both drug crimes and financial crimes depend heavily on the quantity of harm found by the sentencing judge . . . .").

[6] Though Judge Walker suggests otherwise, it is not at all unprecedented for a district court to consider lack of harm relevant to sentencing in a terrorism case. Indeed, in a case that Judge Walker cites, the Eleventh Circuit affirmed a district court decision that did just that. *See United States v. Garey*, 546 F.3d 1359, 1363-64 (11th Cir. 2008) (per curiam). In that case, the district court found that the terrorism enhancement applied, but then granted a downward variance based in part on the fact that the defendant had not carried out any violent acts at the time of his apprehension. *See United States v. Garey*, 383 F. Supp. 2d 1374, 1379 (M.D. Ga. 2005) ("It is . . . troubling that another defendant who carried out a threat to bomb public facilities, injuring and maiming (but not killing) thousands of people, would face the same sentence as this Defendant who did not cause physical injury to a single person."). In upholding the defendant's sentence as

7

of terrorism related crimes, such as for material support, would effectively nullify the policy considerations of Congress and the Sentencing Commission, who have not made reductions for lack of harm part of the terrorism enhancement. Even if the Guidelines do not themselves make lack of harm relevant for the application of the terrorism enhancement—and they fail to do so only in the narrow sense that the enhancement does not positively reflect the existence of injury—the Supreme Court has made clear that a district court, which has "greater familiarity with [] the individual case and the individual defendant," may properly decide that sentencing judgments made by the Guidelines fail properly to reflect the § 3553(a) considerations. *See Rita v. United States*, 551 U.S. 338, 351 (2007).

What is more, the Court has evidenced profound skepticism toward arguments that certain policy judgments, which require departing from the Guidelines, have implicitly been taken off the table as a result of congressional silence or inaction. *See Kimbrough v. United States*, 128 S. Ct. 558, 570-73 (2007). As the Court explained, it is usually inappropriate to draw inferences from congressional silence on sentencing practices because Congress has shown that,

---

not unreasonable, the Eleventh Circuit specifically noted that the district court had already considered the defendant's arguments about the lack of actual harm and, on the basis of the § 3553(a) factors, imposed a reasonable sentence below the advisory Guidelines range. *See Garey*, 546 F.3d at 1364.

Judge Walker cites *Garey*, and other cases, for the proposition that courts apply the terrorism enhancement even in the absence of harm. Op. of J. Walker at **[29 n.13]**. That is true, but it is not relevant to the precise issue we face because the district court here asserted that the enhancement applied to Stewart under the Guidelines, and the majority opinion has stated clearly that any decision to the contrary would be error. Maj. Op. at **[125–26]** It is also incorrect to say that, for all practical purposes, the district court used lack of harm to nullify the sentencing enhancement, because that was not the only consideration relied upon by the district court to support its variance. *See supra* note 2. The real question is whether, *as a procedural matter*, lack of harm can support some downward variance in a terrorism case. To this narrow question, other courts have said, or at least strongly implied, that the answer is yes.

8

when it wants to, it knows how to direct levels of sentencing in express terms. *Id.* at 571 (citing 28 U.S.C. § 994(h), which required Sentencing Commission to set Guidelines sentences for recidivist offenders at or near the statutory maximum). As a result, the fact that Congress increased the statutory maximum in 2001 for material support convictions that caused death, *see* Op. of J. Walker at **[28]**, and did so without saying anything whatever about how a district court may treat harm when issuing a sentence that is less than the applicable maximum, cannot be read to diminish the discretion the district court otherwise has under § 3553(a).[7]

I also rather doubt that we would be willing to apply consistently a principle that harm is irrelevant in terrorism cases. Consider two potential defendants, both of whom provide funds to different terrorists and have the requisite *mens rea* to support a conviction under 18 U.S.C § 2239A. In one case, the terrorist whom the defendant funds attempts to detonate an explosive in a public place, but the explosives do not go off properly and so cause only a few injuries and one death that results, in part also, from inadequate medical treatment. In the second case, the terrorist's detonation attempt succeeds, blowing up a city bus and causing a major traffic collision that kills or injures hundreds of people. While reasonable minds might differ as to the weight the level of harm should be given in this scenario, surely we would not hold it procedurally unreasonable for the district court to take the amount of harm into account when sentencing the respective defendants and—while sentencing the first severely—use it as a reason to give the second defendant a much greater sentence. Yet if that is so, the converse must hold,

---

[7] Indeed, that Congress saw fit to increase the maximum sentence for material support based solely on whether death results can easily be understood to suggest that Congress thought amount of harm *does* matter in this context, even if, at times, that harm is largely fortuitous.

9

because "sentencing discretion is like an elevator in that it must run in both directions." *Cavera*, 550 F.3d at 194. To concede, as I think we must, that when hundreds of people are injured or killed rather than just one a district court may take the amount of harm into account and impose a higher sentence, but then to deny the court that same discretion to reach a lower sentence when, through fortuity, no harm results, would manifestly contravene that principle.[8]

## II.

I have focused to this point on factors the district court may consider procedurally when sentencing, but this case also illustrates the importance of *our* adherence as an appellate court to the right procedure for review of district court sentences. In *Cavera*, we explained that our review involves a two-step process. We first ensure that the district court has not committed procedural error, and only later engage in substantive review to examine whether the district court has rendered a sentence that is one of the "exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." 550 F.3d at 189 (internal

---

[8] I by no means suggest that a district court may not err by attributing too much importance to results, whether on the upside or the downside. When reviewing a sentence for substantive reasonableness, appellate courts may question whether the presence or absence of actual harm can "bear the weight" attributed to it by a district court. *Cavera*, 550 F.3d at 191. And while an appellate court must never forget that its review is deferential, *see Gall*, 128 S. Ct. at 596, it may need to look carefully at a district court's reasons for giving weight to results, especially given the natural tendency to overvalue consequences. The majority opinion appropriately treats this substantive question as analytically distinct from whether a district court may, *as a procedural matter*, rely on lack of harm. *See* Maj. Op. at [99-100 n.33]. The majority opinion also quite properly leaves open, at this time, the question of whether the district court's actual use of lack of harm as grounds upon which to mitigate Stewart's sentence led to a result that was erroneous. Like the majority opinion, I do not yet express any view as to whether the district court in this case placed too much weight on the apparent lack of harm that resulted from Stewart's actions. *See* Part II *infra*.

10

quotations and emphasis omitted). Following this sequence of review is central to our limited role. Because district courts "have an institutional advantage over appellate courts" when making sentencing decisions, *Koon v. United States*, 518 U.S. 81, 98 (1996), our job as a reviewing court is mainly to ensure that a district court's sentence "resulted from the district court's considered judgment as to what was necessary to address the various, often conflicting, purposes of sentencing." *Cavera*, 550 F.3d at 189-90. Evaluating the substantive reasonableness of a sentence before we have found it free from procedural defect risks the substitution of our "considered judgment" for that of the district court.

When we identify procedural error, we have recognized the desirability of remanding to the district court to let it correct its mistake and "exercise its discretion anew," rather than proceeding prematurely to review the sentence for substantive reasonableness. *See Cavera*, 550 F.3d at 190. While we have not held that this course must necessarily be followed in all instances, a review of our cases makes clear that it is the ordinary and much preferred remedy. *See, e.g., United States v. Williams*, 558 F.3d 166, 176 (2d Cir. 2009) ("In light of our decision to remand, we reject, as premature, [the defendant's] challenge to the substantive reasonability of his sentence."); *United States v. Williams*, 524 F.3d 209, 215-17 (2d Cir. 2008) (vacating sentence without reaching issue of whether sentence was substantively reasonable "because we conclude that the district judge committed procedural error"); *United States v. Wills*, 476 F.3d 103, 111 n.6 (2d Cir. 2007) ("*Because we hold that the sentence is procedurally unreasonable, we do not reach the government's argument that if* [the district court had not relied on procedurally erroneous factors,] [Defendant's] sentence should be deemed unreasonable based on

11

its length alone.") (emphasis added), *abrogated on other grounds by Kimbrough*, 128 S. Ct. at 574–75, *as recognized in Cavera*, 550 F.3d at 191.

Other circuits have expressed a similar preference, and have sometimes stated it in even more categorical terms: first remand to allow a district court to correct procedural errors and only later review for substantive reasonableness.[9] This is no formalism. It is consonant with our system of sentencing, which asks the district court to reach a complete judgment about the appropriate sentence in light of the factors enumerated in § 3553(a). Procedural errors prevent the district court from properly arriving at such a holistic judgment. And in light of our obligation to defer significantly to a procedurally correct sentence, we should almost always wait until we have such a sentence to review before evaluating overall reasonableness.

Judge Walker argues that judicial efficiency compels us to identify substantive error at the same time we remand for procedural error. No one wants unnecessary appeals. But I fail to see any systemic advantages from issuing advisory opinions on the reasonableness of sentences that we are vacating, and hence that are now no longer really before us. The decision to remand for procedural unreasonableness presupposes that we believe the district court might not have imposed the same sentence but for the procedural defect. *See, e.g., United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009) (recognizing that procedural errors in sentencing are subject to harmless error rule). When we remand for procedural flaws, it may seem inviting to comment at

---

[9] *See, e.g., United States v. Delgado-Martinez*, 564 F.3d 750, 753 (5th Cir. 2009) (holding that where procedural error is identified, "we must remand" unless error is harmless, and that a court should not move on to *Gall's* second step to review substantive reasonableness of sentence if there is non-harmless procedural error); *United States v. Grissom*, 525 F.3d 691, 696 (9th Cir. 2008) ("[W]e will remand non-harmless procedural errors . . . and *only proceed to review the substantive reasonableness of procedurally sound sentences*.") (emphasis added).

12

the same time on other factors relied upon by the district court that, though procedurally proper, do not, in our judgment, bear the weight the district court attributed to them. It may even be appropriate *in dicta* to suggest our preliminary view on the matter. But it is not our role to weigh the individual § 3553(a) factors ourselves and, in a holding, to give binding advice to the district court based on our views. *See Gall*, 128 S. Ct. at 602.

Let me repeat: Substantive reasonableness calls for review of the overall sentence, not individual factors. And § 3553(a) calls for balancing all the relevant factors. As a result, any non-harmless procedural errors necessarily affect the sentencing calculus. Our task is to evaluate (deferentially) the district court's finished product, and not to grade its individual ingredients. To do this properly, we must almost always wait for the district court to correct the procedural errors that we have identified and to explain its sentence, and only then to consider the substantive reasonableness of the sentence.

I do not mean to suggest an absolutist view on this matter. It may be that there are cases where there is procedural error that—even though it is not harmless—is sufficiently separate from any serious substantive concerns that we have, so as to make it plausible to address the two issues at once. I cannot think of any such cases offhand, however. And, for the reasons well expressed by the majority opinion in its decision to remand, this case is not one of them.

### III.

Another, perhaps uncomfortable, issue deserves discussion. Stewart does not appear to have been the only member of Abdel Rahman's legal team both to agree to abide by the SAMs imposed upon Rahman and then subsequently to violate them. One of Rahman's lawyers, Abdeen Jabara, read to Rahman newspaper articles and letters from followers, while another,

13

Ramsey Clark, the former Attorney General of the United States, acknowledged issuing a statement to the media on behalf of Rahman.[10] Yet neither Jabara nor Clark was prosecuted for these apparent violations. This does not mean that the Government's decision to prosecute only Stewart was invidious or improper, and I join the majority opinion in rejecting Stewart's claim of selective prosecution. But though Stewart's selective prosecution challenge fails, it does not follow that the alleged misconduct of Jabara and Clark—whom the district court may well have decided shared in certain respects the culpable behavior for which Stewart was convicted—is entirely irrelevant to Stewart and to her sentence. I think it possible that it *is* relevant, and I believe that usually only the district court is positioned to evaluate that relevance.

As to claims of selective prosecution, we have properly recognized that our scope of review is limited, for "the decision as to whether to prosecute generally rests within the broad discretion of the prosecutor." *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003). As the Supreme Court has explained, this is because "the decision to prosecute is particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Yet this does not mean that unfettered (even when it is non-invidious) prosecutorial discretion over who gets charged, and for what, is categorically desirable. Quite the contrary: while prosecutorial discretion may be salutary in a wide variety of cases, when left entirely without any controls it will concentrate too much power in a single set of government actors, and they, moreover, may on occasion be subject to political pressure. The result may well be to produce disparities in the way similarly

---

[10] *See* Letter in Support of Lynne Stewart from Abdeen M. Jabara to Judge Koeltl (June 28, 2006), and Letter in Support of Lynne Stewart from Ramsey Clark to Judge Koeltl (Oct. 2, 2006), *available in* J. App. at 2211, 2334.

14

situated people are treated, disparities that our complex, Guidelines-with-district-court-discretion, system has sought to minimize. The district court's exercise of its sentencing discretion may provide the only effective way to control and diminish unjustified disparities, without operating in the blunt fashion of selective prosecution judicial review. It may reduce improper differences in treatment, without impinging on the executive's obligation to enforce the law.

Our case law provides support for this approach. For instance, while we have not *required* a district court to consider sentencing disparities among co-defendants, we have held that district courts are *permitted* to do so. As we explained, it is "appropriate for a district court, relying on its unique knowledge of the totality of circumstances of a crime and its participants, to impose a sentence that would better reflect the extent to which the participants in a crime are similarly (or dissimilarly) situated and tailor the sentences accordingly." *Wills*, 476 F.3d at 110 (internal emphasis omitted). This, as has been recognized, allows district courts to provide a check against certain otherwise unbounded prosecutorial decisions, as to what charges to bring and as to whether to make substantial assistance motions with respect to only some defendants.[11]

---

[11] *See* KATE STITH & JOSÉ A. CABRANES, FEAR OF JUDGING: SENTENCING GUIDELINES IN THE FEDERAL COURTS 140-42 (1998) (articulating concern, pre-*Booker*, that "exercise of broad prosecutorial authority over sentencing *within a system that severely limits the sentencing discretion of federal judges* means that the power of prosecutors is not subject to the traditional checks and balances that help prevent abuse of that power"and advocating system where judges have the "countervailing discretionary authority to restrain prosecutorial power") (emphasis in original); Ryan Scott Reynolds, Note, *Equal Justice under the Law: Post-*Booker, *Should Federal Judges Be Able to Depart from the Federal Sentencing Guidelines to Remedy Disparity Between Codefendant's Sentences?*, 109 COLUM. L. REV. 538, 564-66 (2009) (contending that the emerging rule among circuit courts that allows district courts to consider co-defendant disparity is desirable because it mitigates negative effects of excessive prosecutorial power over sentencing).

15

It is not much of an extension to permit the district courts to exercise analogous supervision over those decisions as to which prosecutors enjoy the greatest discretion and that result in the greatest disparities: the decisions on whether to bring any charges at all.

There are, of course, many reasons for prosecutors to fail to bring charges or to bring lesser charges than they could have, and some of these reasons are clearly irrelevant to the proper sentence of the person who has been charged and convicted. But other reasons may be relevant because they may suggest arbitrariness and can lead to abuse—such as the political clout of some potential defendants as against others. We as appellate judges are ill-suited to distinguish between relevant and irrelevant reasons in any given case. The same cannot be said, however, for a district court judge who has presided over a whole trial in which the behavior of uncharged or undercharged parties was part and parcel of the discussion.

This does not mean that when a district court issues a sentence that it should articulate its reliance on the prosecution's decision not to charge (or to undercharge) other parties. I am not sure. While we generally ask a district court to explain the reasons behind its sentence, and indeed indicated in *Cavera* that "a district court errs if it fails adequately to explain its chosen sentence, and must include an explanation for any deviation from the Guidelines range," 550 F.3d at 190 (internal quotations omitted), there are some things that are perhaps best left unsaid by the district court, even though their potential relevance is apparent on the record.[12] A prosecutor's decision to charge only some parties rather than others may be one of these things.

---

[12] *Cf.* Guido Calabresi, A COMMON LAW FOR THE AGE OF STATUTES 172-81 (1982) (discussing tradeoffs between open recognition of a doctrine and greater opacity, where the latter might be useful in preventing a doctrine's abuse).

The district court might quite reasonably want to avoid impugning the reputation of parties who have not been indicted or tried, and hence have not had the opportunity to assert innocence in open court. But that does not mean that a judge who has presided over a full trial may not have valid reasons to conclude that the failure to charge some potential co-defendants affects, *under the § 3553 factors*, the propriety of a sentence.[13]

I am inclined to think that the district court should not be barred from considering the relevance of prosecutorial discretion in a particular case, and that our legal system should take advantage of the district court's unique position to consider a defendant's sentence "in its *complete* relevant context," *Wills*, 476 F.3d at 110 (emphasis added). As appellate courts we should therefore also keep this issue in mind when we review a district court's sentence, and recognize it as a further reason to defer to a district court's sentencing judgments. In particular, though we may properly ask the district court to explain apparent sentencing anomalies among convicted defendants as both the majority opinion and the partial dissent do here, we should not forget that there might be even greater disparities between a defendant and other individuals who were not charged at all.[14]

---

[13] Significantly, our system of sentencing allows the district court to consider uncharged conduct by the defendant so as to ensure that the sentence is based upon "the *real conduct* that underlies the crime of conviction." *Booker*, 543 U.S. at 250 (Remedial Op., Breyer, *J.*). One of the principal reasons for this, as expressed by the Court, is to prevent prosecutors, when they make charging decisions, from "exercis[ing] a power the Sentencing Act vested in judges." *Id.* at 257.

[14] At footnote 20 *post*, Judge Walker describes as academic my discussion of the possible relation between the sentence imposed on the defendant before us, and the absence of any charges brought against the other lawyers originally involved in this case—lawyers, some of whose acts could surely be described in language as powerful as that used by Judge Walker with respect to the defendant's misdeeds. Whatever may be said of my views, they are not academic. They reflect instead the very practical consequences of: (a) the necessary absence of any judicial control over prosecutorial decisions as to whom to charge, decisions which, as Judge Walker rightly notes, are "exclusive and absolute" and "insulated from judicial review," Op. of J. Walker

17

**IV.**

Finally, I would be remiss if I did not follow the majority opinion in observing the fact that all of the acts for which Stewart was convicted occurred before the attacks of September 11, 2001, an event that illustrates in particularly excruciating fashion that results do matter to us. It does not diminish the gravity of Stewart's crimes to take judicial notice of their timing, and to recognize that our attitudes about her conduct have inevitably been influenced by the tragedy of that day. To suggest otherwise, and to ignore that 9/11 has profoundly influenced our retrospective assessment of the culpability of certain actions related to terrorists and terrorist organizations, would be to ignore reality. As the majority opinion says, Stewart herself might well have viewed her actions differently after 9/11 when the dangerousness of terrorism became so palpable, so stark, and—most important— so proximate. *See* Maj. Op. at **[119]**. We must be careful then in judging Stewart based on lessons that we learned only after her—very serious—crimes were committed.[15] In the end, this factor too is part of the district court's

---

at **[48 n.20]**; (b) the inevitable tendency of human beings, and hence also of "prosecutors acting in good faith," *id.*, to take easy rather than difficult (and possibly politically costly) actions. (It is perhaps worth noting again in this regard that one of the uncharged lawyers in this case was formerly the chief prosecutor of the United States, while the defendant is described by the district court as having "represented the poor, the disadvantaged and the unpopular," Sent'g Tr. 115); (c) the fact that without "initiating [any] inquisitorial foray into the prosecutor's office," Op. of J. Walker at **[48 n.20]**, a district court can get a pretty good read on the likely relative behavior of those involved in the complex set of actions that led to a particular trial, including those participants not charged; and (d) that the district court is given by law the direct task of determining what is "just punishment" and, in doing so, to "avoid unwarranted . . . disparities," 18 U.S.C. § 3553(a).

[15] On various occasions Judge Walker, in his partial dissent, makes reference to much higher sentences given by other federal courts to those who have aided terrorists, including in cases in which no harm occurred. *See* Op. of J. Walker at **[7 n.4, 29 n.13]**. It is no small matter, however, that the overwhelming majority of the cases Judge Walker cites involved post-9/11 actions by the defendants. *See, e.g., United States v. Khan*, 309 F. Supp.2d 789, 796 (E.D. Va.

18

obligation to consider "the nature and circumstances of the offense," and to impose a sentence that "reflect[s] the seriousness of the offense" and "provide[s] just punishment." *See* 18 U.S.C. § 3553(a)(1)-(2).

2004) (describing activities of Randall Royer and co-defendants and indicating "[t]he indictment alleges that . . . preparations culminated in [co-defendants and their co-conspirators] attending a terrorist and jihad training camp after September 11, 2001, with the intent to proceed to Afghanistan and fight for the Taliban and Al-Qaeda against United States troops").

This is not the only difference between Stewart and the defendants sentenced for material support crimes in the cases Judge Walker mentions—leaving aside one case, relied on by Judge Walker, where the convictions were subsequently vacated on appeal. *See United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) (vacating convictions of Al-Moayad and his co-defendant Mohsen Zayed due to serious evidentiary errors). Indeed, in one instance where the district court imposed a 180-month sentence, the court explicitly found that, for a variety of reasons, the defendant was *not* similarly situated to Stewart. *See United States v. Aref*, No.04-CR-402, 2007 WL 804814, at *7 (N.D.N.Y. Mar. 14, 2007).

19

United States v. Stewart
No. 06-5015-cr

WALKER, Circuit Judge, concurring in part and dissenting in part:

For two years, defendant Lynne Stewart, through artifice and deception, and despite sworn commitments to the contrary made to the government, carried out a criminal plan to transmit instructions from her imprisoned client, a terrorist leader, to his jihadist followers in the Middle East, including, ominously, his withdrawal of support for a fragile cease-fire in Egypt, an action that effectively sanctioned renewed terrorist attacks and indiscriminate loss of human life. The district court termed these deliberate and horrific crimes of terrorism, for which the Sentencing Guidelines recommends 30 years' imprisonment, "extraordinarily severe criminal conduct." And yet the district court imposed a breathtakingly low sentence of 2 1/3 years. Because the majority fails to recognize that this sentence trivializes Stewart's extremely serious conduct with a "slap on the wrist" that is substantively unreasonable, and because the majority fails to appreciate the full extent of the district court's numerous procedural errors, I respectfully dissent.[1]

---

[1] I concur, however, in the majority's opinion insofar as it upholds the defendants' convictions and directs the district court to resentence Stewart on the basis that it procedurally erred by failing to account for Stewart's likely perjury and obstruction of justice in imposing a sentence. The majority also has determined that, at resentencing, the district court must consider "whether Stewart's conduct as a lawyer triggers the special skill/abuse of trust enhancement under the Guidelines, see U.S.S.G. § 3B1.3 (2000), and reconsider the extent to which Stewart's status as a lawyer affects the appropriate sentence," Maj. Op. at **[127]**, but declined to find the district court's failure in this regard to be a procedural error. For reasons I set forth, this failure was one, among several, procedural errors that the majority failed to recognize.

In imposing Stewart's comparably insignificant sentence, the district judge rejected entirely a major enhancement, established by the Sentencing Commission under Congress' express command, that applies generally to the "material support" of terrorism. Despite finding that Stewart's crime was within the enhancement's "heartland," Sent'g Tr. 108, the district court found that the "atypicality" of Stewart's "material support" conduct in "provi[ding] a co-conspirator to a terrorist conspiracy," Sent'g Tr. 113, justified discarding the terrorism component of Stewart's crime in its § 3553(a) analysis. But, wholly apart from the fact that the provision of "personnel" falls squarely within the definition of "material support" provided in 18 U.S.C. § 2339A(b), it trivializes Stewart's conduct to even suggest that enabling a jailed terrorist leader, with enormous sway over his jihadist followers, to actively conspire with others in a scheme to kidnap and kill innocent people somehow mitigates the gravity of the crime. The district court also based its rejection of an enhancement for the material support of terrorism on the fact that Stewart's conduct did not result in actual injuries or death, even though that fact is rarely, if ever, a mitigating circumstance, much less a reason to jettison the terrorism enhancement altogether in its § 3553(a) analysis.

In addition to failing to make required findings on obstruction of justice based on evidence of Stewart's double perjury at trial, as the majority recognizes, Maj. Op. at **[122-124]**, the district court also all but ignored Stewart's gross

2

abuse of the fiduciary trust placed in her by the United States government, and, in the face of contrary policy statements by the Sentencing Commission, gave unjustified controlling weight to its mitigating view of Stewart's age, health, and previous career. Numerous additional errors attended the radical reduction of Stewart's sentence from the recommended 30 years to 2 1/3 years.

Section 3553(a) of Title 18 of the United States Code, which governed Stewart's sentence, requires that every sentence take into appropriate account "the nature and circumstances of the offense[,] and the history and characteristics of the defendant"; "reflect the seriousness of the offense"; "promote respect for the law"; and "adequate[ly] deter[]" similar conduct in the future. 18 U.S.C. § 3553(a)(1)-(2). The statute also mandates consideration of "the need to avoid unwarranted sentenc[ing] disparities." Id. § 3553(a)(6). Recognition of the full scope of the district court's procedural errors makes plain that Stewart's sentence fails to respect these goals and is so extraordinarily lenient as to manifest an abuse of discretion resulting in a substantively unreasonable sentence.

The majority appropriately acknowledges the fine reputation of the district court judge, a point with which I concur. And, like the majority, I commend the district court's management of this complex and difficult trial. However, the majority goes on to suggest, with Judge Calabresi's concurrence being quite explicit, that because of the district court's reputation, our review of the Stewart sentencing should be more deferential than

3

would normally be the case. This court has never recognized two classes of judges – those who are so good that their judgment is beyond reproach, and all the rest. Indeed, no judge on any federal court, including the Supreme Court, can lay claim to infallibility. Great respect for a particular judge cannot be a basis for overlooking what, in my view, amounts to a distortion of our sentencing laws. For the foregoing reasons, and others that I will describe, Stewart's sentence must be vacated and she must be resentenced.

## I. The Defendants' Exceptionally Serious Criminal Conduct

Sheik Abdel Rahman, Stewart's client, is a dedicated terrorist leader with a large jihadist following in the Middle East, known as the "Islamic Group" among other names, Maj. Op. at **[10]**, and a more discrete following in the United States. See United States v. Rahman, 189 F.3d 88, 104-05 (2d Cir. 1999) (per curiam). Abdel Rahman was locked up in federal prison in Rochester, Minnesota, to serve a life sentence imposed in 1996, after he was convicted for both (1) trying to wreak havoc in New York City by blowing up bridges, tunnels, and buildings, and (2) attempting to assassinate Egyptian President Hosni Mubarak. See id. at 148.

For two years, 2000 and 2001, the defendants in this case — Sattar, another jihadist with direct links back to Abdel Rahman's Egyptian followers; Stewart, Abdel Rahman's lawyer; and Yousry, Stewart's student interpreter — made sure that Abdel Rahman could continue to communicate with his jihadist cohorts. The

4

Department of Justice had employed "Special Administrative Measures" (SAMs) specifically designed to prevent such communications while still enabling an imprisoned terrorist to speak to, and be effectively represented by his attorney. Compliance with the SAMs system largely depends upon the trust placed in the attorney. In accordance with the SAMs, Stewart, repeatedly swore under oath that she would not transmit any non-legal communications to or from Abdel Rahman. She swore falsely.

Undeterred by the SAMs, Stewart, assisted by Yousry, executed a scheme of lies and deception against the government to keep the lines of communication open between Abdel Rahman and Sattar, and, through Sattar, the Egyptian jihadists. These communications included a declaration by Abdel Rahman that he was withdrawing his support for a tenuous cease-fire that, for some time, had aimed at curbing violent attacks by Abdel Rahman's followers upon targets in Egypt.[2] Stewart even went so far as to deliver this statement to an Arab journalist on Abdel Rahman's behalf, which resulted in the message's wide dissemination through the media in the Middle East.

The federal crimes committed by the defendants are numerous. All three conspired to defraud the United States, in violation of 18 U.S.C. § 371. Rahman, Sattar, and other jihadists conspired to kill and to kidnap persons in a foreign country, in violation

---

[2] The cease-fire's fragility is evident from its inability to stop an Islamic Group faction from slaughtering sixty tourists in Luxor, Egypt in 1997. See Douglas Jehl, 70 Die in Attack at Egypt Temple, N.Y. Times, Nov. 18, 1997, at A1.

5

of 18 U.S.C. § 956(a)(1), (a)(2)(A), and solicited crimes of violence, in violation of 18 U.S.C. § 373. Stewart and Yousry, both individually and in conspiracy, provided and concealed material support to terrorist activity — namely Rahman's and Sattar's conspiracy to kill and to kidnap — in violation of 18 U.S.C. §§ 371, 2339A. Additionally, Stewart made multiple false statements to the Department of Justice and to the Bureau of Prisons, in violation of 18 U.S.C. § 1001. Such behavior constitutes extraordinarily serious, indeed horrendous, criminal conduct; that there was no evidence that Stewart's conduct ultimately resulted in death and injury to innocent people was due to law enforcement's diligence, and not to any lack of effort by the defendants or their confederates.

For such crimes, the advisory Sentencing Guidelines effective on November 1, 2000, applicable here, provided for lengthy sentences: life imprisonment for Sattar, 360 months' imprisonment for Stewart, and 78 to 97 months' imprisonment for Yousry. A Guidelines recommendation, of course, is just that — a recommendation — and a district judge has considerable discretion to sentence outside of the Guidelines. See Gall v. United States, 128 S. Ct. 586, 594 (2007). The district court sentenced the defendants well below the recommended Guidelines ranges, lowering Sattar's sentence from a recommended life term to 24 years, Yousry's sentence from 78 months to 20 months, and Stewart's sentence from 360 months to a mere 28 months.

What is immediately striking about Stewart's sentence is not

6

simply its extraordinary 92 percent reduction from the recommended Guidelines range,[3] but also the fact that the actual term of incarceration imposed — 2 1/3 years — is unprecedented in convictions for material support of terrorism.[4] The Supreme Court has made clear that the Guidelines provide "the starting point and the initial benchmark" for sentencing, and that

---

[3] In Gall, the Supreme Court instructed appellate courts not to use, as a general matter, "the percentage of a departure [from the Guidelines] as the standard for determining the strength of the justifications required for a specific sentence." 128 S. Ct. at 595. This proscription recognizes that percentages cannot speak reliably across the Guidelines ranges. See id. ("The mathematical approach also suffers from infirmities of application."). For low Guidelines ranges, even small sentencing variances can yield large percentages, unfairly exaggerating a district court's action in imposing a non-Guidelines sentence. Id. For high Guidelines ranges, major variances can yield relatively modest percentages, inaccurately representing the significance of the district court's action. That percentages cannot always accurately measure a variance's significance does not, however, mean that percentages are always irrelevant. When, as here, a variance from the recommended Guidelines range is extraordinarily large both in terms of the actual reduction of time to be served (a 232-month reduction) and the percentage of the reduction (92 percent), these facts taken together strongly signal the need for careful review of the justifications advanced for the challenged sentence. See id. at 597 (observing that appellate courts may reasonably expect a "major departure" from the Guidelines sentencing range to be supported "by a more significant justification than a minor one").

[4] In material support convictions after the Guidelines were deemed advisory in United States v. Booker, 543 U.S. 220, 245 (2005), district courts have generally imposed sentences of at least ten years per material support count, with considerably higher total sentences. See, e.g., United States v. Aref, No. 04-CR-402, 2007 WL 804814, at *8 (N.D.N.Y. Mar. 14, 2007) (total sentences of 15 years for each of two defendants, with 15 years on each of 16 material support (MS) counts); United States v. Paracha, No. 03-CR-1197, Docket Entry No. 88 (S.D.N.Y. July 21, 2006) (total of 30 years, with 15 years on each of 2 MS counts); United States v. Ali, No. 05-CR-53, Docket Entry No. 397 (E.D. Va. Apr. 17, 2006) (total of 30 years, with 10 years on each of 4 MS counts); United States v. al-Moayad, No. 03-CR-1322, Docket Entry Nos. 197, 205 (E.D.N.Y. Sept. 14, 2005) (total of 75 years, with 15 years on each of 5 MS counts for first defendant; total of 45 years, with 15 years on each of 3 MS counts for second defendant), rev'd on other grounds, 545 F.3d 139 (2d Cir. 2008); United States v. Lakhani, No. 03-CR-880, Docket Entry No. 99 (D.N.J. Sept. 12, 2005) (total of 47 years, with 15 years on one MS count); United States v. Gamarra-Murillo, No. 04-CR-349, Docket Entry No. 59 (M.D. Fla. Aug. 9, 2005) (total of 25 years, with 15 years on one MS count); United States v. Royer, No. 03-CR-296, Docket Entry Nos. 600-02 (E.D. Va. July 29 2005) (total of 10 years for each of two defendants, with 10 years on each of 2 MS counts; total of 97 months for third defendant, with 97 months on 1 MS count). Most of these courts chose the maximum material support sentence available to them under federal law: fifteen years. See 18 U.S.C. §§ 2339A(a), 2339B(a)(1).

7

district judges must "remain cognizant of them" throughout the sentencing process. Id. at 596, 597 n.6; accord United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). When faced with an "unusually lenient" sentence such as Stewart's, we must ensure that the district judge has offered "sufficient justifications" to support his conclusion that the sentence is appropriate. Gall, 128 S. Ct. at 594. Despite the significant discretion accorded to district judges, we retain a limited but important reviewing function: We must review sentences for both procedural and substantive reasonableness.

## II. Relevant Legal Standards

Our review proceeds under a "deferential abuse-of-discretion standard," Gall, 128 S. Ct. at 591, and "a district court's decision to vary from the Guidelines 'may attract greatest respect when the sentencing judge finds a particular case [to be] outside the "heartland" to which the Commission intends individual Guidelines to apply,'" Cavera, 550 F.3d at 192 (quoting Kimbrough v. United States, 128 S. Ct. 558, 574-75 (2007)). However, "closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range fails properly to reflect § 3553(a) considerations even in a mine-run case." Kimbrough, 128 S. Ct. at 575 (internal quotation marks omitted); accord Cavera, 550 F.3d at 192. The basic contours of our role are as follows.

To evaluate procedural reasonableness, we must ensure that

8

the district court, in imposing a sentence, followed the procedural steps prescribed by law. Procedural reasonableness "requires that we be confident that the sentence resulted from the district court's considered judgment as to what was necessary to address the various, often conflicting, purposes of sentencing." Cavera, 550 F.3d at 189-90. Thus, a district court commits procedural error when it fails to calculate or incorrectly calculates the Guidelines range, treats the Guidelines as mandatory, neglects to consider the factors set forth in 18 U.S.C. § 3553(a),[5] or bases its sentence on a clearly

---

[5] Section § 3553(a) states in relevant part:

The [district] court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

        . . .

(5) any pertinent policy statement—

9

erroneous factual finding. See id. at 190. To avoid procedural error, a district court must also "adequately . . . explain its chosen sentence," including the reasons that the sentence should be different (in this case, extraordinarily different) from that recommended by the Guidelines, id., in order "to allow for meaningful appellate review and to promote the perception of fair sentencing," Gall, 128 S. Ct. at 597.

We do not categorically proscribe any factor "concerning the [defendant's] background, character, and conduct," with the exception of invidious factors. 18 U.S.C. § 3661; see also Cavera, 550 F.3d at 190-91; United States v. Kaba, 480 F.3d 152, 156-57 (2d Cir. 2007). Still, while a district court may "take into account any information known to it," United States v. Concepcion, 983 F.2d 369, 387 (2d Cir. 1992), it does not possess "a blank check to impose whatever sentences suit [its] fancy," Cavera, 550 F.3d at 191 (quoting United States v. Jones, 531 F.3d 163, 174 (2d Cir. 2008)). And a district court, despite its discretion, cannot ignore any of the § 3553(a) factors; it must consider them all, Gall, 128 S. Ct. at 596, including the relevant Guidelines range and "any pertinent Sentencing Commission policy statement," Cavera, 550 F.3d at 188-89. See also 18 U.S.C. § 3553(a)(4)-(5). As we stated in United States v.

---

(A) issued by the Sentencing Commission . . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

10

Fernandez:

> As long as the judge is aware of both the statutory requirements and the sentencing range or ranges that are arguably applicable, and nothing in the record indicates misunderstanding about such materials or misperception about their relevance, we will accept that the requisite consideration [of the § 3553(a) factors] has occurred.

443 F.3d 19, 29-30 (2d Cir. 2006) (quoting United States v. Fleming, 397 F.3d 95, 100 (2d Cir. 2005) (emphasis from Fernandez omitted)). However, if the district court has "ignored or slighted a factor that Congress has deemed pertinent" in § 3553(a), it has abused its discretion. United States v. Taylor, 487 U.S. 326, 337 (1988); Gall, 128 S. Ct. at 607 (Alito, J., dissenting); see also id. at 596 (majority opinion) (directing district courts to "consider all of the § 3553(a) factors" (emphasis added)).

In performing substantive reasonableness review, we must determine whether the district court's sentence is "located within the range of permissible decisions." Cavera, 550 F.3d at 191 (internal quotation marks omitted). "[W]e take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." Id. at 190. But we must accept that such discretion is not boundless. "In sentencing, as in other areas, district judges at times make mistakes that are substantive. . . . Circuit courts exist to correct such mistakes when they occur." Rita v. United States, 551 U.S. 338, 354 (2007). Because the § 3553(a) factors are to "guide sentencing," the factors also "guide appellate

courts . . . in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. 220, 261 (2005). And because "it is fair to assume that [the Guidelines], insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives," Rita, 551 U.S. at 350, our judgment of a sentence's substantive reasonableness must be informed by "the extent of any variance from the Guidelines range," Gall, 128 S. Ct. at 597.

In light of a district court's wide discretion in sentencing, we do not "presume that a non-Guidelines sentence is unreasonable." Cavera, 550 F.3d at 190. But when a district judge chooses to step away from the Guidelines, we "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Gall, 128 S. Ct. at 597; accord Cavera, 550 F.3d at 190. There is no "rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." Gall, 128 S. Ct. at 595. Rather, our focus on the degree of deviation is derived from the "uncontroversial" proposition "that a major departure should be supported by a more significant justification than a minor one." Id. at 597. Whatever the justification, its persuasive power depends in large part on the quality of its reasoning. Accordingly, in order to determine whether the sentencing court acted reasonably, we must examine how it reached its conclusions, and determine how persuasive its stated reasons

12

are in supporting its exercise of discretion. See id. at 600-02. If the district judge's reasoning is sound, "we will not second guess the weight (or lack thereof) that the judge accorded to a given [§ 3553(a)] factor . . . . as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented." Fernandez, 443 F.3d at 32, 34 (emphasis added). We have noted, however, that "unjustified reliance upon any one factor is a symptom of an unreasonable sentence," United States v. Rattoballi, 452 F.3d 127, 137 (2d Cir. 2006), but only a symptom: We must reach our decision by examining the reasoning of the district court in light of the totality of the circumstances, with due deference to the district court's judgment.

**III. Stewart's Sentence**

A. The District Court's Findings and Conclusions

In sentencing Stewart, the district court began by calculating her sentencing range under the Guidelines, and found it to be 360 months, the statutory maximum.[6] Sent'g Tr. 112. The district court's Guidelines calculation was clearly appropriate. The majority speculates that the district court might not have fully applied the terrorism enhancement in calculating Stewart's range, see Maj. Op. at **[125 n.37]**; this speculation is belied by the record and is therefore unwarranted, see Sent'g Tr. 112, 114. Over Stewart's objection, the district

---

[6] The district court calculated Stewart's total Adjusted Offense Level at 41 with a Criminal History Category of VI, yielding a Guidelines "sentencing range" of the statutory maximum of 360 months' imprisonment.

13

court found that the Guidelines terrorism enhancement, U.S.S.G. § 3A1.4 (2000), applied because she had committed a "federal crime of terrorism." Sent'g Tr. 107-08. In light of the "ample evidence" showing that Stewart's "actions were calculated to affect the conduct of the Egyptian government through intimidation and coercion," the district judge held that her conduct "cannot be found to be outside the heartland of the enhancement." Sent'g Tr. 108. The district court acknowledged Stewart's arguments that the enhancement did not apply, and that its effect on her Criminal History Category overstated the seriousness of her past conduct and the likelihood that she would commit further crimes. Sent'g Tr. 108-09. The district court, however, did not waver from its "heartland" determination, and chose to defer consideration of Stewart's non-application and overstatement claims to its § 3553(a) analysis, instead of determining whether they warranted departures within the Guidelines' scheme. Sent'g Tr. 109.

The district court also declined to determine whether Stewart's conduct warranted a Guidelines enhancement for her potential obstruction of justice under U.S.S.G. § 3C1.1 (2000). The government had urged this enhancement based upon Stewart's alleged double perjury at trial. Sent'g Tr. 111. The district court found "evidence to indicat[e] that [Stewart's] statements were false." Sent'g Tr. 111. The court nonetheless chose not to consider the enhancement's applicability, on the basis that the Guidelines, because of the terrorism enhancement, already

14

provided for the statutory maximum. Sent'g Tr. 111. The district court also noted that it believed a non-Guidelines sentence would be "most consistent with the [§ 3553(a)] factors." Sent'g Tr. 111-12.

Stewart sought several downward departures under the Guidelines. First, she argued that she deserved a "lesser harms" departure pursuant to U.S.S.G. § 5K2.11 (2000) because she committed her crime in order to avoid a perceived greater harm.[7] Rejecting this argument, the district court found that "the circumstances of this case do not diminish society's interest in punishing the conduct at issue," and that "[t]his is not a case where the interest in punishment or deterrence is reduced." Sent'g Tr. 109-10. The district court also rejected Stewart's request for a downward departure under U.S.S.G. § 5K2.20 (2000), which applies to "aberrant behavior." The district court refused to grant this departure because Stewart's conduct "was committed over an extended period of time, involved repeated acts of deception, and involve[d] significant planning." Sent'g Tr. 110.

---

[7] Specifically, Stewart claimed that her criminal conduct "was the product of her perception that [Abdel Rahman's] health and well-being were seriously jeopardized by his continued imprisonment in the United States." Stewart Sent'g Br. 44-45. She explained at trial that it "was important for [Abdel Rahman's] frame of mind that he have sort of peace of mind about his family, about people he had known when he was in the world, or the letters that were usually sent to him." Trial Tr. 7720-21. Stewart's justification for her conduct is patently absurd in light of evidence that she transmitted messages related not to personal family matters but rather to plans to kidnap and kill large numbers of innocent people, and to terrorize even more. The fact that Stewart attempted to justify her potentially devastating criminal conduct by citing her obligations to her client not only highlights her eagerness to corrupt the role of defense counsel, but also casts serious doubt on two of the district court's purported mitigating factors: (1) the unlikelihood that Stewart would provide material support to terrorism in the future, and (2) the "public service" value of her work as a defense attorney.

15

Finally, the district court stated that it would take into account Stewart's requested departure for "extraordinary medical conditions," pursuant to U.S.S.G. § 5H1.4, when making its § 3553(a) determination.

Having found that the Guidelines called for Stewart to receive the statutory maximum of 360 months, the district court proceeded to its § 3553(a) analysis. The district court cited what it believed to be "numerous factors that argue in favor of a very substantial downward variance." Sent'g Tr. 113. First, the district court noted that "this is an atypical case for the terrorism enhancement," because "there are few, if any, cases where the thrust of the violation was the provision of a co-conspirator to a terrorist conspiracy." Sent'g Tr. 113. "Moreover," the district court explained, "there is no evidence that any victim was in fact harmed as a result of the offense as charged . . . ." Sent'g Tr. 113. The district court also found the terrorism enhancement's impact on Stewart's Criminal History Category to be "dramatically unreasonable." Sent'g Tr. 113.

The district court thus concluded that application of the full terrorism enhancement, "while correct under the guidelines, would result in an unreasonable result in this atypical case and produce a guideline range about quadruple the range without that enhancement." Sent'g Tr. 114. Accordingly, the district court proceeded to consider Stewart's sentence as if there was no terrorism component to her material support. Although the district court reached the appropriate Guidelines calculation,

16

the district court, in its § 3553 analysis, effectively set aside the enhancement, sentencing Stewart as if the Guidelines ranges were 78 to 97 months' imprisonment without the government's requested obstruction enhancement, and 97 to 121 months' imprisonment with that enhancement. Sent'g Tr. 114. The district court then stated that these ranges did not "tak[e] into account the extraordinary personal characteristics of the defendant[,] which also argue strongly in favor of a substantial downward variance." Sent'g Tr. 114.

Noting that "[t]he personal characteristics of the defendant are intertwined with several of the [§ 3553(a)] factors," Sent'g Tr. 115, the district court then discussed at length Stewart's age, health, and career. The district court described Stewart's career of "represent[ing] the poor, the disadvantaged[,] and the unpopular," and concluded that it was "no exaggeration to say that Ms. Stewart performed a public service not only to her clients but to the nation." Sent'g Tr. 115-16. Although acknowledging that, under the Guidelines, "prior good works are not ordinarily relevant" to a defendant's sentence, the district court noted that even the Guidelines permitted "extraordinary contributions [to] take a defendant outside the Guidelines ra[n]ge." Sent'g Tr. 116. Accordingly, the district court held that Stewart's past work warranted a "substantial downward variance." Sent'g Tr. 116.

The district court then explained that Stewart's conviction would likely prevent her from ever practicing law again. The

17

court found that this "is itself a punishment," and "means that the occasion for offenses will be removed and that a lengthy sentence of imprisonment would be an excessive one . . . for deterrence and protection of the public." Sent'g Tr. 116-17.

The district court noted that Stewart was 67 years old, making "imprisonment . . . particularly difficult on her." Sent'g Tr. 117. And the court found Stewart's history of overcoming cancer relevant because she had a "statistically significant chance of recurrence" and "suffers from other medical conditions including sleep apnea." Sent'g Tr. 117. The district court acknowledged that "[m]edical care can be delivered while in prison," but found it "clear that prison will be particularly difficult for this defendant." Sent'g Tr. 117.

Despite noting that "age and physical condition are discouraged factors under the guidelines," the district court concluded that, "[b]ecause imprisonment will be particularly hard on the defendant, a lesser sentence than otherwise called for by the advisory guidelines would be sufficient to accomplish the goals of Section 3553(a)(2)." Sent'g Tr. 117-18. But the district court reiterated that there still was "an irreduceable core of extraordinarily severe criminal conduct." Sent'g Tr. 118. The court "point[ed] out that the offenses of conviction were serious, involved dishonesty and breach of trust, and had potentially lethal consequences . . . ." Sent'g Tr. 119. However, the district court felt that "the seriousness of the offense d[id] not wipe out the three decades of service and the

18

other characteristics of the defendant and the particular effects of the sentence on this defendant." Sent'g Tr. 119. Accordingly, "[t]aking all of the [§ 3553(a)] factors into account," the district court sentenced Stewart to 28 months' imprisonment. Sent'g Tr. 120.

B. The District Court's Procedural and Analytical Errors

The majority raises four issues concerning Stewart's sentence: (1) It does not understand why Stewart's abuse of her position as a lawyer did not warrant a higher sentence, Maj. Op. at **[120-121]**; (2) it does not understand why Stewart's sentence was only eight months longer than Yousry's, despite her significantly more egregious conduct, Maj. Op. at **[121-122]**; (3) it finds that the district court procedurally erred by ignoring Stewart's potential perjury, which was relevant to her sentence under § 3553(a), Maj. Op. at **[122-124]**; and (4) without finding error, it notes the district court's failure to include consideration of whether support of terrorism is an aggravating factor and suggests that the district court reconsider whether Stewart's sentence was appropriate in view of the offense for which she was convicted; Maj. Op. at **[124-126]**. Accordingly, the majority remands for resentencing, directing the district court to address the perjury issue, consider whether Stewart's conduct as a lawyer triggers the abuse-of-trust enhancement under U.S.S.G. § 3B1.3, reconsider the extent to which Stewart's status as a lawyer affects the appropriate sentence, and examine the overall appropriateness of Stewart's sentence, taking into

19

account the terrorism enhancement, in light of the magnitude of her offense. Maj. Op. at **[127-128]**.

Although I share the majority's four concerns and its conclusion that resentencing is required, the district court made several substantial errors that the majority refuses to identify as legal errors. Our error correcting function requires us to specify these errors now, when they are evident to the court, to prevent their repetition on remand and in other cases. Notably, because the district court's stated reasons for effectively removing altogether the terrorism object of Stewart's material support in its § 3553(a)(2)(A) analysis cannot, in fact, mitigate the seriousness of Stewart's crime, I identify procedural error in the district court's application of 18 U.S.C. § 3553(a)(2)(A). This grave error in assessing the seriousness of Stewart's crime, moreover, was compounded by the district court's failure to account for two aggravating factors plainly relevant under the Guidelines: Stewart's perjury, and her persistent and blatant abuse of a position of trust to commit her crime. See 18 U.S.C. § 3553(a)(4). While the majority acknowledges these last two procedural errors, its failure to explicitly recognize the error that they compound minimizes the magnitude of the district court's error in identifying the seriousness of Stewart's criminal conduct — which, in turn, contributed to other errors.

Without a reasonable assessment of the seriousness of Stewart's crime, the district court could not reliably determine the sentence necessary to afford adequate general and specific

20

deterrence for crimes of material support of terrorism. See 18 U.S.C. § 3553(a)(2)(B). The district court's error in assessing the seriousness of Stewart's crime further precluded a reliable determination of the sentence necessary to avoid unwarranted disparities with similarly situated criminals. See 18 U.S.C. § 3553(a)(6).

Moreover, the district court's error in assessing the seriousness of Stewart's crime prompted it to accord Stewart's age, health, and career mitigating weight that they cannot reasonably bear. The totality of these procedural errors, all originating in a disturbing misunderstanding of the seriousness of Stewart's conduct, contributed to a sentence that so trivializes the terrorism crimes of conviction as to present a rare occurrence in this court: a sentence that cannot be deemed to fall within the wide range of substantively reasonable choices available to a sentencing judge. Cf. Jones, 531 F.3d at 174.

## 1. Assessing the Seriousness of Stewart's Crime as Required by § 3553(a)(2)(A)

### a. The Terrorism Enhancement

In 1994, Congress expressly mandated that the Sentencing Commission provide for a terrorism enhancement to ensure that crimes of terrorism were met with a punishment that reflected their extraordinary seriousness. See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022. The Commission accordingly created an enhancement that operates both vertically, increasing the offense level to

21

indicate the seriousness of the crime, and horizontally increasing the defendant's Criminal History Category to reflect the need for deterrence, regardless of the defendant's prior record. See U.S.S.G. § 3A1.4 (2000).[8] As the majority acknowledges, the Sentencing Commission "unambiguously cast a broad[] net" when drafting the terrorism enhancement. Maj. Op. at [95] (quoting United States v. Mandhai, 375 F.3d 1243, 1247 (11th Cir. 2004)). The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 91-92 (2d Cir. 2003) (emphasis added). Under the applicable Guidelines, the enhancement increases the Guidelines sentence for a terrorism crime to a minimum of 210 months or 17 1/2 years; particularly serious crimes, such as Stewart's, have even higher sentences after the enhancement is applied.[9]

_____

[8] The terrorism enhancement provides:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4 (2000).

[9] As previously noted, the district court calculated the Guidelines "sentencing range" to be the statutory maximum of 360 months' imprisonment.

22

Despite finding that Stewart's crime fell within the terrorism enhancement's "heartland," the district court, in its § 3553(a) analysis, sentenced Stewart as if there was no terrorism component to her material support - and then proceeded to reduce her sentence considerably further for additional reasons. The district court effectively sentenced Stewart as though she had committed no "federal crime of terrorism," U.S.S.G. § 3A1.4 (2000), even though the jury and the district court itself had expressly found to the contrary. In an effort to avoid addressing this issue today, the majority suggests that the record could support the conclusion that the district court, in fact, considered the terrorism aspect of Stewart's crime as an aggravating factor and thus did not commit error by failing to factor the terrorism component of Stewart's crime into its § 3553(a) analysis. This suggestion has no basis in the record, and the majority does not even begin to explain how the terrorism component could have possibly been an aggravating factor in a sentence that radically reduced Stewart's sentence from the recommended 30 years to a mere 2 1/3 years.

Whatever the merits of the district court's disregard of the enhancement on the basis that it overstated Stewart's criminal history, the district court's complete elimination of the effect of the enhancement's vertical component in assessing the seriousness of Stewart's crime cannot withstand scrutiny in light of the district court's obligation to impose a sentence sufficient to reflect the seriousness of the crime of conviction.

23

The district court offered two rationales for ignoring the terrorism enhancement's vertical component when determining Stewart's sentence under § 3553(a): the "atypical" nature of Stewart's crime, and the lack of evidence of harm to victims. Neither rationale is sustainable in this case.

Because the district court offered unsound rationales for mitigating the seriousness of the terrorism aspect of Stewart's crime, effectively sentencing Stewart as if there was no terrorism component to her crime whatsoever, I find error. The error is evident in light of the values inherent in the Guidelines, which provide a very strong signal that crimes in furtherance of terrorism objectives are to be considered exceptionally serious, see U.S.S.G. § 3A1.4 (providing for a 12 offense level increase with a minimum offense level of 32 and minimum Criminal History Category of VI). Jettisoning the terrorism component of Stewart's crime in its § 3553(a) analysis is particularly inexplicable when considered against the district court's recognition that Stewart's conduct fell within the enhancement's "heartland," and the fact that terrorism was a required element of the crime for which Stewart was convicted.

Offering its first rationale, the district court stated that Stewart's conviction was "an atypical case for the terrorism enhancement" despite concluding minutes earlier that Stewart's conduct "cannot be found to be outside the heartland of the enhancement." Sent'g Tr. 108, 113. The "atypical" heartland conduct, the district court added, was "the provision of a co-

24

conspirator to a terrorist conspiracy." Sent'g Tr. 113. The district court did not explain this conclusion, nor can the record support a reasonable explanation. At the outset, I question the atypicality of this conduct as a mitigating factor. Congress itself has made plain that giving material support, which is a crime of terrorism under the Guidelines, can be satisfied entirely by the provision of "personnel." See 18 U.S.C. § 2339A(b) (including the provision of personnel in the definition of "material support"). Indeed, it is absurd and therefore necessarily unreasonable to even suggest that enabling an incarcerated terrorist leader with enormous influence to actively conspire with others in a scheme to kidnap and kill innocent persons somehow mitigates the seriousness of the crime.

Sheik Abdel Rahman was no ordinary "co-conspirator." He was the head of the snake, a spiritual leader of a violent terrorist group whose words carried the force of a holy writ among his followers, and a man serving a life term for conspiring to bring deadly chaos to New York City. See Rahman, 189 F.3d at 103-11. After Abdel Rahman's influence had been sapped by the incarceration and isolation attending his lawful conviction, Stewart's crime specifically targeted undoing this protection by successfully enabling Abdel Rahman, as the Islamic Group's spiritual leader, to communicate with his followers and to support the renewal of bloodshed. Abdel Rahman's unique stature in the terrorist world surely renders Stewart's crime "atypical," but this atypicality is an aggravating factor, not a mitigating

25

one, thereby making Stewart more culpable than a defendant engaged in more "typical" material support, such as providing money or a cache of firearms to a terrorist group.

Although material support of terrorism may cover a "multitude of sins," as Judge Calabresi's concurrence states, Op. of J. Calabresi at **[3]**, this observation does no work in justifying a district court's complete disregard of the terrorism enhancement. Each "sin" has a critical feature in common; it supports terrorism. And Congress has sent a clear signal that this feature alone warrants enhancement of punishment. See U.S.S.G. § 3A1.4 (providing for a 12 offense level increase with a minimum offense level of 32 and minimum Criminal History Category of VI). That signal was not heeded in this case. The procedural concern with the district court's sentence is not with where Stewart's conduct was placed on the terrorism spectrum: it is with whether that conduct was placed on the spectrum at all. Removing Stewart from the spectrum on account of the nature of her "sins" is particularly egregious given that Stewart's conduct supported Abdel Rahman, a terrorist at the highest level.

Beyond erroneously finding mitigating atypicality in "provi[ding] a co-conspirator to a terrorist conspiracy," Sent'g Tr. 113, the district judge offered no further explanation of why Stewart's "atypical" conduct should lessen Stewart's culpability or justify ignoring the terrorism object of Stewart's material support as an aggravating factor in its § 3553(a) analysis, particularly in view of its "heartland" finding. As a result, we

26

are left only with the district judge's bare assertion of atypicality, which cannot reasonably support the complete rejection of the terrorism enhancement.  See Cavera, 550 F.3d at 193.

The district court's second rationale for giving no effect to the terrorism component of Stewart's material support — the absence of evidence that Stewart's terrorism crimes resulted in actual harm — is similarly flawed.[10]  Several points must be made before explaining why this reasoning amounted to procedural error.  First, the absence of harm is in no sense attributable to Stewart.  Alaa Abdul Raziq Atia, the leader of the violent faction of the Islamic group, including Abdel Rahman, was located and killed by Egyptian authorities after the cease-fire was lifted but before he could act upon it.  Second, the district court did not simply consider the absence of harm as a factor to lessen the effect of the terrorism enhancement; it used that fortuity to completely eliminate the effect of the terrorism enhancement in its § 3553(a) consideration, so that Stewart, in substance, was punished as if she had committed no crime of terrorism at all.  Third, the district court provided no reason, much less a persuasive one, for why the absence of death or injury should have such a steep mitigating effect in this case.

I take issue with the majority's failure to identify as procedural error the district court's deeply flawed reliance on

---

[10] Because the district court's flawed reliance on the absence of harm in this case also infected Sattar's and Yousry's sentences, I would vacate their sentences and remand for resentencing as to them as well.

27

the fortuity that Stewart's crime did not have the horrific consequences that she and Abdel Rahman intended. In doing so, the majority fails to appreciate the unique nature of terrorism support crimes, and the enhancement punishment they warrant as envisioned by Congress. Judge Calabresi's concurrence mistakenly equates such crimes to ordinary crimes and attempts, and erroneously permits the district court to eliminate the enhancement altogether primarily because the intended destruction of innocent life did not come to pass. Op. of J. Calabresi at **[6]**.

Congress and the Sentencing Commission plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences. See United States v. Abu Ali, 528 F.3d 210, 264-65 (4th Cir. 2008). Such intent is plain from the many criminal statutes and Guidelines unrelated to terrorism that specifically account for the level or absence of injury, while the material support statute and terrorism enhancement do not.[11] Moreover, Congress amended Stewart's statute of conviction in 2001 so that causing death increased the statutory

---

[11] See, e.g., 18 U.S.C. § 2119 (varying maximum penalty for carjacking based on injuries caused); U.S.S.G. § 2A1.5(c)(1) (2000) (increasing offense level for conspiracy or solicitation to commit murder if the offense resulted in the death of a victim); id. § 2A2.2(b)(3) (2000) (varying offense level for aggravated assault based on the victim's injuries).

28

maximum from 15 years to life imprisonment.[12] Contrary to the suggestion in Judge Calabresi's concurrence that the achievement of harm, like a two-way elevator, cannot be an aggravating factor unless the absence of such harm is a mitigating factor, Op. of J. Calabresi at **[9]**, Congress has been unmistakably clear that, as a general matter, the achievement of actual harm may aggravate the seriousness of a terrorism crime but that the absence of proven harm does not mitigate such a crime. As such, the district court's decision to place substantial mitigating weight upon the absence of harm is thus so far contrary to the policy choices of Congress and the Commission that it cannot be deemed reasonable under § 3553(a)(1)(A) without persuasive explanation. See Kimbrough v. United States, 128 S. Ct. 558, 575 (2007).

Unremarkably, courts routinely, and unflinchingly, apply the terrorism enhancement in the absence of proven harm.[13] Here, the Egyptian police caught and killed Alaa Abdul Raziq Atia, a

___

[12] See Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, § 810(c)(2), 115 Stat. 272, 380 (codified as amended at 18 U.S.C. § 2339A(a), 2339B(a)(1)).

[13] See, e.g., Meskini, 319 F.3d at 91-92; United States v. Garey, 546 F.3d 1359, 1363 (11th Cir. 2008) (per curiam); United States v. Benkahla, 530 F.3d 300, 313 (4th Cir. 2008) ("Here, . . . the terrorism enhancement is doing just what it ought to do: Punishing more harshly than other criminals those whose wrongs served an end more terrible than other crimes."); United States v. Hale, 448 F.3d 971, 988 (7th Cir. 2006) ("That [the defendant] did not commit a federal crime of terrorism is irrelevant; the district court found the purpose of his soliciting [a co-conspirator] was to promote a federal crime of terrorism . . . ." (emphasis in original)). In footnote 6 of his concurrence, Judge Calabresi correctly points out that Garey resulted in a downward variance from the Guidelines. Op. of J. Calabresi at **[7 n.6]**. But the district court did not reject the terrorism component of the defendant's crime altogether in its § 3553 calculus, as here. In applying a somewhat reduced enhancement – even for that mentally ill defendant who's crime was telephoning threats to a shopping mall  – it imposed a 30 year prison sentence.

29

violent co-conspirator, after Abdel Rahman and Stewart withdrew Rahman's support for the cease-fire, but before Atia could act on that message. This fortuity likely prevented Stewart's crime from harming victims, but "[f]ortuity has no bearing on culpability," United States v. Mitchell, 178 F.3d 904, 910 (7th Cir. 1999), nor does it mitigate to any degree the seriousness of Stewart's conduct.[14] Abdel Rahman himself was appropriately given a life sentence even though his plans to assassinate President Hosni Mubarak and to blow up bridges, tunnels, and buildings in New York City were frustrated. See Rahman, 189 F.3d at 124-126. There is no reason why fortuity should have enabled Stewart, Rahman's supporter, enabler, and co-conspirator, to be sentenced as if no terrorism crimes had ever occurred.

In suggesting that the district court's heavy reliance on the lack of proven harm was reasonable, neither the majority's opinion nor Judge Calabresi's concurrence finds support in the case law, and I have found none. Judge Calabresi is reduced to observing that attempted crimes are sometimes treated differently from completed crimes, even when only fortuity separates the two. Op. of J. Calabresi at **[5-6]**. But how the law treats attempts is besides the point. As the majority itself recognizes, material support of terrorism is "a substantive, not inchoate, offense."

---

[14] Cf. United States v. Simpson, 538 F.3d 459, 464 (6th Cir. 2008) ("It cannot be . . . that a crime [of insurance fraud] spanning several years . . . is not very serious merely because none of the employer's workers happened to get hurt."); United States v. Butler, 970 F.2d 1017, 1030 (2d Cir. 1992) (Newman, J., concurring) ("Whatever sentence is ultimately imposed on [the defendant], . . . [it] should not turn on fact-finding that has little if any relevance to moral culpability.").

Maj. Op. at **[51]**. "This is an independent crime, complete in its most serious form when the [material support] is complete and nothing is added to its criminality by success or consummation, as would be the case, say, of attempted murder." Spies v. United States, 317 U.S. 492, 498-99 (1943).

The Fourth Circuit recently agreed with my position, vacating a sentence of 30 years' imprisonment because the district court impermissibly reduced, on the basis of lack of harm, the sentence of a defendant, as here, convicted of conspiracy to provide material support. Abu Ali, 528 F.3d at 264-65. It reasoned that "[t]o deviate on the basis of unrealized harm is to require an act of completion for an offense that clearly contemplates incomplete conduct. By definition, conspiracy offenses do not require that all objects of the conspiracy be accomplished. The Guidelines appropriately recognize this fact: while they normally afford a three-level decrease for non-specific offense conspiracies that were not on the verge of completion, they specifically exclude from this decrease any conspiracies that involve or promote 'a federal crime of terrorism.'" Id. at (citing U.S.S.G. § 2X1.1). I completely agree with this statutory conclusion. As the Fourth Circuit aptly stated, we are not relegated to "wait[ing] until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism." Id.

Stewart completed her crime as Congress chose to define it, and the Sentencing Commission, in drafting the terrorism

31

enhancement, elected not to mitigate its seriousness by rewarding a defendant whose crime did not ultimately result in death or serious injury with a reduced sentencing range. It is for this reason that lack of success cannot normally be a mitigating factor even though achievement of harm may be an aggravating factor. Permitting a district judge to require success in harming innocents before he will consider the terrorism component of a crime, particularly in a "heartland" case, is to permit that judge to disregard the fact that material support is itself a fully completed crime.

The majority states that "[f]ortuitous events are not categorically irrelevant to the determination of a just punishment nor is their consideration necessarily inappropriate." Maj. Op. at **[100]**. As a general matter, of course, I agree. In addition, I do not mean to suggest that there can never be a terrorism case in which absence of harm might be an appropriate consideration. Rather, I am suggesting that there is a very broad heartland of cases in which it should not be considered, and further that in this heartland, as here, it is error to use lack of harm as a primary reason for rejecting the terrorism component of a material support conviction. If, for example, an incompetent terrorist satisfies the enhancement by putting a small amount of arsenic into a reservoir for New York's drinking water with every intention of killing thousands, but without understanding that the quantity is insufficient to cause harm, the complete absence of any practical possibility that the plot

32

could cause harm may well be relevant. But, that is far from the instant case, in which Stewart's actions were designed to embolden Rahman's followers to resume a murderous jihad against scores of innocent individuals in Egypt and elsewhere. In this case, it was unreasonable for the district court to place any weight on the fortuitous and attenuated events that saved the potential victims of Stewart's crime, much less to use it to wipe out the terrorism component of Stewart's crime in its § 3553(a) analysis, in light of the values signaled by the Guidelines terrorism enhancement.

Judge Calabresi's attempt to defend the district court's analysis, by offering a hypothetical comparing the punishment of a terrorist who succeeds in causing harm with the punishment of one who does not misses the mark. See Op. of J. Calabresi at [9]. The question at issue is not whether the amount of harm can never be a factor in sentencing. It is whether the terrorist who attempts to detonate a bomb in a public place, with the intent of killing many innocent Americans, should be able to escape the terrorism enhancement altogether simply because his plan happens to fail or be foiled by authorities. The answer, as the Sentencing Commission has made clear, is no. A more persuasive reason than the mere absence of injury must be provided by the district judge who uses that factor to eliminate entirely the effect of the terrorism enhancement. To permit a judge to completely ignore the terrorism component of a material support conviction in a "heartland" case simply because the terrorist did

33

not succeed, without further explanation as to why that case is *sui generis*, is to overlook the reality that the objective of terrorism is to kill large numbers of innocent people and that maximum deterrence needs to be achieved irrespective of success. *See* Abu Ali, 528 F.3d at 264-65.

Actual harm is a flawed metric when determining culpability in material support prosecutions. Precisely because of the devastating consequences at stake, it is, and should be, the focus of enforcement authorities to make every effort to prevent those consequences before they occur. When enforcement authorities are successful, it is to their great credit and their efforts should in no sense lessen the deterrent effect of punishment by conferring a sentencing benefit on those whose efforts were thwarted. Indeed, the House Report accompanying the Comprehensive Antiterrorism Act of 1995, which criminalized the material support of terrorism, explained that one of the legislation's primary goals was to "enhance [law enforcement's] capability of thwarting, frustrating, and preventing terrorist acts *before* they result in death and destruction." H.R. Rep. No. 104-383, at 42 (1995) (emphasis added).

I fully recognize that district judges must develop ways of distinguishing whether and why one form of material support is more or less reprehensible than another, given the broad range of conduct that the material support statute criminalizes, *see* 18 U.S.C. § 2339A. However, it makes little sense to have the presence or absence of resultant harm to victims be a factor in

34

that determination.  Cf. United States v. Whiteskunk, 162 F.3d 1244, 1251 (10th Cir. 1998) (finding it "unfair not to recognize and accommodate th[e] varying spectrum of culpability" when sentencing for a "broad category of conduct" (emphasis added)). Because material support providers often have been, and hopefully will continue to be, apprehended before the crimes that they foster come to fruition, the lack of physical injury is more likely to be the norm than the exception.

Accordingly, the lack of injury here was not a fact of "critical relevance . . . distinguish[ing]" Stewart's conduct "not only from that of all [her] codefendants, but from the vast majority of defendants convicted of conspiracy in federal court." Gall, 128 S.Ct. at 600.  Giving the absence of harm mitigating significance thus not only fails to recognize the extreme seriousness of such crimes even without achievement of actual harm, it undermines one of § 3553(a)'s express goals: eliminating sentencing disparities.  See 18 U.S.C. § 3553(a)(6); United States v. Simpson, 538 F.3d 459, 464 (6th Cir. 2008) (noting that focusing on "the defendant's culpability" instead of fortuity when sentencing "prevents arbitrary disparities" (emphasis added)).  The happenstance lack of devastating injury implicit in terrorism crimes generally and Stewart's in particular simply cannot "bear the weight" the district court assigned to it.  Cavera, 550 F.3d at 191.  The district court acted unreasonably by using the absence of proven harm to justify completely discarding the terrorism component of Stewart's crime

35

and to support an unwarranted mitigation of the seriousness of the crime of conviction. See 18 U.S.C. § 3553(a)(2)(A).

My colleagues in the majority also suggest that because Stewart's terrorism crimes preceded the events of September 11, 2001 her view of her own culpability might have been different than would be true after that tragic day. While such a lack of awareness may be true of the ordinary New Yorker, such attribution is ill-suited for Stewart who, as Abdel Rahman's lawyer, sat through extensive horrific evidence at his trial, including that the Islamic Group was responsible for the slaughter of scores of innocent tourists at Luxor and the Islamic Group's plans to bring New York to its knees by blowing up buildings, bridges, tunnels, and by assassinating the Egyptian President while in New York City.

### b. The Absence of an Enhancement for Perjury and Obstruction of Justice

After jettisoning the terrorism component of Stewart's crime in assessing the seriousness of Stewart's crime of conviction pursuant to § 3553(a)(2)(A), the district court then noted that — with this mitigation — the Guidelines (absent the terrorism enhancement) would provide for a sentencing range for Stewart of either 78 to 97 months or 97 to 121 months, depending on whether the obstruction of justice enhancement applied. I join the majority's view that the district court's failure to make any findings regarding obstruction was procedurally unreasonable. Maj. Op. at **[123-124]**. The district court's reason for not

36

making such findings was that there was no point in doing so, because the terrorism enhancement took the Guidelines sentence to the statutory maximum. After the district court rejected the terrorism component of Stewart's sentence, however, the obstruction enhancement became relevant to its hypothesis of a revised Guidelines calculation. In addition, as the majority notes, it was error for the district court not to account for Stewart's potential perjury in the § 3553(a) calculus. See Cavera, 550 F.3d at 190.

### c. The Absence of an Enhancement for Abuse of Trust

The majority properly faults the district court for failing to "explain how and to what extent the sentence reflected the seriousness of the crimes of conviction in light of the fact that Stewart was . . . a member of the bar when she committed them." Maj. Op. at **[121]**. The majority asks whether, in that light, "her punishment should have been greater than it was," and then suggests the obvious answer. Maj. Op. at **[121]**. I agree with the majority's criticism. As a "guardian[] of the law," a lawyer has a special obligation to "refrain from all illegal and morally reprehensible behavior." New York Code of Professional Responsibility, Preamble, EC 1-5 (effective through March 31, 2009). However, the majority does not go far enough. Stewart was not just a lawyer who committed crimes. And she did not use her professional position simply to gain access to her client and to carry his jihadist messages by criminal means, conduct that, as noted in the previous section of this opinion reflects an

37

extreme seriousness unreasonably overlooked by the district court. Stewart also committed her material support crimes by garnering the trust of the government, and then blatantly violating that trust — a fiduciary obligation that lies at the core of the SAMs system and that protects the right to counsel, even for convicted terrorists.

Under the Guidelines, the abuse-of-trust enhancement applies when a defendant has "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3 (2000). As the Commentary explains, a position of trust is "characterized by professional or managerial discretion," for "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature," id. cmt. n.1 (2000), and "[s]uch persons generally are viewed as more culpable," id. cmt. background (2000).

The district court failed to explain why an enhancement for abuse of trust is not plainly appropriate in this case. The majority fails to fault the district court on this score because "the government did not specifically invoke section 3B1.3 in its sentencing memorandum." Maj. Op. at **[121 n.37]**. But the government explicitly argued for consideration of Stewart's abuse of trust at the sentencing hearing:

> [T]he United States Attorney's Office who was administering the SAMs trusted Ms. Stewart, put their faith in Ms. Stewart that she was doing what she promised to do. She considered that attorney affirmation that she signed an oath, a promise. Those are her

38

words. And the government accepted that commitment and believed she would honor that commitment, but she violated that trust that was put in her by the United States Attorney's Office, by the Justice Department, repeatedly violated [it].

Sent'g Tr. 95. As a result, the issue was properly before the district court.

The SAMs placed trust in Stewart because she was a member of the bar appointed under the Criminal Justice Act to represent Abdel Rahman, and she made explicit affirmations to the government specifically required to curb her client's ability to continue terrorist activities. Only because of the SAMs did Stewart have private access to, and "significantly less supervision" in her contacts with, Abdel Rahman, U.S.S.G. § 3B1.3 cmt. n.1 (2000), and obtain the freedom she needed to act as his lawyer. Stewart used, or more accurately abused, the trust that the government placed in her to "facilitat[e] the commission . . . of [her] offense," id., furthering terrorist communications that put innocent lives in jeopardy. Stewart was only given access to Abdel Rahman to discuss legal matters; instead, she engaged in criminal actions that, as she conceded at trial, had nothing to do with any past, pending, or future legal proceedings and were unrelated to the rendering of legal advice. See Trial Tr. 7722 (acknowledging that Abdel Rahman's "appeals [were] exhausted, with no issue legally on the horizon").

Stewart's abuse of trust is particularly significant because it supports the arguments of those who say that our Article III courts, and the constitutional protections they afford, are not suited to terrorist trials. See generally, e.g., Michael B.

39

Mukasey, <u>Civilian Courts Are No Place To Try Terrorists</u>, Wall St. J., Oct. 19, 2009, at A21 (discussing the difficulties of trying terrorists in Article III courts). The SAMs are designed to safeguard those rights, but they must necessarily be conditioned on attorneys respecting the trust placed in them, and cannot be sustained without that trust. Stewart's conduct thus raises concerns reaching even beyond her dealings with Abdel Rahman. Her criminal acts jeopardize, in a sensitive set of cases, the accused's right to his choice of independent counsel, which is the right upon which the vindication of all of the accused's other rights, and, in a larger sense, the right to a trial by an Article III court, depends.[15]

Section 3553(a) requires a district court to consider <u>all</u> of the Guidelines relevant to a defendant's conduct. <u>See</u> 18 U.S.C. § 3553(a)(4); <u>Cavera</u>, 550 F.3d at 189 (requiring a district court to "conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense"). In sentencing Stewart, the district court mentioned "abuse of trust" as part of the litany of her crimes and noted that Stewart "abused her position as a lawyer" in order to further Abdel Rahman's terrorist quest. Sent'g Tr. 118. Yet the district court gave no indication that it considered to any extent the

---

[15] <u>See</u> <u>Gideon v. Wainwright</u>, 372 U.S. 335, 344 (1963) ("The right . . . to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, [we] have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law."); <u>Powell v. Alabama</u>, 287 U.S. 45, 69 (1932) ("Without [this right], though [a defendant] be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.").

depth of Stewart's abuse of trust as argued by the government, which went beyond simply abusing her position as a lawyer to gain access to Abdel Rahman. By not fully responding to the government's clear and forceful argument by considering the policy reflected in U.S.S.G. § 3B1.3,[16] and accounting for Stewart's grave abuse of trust in assessing the seriousness of Stewart's crime and imposing its sentence, the district court erred procedurally.

### d. The Impact of These Errors on the Rest of the § 3553 Analysis

The district court's errors in assessing the seriousness of Stewart's crime impacted other parts of its § 3553 analysis and, for that reason, must be recognized if any remand in this case is to yield a reasonable sentence. Necessarily, the district court's unreasonable underappreciation of the gravity of Stewart's offense, evident from its reasoning despite its statements to the contrary, infected its consideration of "the need . . . to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2), and "the need to avoid unwarranted sentence disparities," id. § 3553(a)(6), because both factors are calibrated by the seriousness of the offense at stake. More serious crimes require greater deterrence; an unreasonably low

---

[16] See United States v. Carty, 520 F.3d 984, 992-93 (9th Cir. 2008) (en banc) ("[W]hen a party raises a specific, nonfrivolous argument tethered to a relevant § 3553(a) factor in support of a requested sentence, then the judge should normally explain why he accepts or rejects the party's position." (citing Rita, 551 U.S. at 355-56)); see also Gall, 128 S. Ct. at 599 ("Had the prosecutor raised the issue, specific discussion of the point might have been in order . . . .").

view of a crime's severity will taint a district court's stance on whether a given sentence sufficiently deters future criminal conduct, both for the specific defendant and for the public at large.  In no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life.  Similarly, an erroneous assessment of a crime's seriousness precludes accurate comparison with equally serious crimes, to avoid unwarranted disparities.  Thus, although the district court's mishandling of the seriousness of Stewart's crime constitutes reversible error on its own, I believe it also infects other judgments the court made in its mandatory § 3553(a) analysis.

2. The District Court's Overwhelming Emphasis on Stewart's Age, Health, and Career

The district judge found that Stewart's "extraordinary personal characteristics . . . argue[d] strongly in favor of a substantial downward variance," Sent'g Tr. 114, and used that finding to effectively set aside the Guidelines and their import.[17]  To be sure, it was appropriate, indeed required that

---

[17] A district court, of course, has wide discretion to impose a non-Guidelines sentence after properly calculating the appropriate Guidelines range.  Gall, 128 S. Ct. at 597.  But because the Guidelines are the touchstone or "starting point" for sentencing, id. at 596, the entire thrust of sentencing below or above the Guidelines is that "any deviation [is] from the Guidelines," id. at 597, and is to be justified in that context.  Because a district judge "must begin [his] analysis with the Guidelines and remain cognizant of them throughout the sentencing process," id. at 597 n.6 (emphasis added), it is not permissible simply to set them aside in toto and to impose a sentence that bears no rational relationship to them as if they did not exist.  See United States v. Williams, 524 F.3d 209, 215 (2d Cir. 2008) (explaining that "displacement of the Sentencing Guidelines at the threshold . . . cannot be reconciled with 18 U.S.C. § 3553(a)").  But this is precisely what the district judge did.

42

the district judge consider Stewart's "history and characteristics" under § 3553(a)(1). But the district court abused its discretion by allowing this factor to overwhelm its consideration of "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense, and . . . to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2), and by using it to justify the deep discount of 332 months in Stewart's sentence. Indeed, given the magnitude of the district court's error in evaluating the seriousness of the offense in this case, it could not reasonably determine what weight, if any, to assign to personal mitigating factors.

Although we have no specific formula for balancing the § 3553(a) factors, "unjustified reliance upon any one factor is a symptom of an unreasonable sentence," Rattoballi, 452 F.3d at 137, and here, the district judge's focus on Stewart's personal qualities exceeded the bounds of reasonableness in light of the gravity of her crimes. Whatever weight Stewart's career, age, and physical condition might reasonably warrant, these factors cannot support an unprecedentedly lenient 28-month sentence for what the district court itself termed her "extraordinarily severe criminal conduct." Sent'g Tr. 118; see supra note 3.

The imposition of a 28-month prison sentence "slighted," Taylor, 487 U.S. at 337, the extreme criminality of Stewart's

43

offense[18] and disregarded the manifest purpose of the Guidelines regime: to avoid "unwarranted sentencing disparities," 18 U.S.C. § 3553(a)(6). See Booker, 543 U.S. at 264-65. The Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives," Rita, 551 U.S. at 350, and Stewart's age, health, and career simply cannot justify the degree to which the district judge deviated from the Guidelines pursuant to § 3553(a).

The district court's apparent disregard of "the need to avoid unwarranted sentence disparities," 18 U.S.C. § 3553(a)(6), is particularly striking in light of the court's obligation to consider "pertinent [Commission] policy statement[s]," id. § 3553(a)(5). For example, the Commission has determined that only "an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range," U.S.S.G. § 5H1.4 (2000) (emphasis added), yet the record indicates that Stewart, despite medical issues, will receive appropriate medical care in prison, and the district judge himself acknowledged that "[m]edical care can be delivered while in prison," Sent'g Tr.

---

[18] The district court treated Stewart's terrorism and fraud crimes — "particularly grave" offenses, Meskini, 319 F.3d at 92 — much more leniently than what the Guidelines recommend for bank embezzlement, see U.S.S.G. § 2B1.1(b)(6)(B) (2000) (recommending a minimum range of 51-63 months for embezzlement "affect[ing] a financial institution" and resulting in over "$1,000,000 in gross receipts"), and on par with the Guidelines recommendations for criminal trademark infringement, see U.S.S.G. § 2B5.3 (2000) (recommending a minimum range of 24-30 months for the manufacture of infringing items exceeding $120,000 in total retail value), conspiring to steal over $5,000 of car parts, see U.S.S.G. § 2B1.1(b)(1)(E), (5) (2000) (15-21 months), burgling a residence and stealing a $2,600 television, see U.S.S.G. § 2B2.1(a)(1), (b)(2)(B) (2000) (27-33 months), and possessing 1.5 grams of crack cocaine with the intent to distribute it, see U.S.S.G. § 2D1.1(c)(11) (2000) (27-33 months).

44

117. The district judge, of course, is not bound by Commission policy, but the record nowhere suggests that Stewart's condition was sufficiently compelling to distinguish her from others in the prison population and to warrant any leniency on that score. As for Stewart's age, the Commission has concluded that this factor "is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range[, but it] may be a reason to impose a sentence below the applicable guideline range in a case in which the defendant is elderly and infirm . . . ." U.S.S.G. § 5H1.1 (2000). Again, the district court was not bound by this statement. But the district judge's point that Stewart's sentence "will represent a greater portion of her remaining life than for a younger defendant," Sent'g Tr. 117, would apply to any older defendant, and this is not an extraordinary factor, such as being "elderly and infirm," that can justify excessive leniency. See Rattoballi, 452 F.3d at 136 n.4, 137. The district court cited both Stewart's age (67 years) and health (sleep apnea; cancer survivor with a chance of recurrence) in concluding that "[a]ny sentence of imprisonment will be particularly difficult for the defendant." Sent'g Tr. 117. Yet as the majority notes, Maj. Op. at **[26-27 n.9]**, Stewart herself apparently did not share the district court's misgivings: "I don't think anybody would say that going to jail for 28 months is anything anyone would look forward to, but as my clients have

45

told me, 'I can do that standing on my head.'"[19] Stewart was not "elderly and infirm," and I do not see how her age or health could reasonably contribute to such a significant variance from the Guidelines. Advancing age and treatable medical conditions are not normally a ticket to overwhelming leniency, and this case is no different from the norm in that respect.

Similarly, Stewart's career of public service, as admirable as it seemed to the district court, can only go so far. "[I]t is usually not appropriate to excuse a defendant almost entirely from incarceration because [s]he performed acts that, though in society's interest, also were the defendant's responsibility to perform and stood to benefit the defendant personally and professionally." United States v. D'Amico, 496 F.3d 95, 107 (1st Cir. 2007). The district court placed emphasis on Stewart's providing legal services to "the poor, the disadvantaged[,] and [the] unpopular over three decades," Sent'g Tr. 115, but as the district judge himself put it, "that credit does not extend to the knowing violation of the law," Sent'g Tr. 119. Yet given the severity of Stewart's conduct, this credit, which contributed heavily to a 332-month reduction from the recommended Guidelines range to a 28-month sentence, goes further than the district court's explanation can bear. Giving such excessive weight to Stewart's resumé trivializes the seriousness of her crimes,

---

[19] Ellen Barry, Terrorist Lawyer Gets Two-Year Term, LA Times, Oct. 17, 2006, available at http://articles.latimes.com/2006/oct/17/nation/na-stewart17 (last visited Aug. 20, 2009); Katie Cornell, Wrist Slap for Smirk Jerk Terror Attorney, N.Y. Post, Oct. 17, 2006, at 4.

46

particularly when her legal career, by leading the government to trust her, is what enabled her to commit these crimes.

Overemphasizing Stewart's career as a lawyer also fails to "promote respect for the law" or "afford adequate deterrence to criminal conduct" under any reasonable understanding of those mandatory sentencing considerations. 18 U.S.C. § 3553(a)(2). The district court found that Stewart's likely disbarment "significantly . . . mean[t] that the occasion for her offenses will be removed," Sent'g Tr. 116. This is wrong. One does not need a law license in order to materially support terrorism or to defraud the U.S. government.

In sum, though we will rarely identify procedural error in the weight a sentencing judge assigns to relevant factors, this is one of those rare cases where the record of a defendant's personal characteristics simply cannot bear the weight necessary to support the challenged sentence. See Cavera, 550 F.3d at 192.

3. Overall Substantive Unreasonableness

I by no means assume that, upon resentencing, Stewart's sentence will remain at 28 months, but I would be remiss if I did not comment further on Stewart's current sentence. Unlike the majority, I do not believe that this court must hold off on the question of substantive unreasonbless until the procedural flaws it identifies are remedied. Maj. Op. at **[99-100 n.33]**. The "informed intuition of the appellate panel" has a place in appellate review. See United States v. Rigas, No. 08-3485-cr, 2009 WL 3166066, at *11 (2d Cir. Oct. 5, 2009). And in the rare

47

instance when a sentence imposed by a district court judge makes it plain that his judgment is in stark contrast with the appellate panel's intuition – as evidenced, for example, by the comparative sentences of co-defendants – judicial efficiency counsels us to identify the substantive error along with procedural error at this time to minimize the need for subsequent appeals. This is not, as Judge Calabresi suggests, the issuing of an advisory opinion. Op. of J. Calabresi at **[12]**. Rather it is providing a district court with the full basis for the appellate panel's remand prior to resentencing.[20]

I stress that it is not the role of the appellate court to compare the district court's sentence to what the appellate court deems the "correct" sentence. Instead, our task is to ask

---

[20] Judge Calabresi's concurrence also contains the notion, never mentioned earlier in these proceedings, that because Abdel Rahman's two other lawyers were not charged with SAMs violations some justification for a lower sentence for Stewart might be found since "there might be even greater disparities between a defendant and other individuals who were not charged at all." Op. of J. Calabresi at **[16-17]**. Judge Calabresi further suggests that it is not much of an extension to permit district courts to use their sentencing authority "to exercise . . . supervision" over discretionary prosecutorial decisions not to bring charges where there is no claim of selective prosecution. Op. of J. Calabresi at **[15]**. Whatever attraction this idea might hold for a law review editor, it should not find a home in the law. Prosecutorial discretion is traditionally exclusive and absolute, subject of course to constitutional limits. See United States v. Nixon, 418 U.S. 683, 693 (1974); United States v. Molina, 530 F.3d 326, 332 (5th Cir. 2008); In re U.S., 503 F.3d 638, 642 (7th Cir. 2007). Insulated from judicial review by the separation of powers, United States v. Campo, 140 F.3d 415, 419 (2d Cir. 1998), prosecutors acting in good faith, and there is no suggestion to the contrary in this case, base their decisions not to prosecute on many factors (cooperation and truthful accounts, trial dynamics, the quality of evidence, time and resource requirements to name a few). It is enough of a task for a busy district judge to administer justice in the cases actually before the court without initiating its own inquisitorial foray into the prosecutor's office. In re U.S., 503 F.3d at 641 ("Judges in the United States resolve the parties' disputes rather than initiate their own factual inquiries on issues that the parties have not contested; that's a major difference between adversarial and inquisitorial systems.") And to what purpose? To possibly reduce an otherwise just sentence?

whether the sentence imposed by the district court is so high or low that it is manifestly unjust or shocks-the-conscious. Id. We are not a mere "rubber stamp." Id. (citing United States v. Rattoballi, 452 F.3d 127, 132 (2d Cir. 2006)). "If we are going to let (district) judges be judges, and trust them to exercise the necessary discretion with sensitivity to the need for coherent sentencing policy, so we should let (appellate) judges be judges as well, performing their traditional function of reining in excess and gradually developing a "common law" of what is and is not sensible."[21] Hon. Gerard E. Lynch, Sentencing After Gall and Kimbrough: Letting Guidelines Be Guidelines (and Judges Be Judges), Ohio St. J. Crim. L. Amici: Views From the Field (Jan. 2008), available at http://osjclblogspot.com.

Even apart from the aggravating circumstances of Stewart's obstruction of justice, her abuse of trust, and her false statements to the government, Stewart's conduct was closer to that of Sattar, whose 24-year sentence still represented a sharp reduction from his Guidelines sentence of life imprisonment, than that of Yousry. The district court found that Stewart and Sattar had engaged in conduct that warranted application of the terrorism enhancement and that was "calculated to influence or affect the conduct of the Egyptian government," see Sent'g Tr.

---

[21] Judge Calabresi suggests that substantive unreasonabless should not be determined when tied to procedural error than can be corrected first, although if the two are distinct then it may be "plausible to address the two issues at once" if the procedural error is not harmless. Op. of J. Calabresi at [12]. But whether the procedural error is harmless is irrelevant to substantive unreasonableness. In any event, he fails to explain the benefit of a "two-step appeal" rule that can result in correcting a good district judge on two separate occasions when one would suffice.

49

24, 28, & 108, but that student interpreter Yousry had not, Sent'g Tr. 143-44.

Nonetheless, Stewart's sentence was much closer to that of Yousry, even though, as the district court noted, Yousry's "role in the offenses was subservient to the others involved," Sent'g Tr. 150. Stewart was given a sentence only eight months greater than that of Yousry, and in relative terms, she was treated far more leniently. Yousry's conduct, unlike that of Sattar and Stewart, was found by the district court to not warrant the terrorism enhancement; nor did Yousry falsely sign the SAMs or merit consideration for obstruction-of-justice and abuse-of-trust enhancements. As a result, Yousry's Guidelines range was 78 to 97 months, less than one-third of Stewart's Guidelines range of 360 months. Yousry's actual 20-month sentence represented just under one-quarter of the 88-month median of his Guidelines range, while Stewart's sentence was under one-tenth of her 360-month Guidelines range. Under the Guidelines, more than 260 months separated the sentences of Stewart and Yousry, yet the district court chose sentences that were only eight months apart. Like the majority, I am puzzled by this mismatch, particularly in light of "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).

Because Stewart's sentence is so out of line with the extreme seriousness of her criminal conduct (and, not surprisingly given that fact, with what the Guidelines recommend), notwithstanding the considerable deference due the

50

district court at sentencing, I conclude that Stewart's sentence is not only procedurally unreasonable, but also substantively unreasonable and an abuse of discretion. The district court's rationale for the sentence cannot "bear the weight assigned it under the totality of circumstances in the case." <u>Cavera</u>, 550 F.3d at 191. Indeed, I am at a loss for any rationale upon this record that could reasonably justify a sentence of 28 months' imprisonment for this defendant under § 3553(a). Accordingly, in addition to the procedural flaws that I have identified, Stewart's sentence should be vacated as substantively unreasonable and resentencing required on that basis.

51